**2015-1506, -1543**

# United States Court of Appeals
# for the Federal Circuit

---

KILOPASS TECHNOLOGY, INC.,

*Plaintiff-Appellant,*

v.

SIDENSE CORPORATION,

*Defendant-Cross-Appellant.*

---

*Appeal from the United States District Court for the Northern District of California in Case No. 3:10-cv-02066-SI, Judge Susan Illston*

---

**NON-CONFIDENTIAL BRIEF OF PLAINTIFF APPELLANT KILOPASS TECHNOLOGY, INC.**

---

DURIE TANGRI LLP
DARALYN J. DURIE
ddurie@durietangri.com
MARK A. LEMLEY
mlemley@durietangri.com
TIMOTHY C. SAULSBURY
tsaulsbury@durietangri.com
ZAC A. COX
zcox@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666

July 28, 2015

*Counsel for Plaintiff-Appellant Kilopass Technology, Inc.*

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a)(1) and Federal Rule of Appellate

Procedure 26.1, counsel for Plaintiff-Appellant Kilopass Technology, Inc. certifies

the following:

1.    The full name of every party represented by us is:

Kilopass Technology, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Kilopass Technology, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

None.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

Dentons US LLP, Greenberg Traurig LLP, LiLaw Inc.: Mark L. Hogge, Shailendra K. Maheshwari, Jimmy Shin, Andrew H. Blair, Rachel Repka, Imran A. Khaliq, James A. Klenk, David Perez, J. James Li, Matthew Larson, Qian Huang.

Durie Tangri LLP: Daralyn J. Durie, Mark A. Lemley, Eugene Novikov, Alex J. Feerst, Timothy C. Saulsbury, Zac A. Cox

DATED:  July 28, 2015                    DURIE TANGRI LLP


                          By:    */s/ Daralyn J. Durie*
                                   Daralyn J. Durie

                                   *Counsel for Plaintiff-Appellant*
                                   *Kilopass Technology, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................i

CONFIDENTIAL MATERIALS STATEMENT .............................................. iii

TABLE OF ABBREVIATIONS AND CONVENTIONS ..................................vii

STATEMENT OF RELATED CASES ..............................................................1

JURISDICTIONAL STATEMENT ...................................................................3

INTRODUCTION ............................................................................................4

STATEMENT OF ISSUES ...............................................................................8

    STATEMENT OF THE CASE.......................................................................8

    STATEMENT OF THE FACTS ...................................................................10

I.      TECHNOLOGY BACKGROUND...............................................10

      A.    Conventional MOSFETs...................................................10

      B.    The Patented Two-Connection Programmable Memory Cells ...................................................................12

II.     KILOPASS'S PRE-FILING INVESTIGATION........................16

      A.    Initial Investigation by Perkins Coie..................................17

      B.    Second Opinion from MoFo ..............................................20

      C.    The Decision to Sue ..........................................................24

III.    THE LAWSUIT AND REEXAMINATION ...............................26

      A.    Infringement Contentions...................................................26

      B.    Claim Construction ...........................................................27

      C.    Dr. Neikirk's Expert Report ..............................................27

D.      Summary Judgment and Merits Appeal ..............................28

E.      The Parties' Cross-Motions for Fees..................................33

F.      Sidense's Renewed Fees Motion .......................................34

SUMMARY OF THE ARGUMENT ....................................................35

ARGUMENT .......................................................................................38

I.      STANDARD OF REVIEW ..........................................................38

II.     THE   DISTRICT   COURT'S   EXCEPTIONALITY
        FINDING IS UNSUPPORTED ...................................................38

        A.      Kilopass's Argument that the STI Was Equivalent
                to the "First Doped Semiconductor Region" Was
                Far from Frivolous ............................................................40

                1.      An STI can be equivalent to a doped
                        semiconductor region in the context of this
                        patent. .....................................................................41

                2.      The   district   court's   consideration   of
                        memory   cell   size   in   its   doctrine   of
                        equivalents analysis was legal error.........................43

        B.      The District Court's Erroneous Doctrine of
                Equivalents Analysis Infects Its Analysis of
                Kilopass's Pre-Suit Investigation .......................................52

III.    EVEN IF THIS COURT WERE TO DECLINE TO
        DISTURB   THE   EXCEPTIONALITY   FINDING,
        REMAND  IS  REQUIRED  FOR  A  PROPER  FEE
        ASSESSMENT ..............................................................................57

CONCLUSION ....................................................................................62

## CONFIDENTIAL MATERIALS STATEMENT

This brief contains confidential information that is subject to a protective order. The confidential information, which has been redacted on pages 4, 5, and 16, relates to the development of Kilopass's or Sidense's technology, patenting activities and marketing activities, and is claimed by Appellant Kilopass or Appellee Sidense under the district court protective order as confidential information. This information is claimed by Appellant Kilopass or Appellee Sidense as highly sensitive in nature, is not publicly available, and has been designated as confidential.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AquaTex Indus., Inc. v. Techniche Solutions*,
  479 F.3d 1320 (Fed. Cir. 2007) ............................................................ 43, 44, 50

*Beckman Instruments, Inc. v. LKB Produkter AB*,
  892 F.2d 1547 (Fed. Cir. 1989) ............................................................60

*Deere & Co. v. Bush Hog, LLC*,
  703 F.3d 1349 (Fed. Cir. 2012) ............................................................43

*Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*,
  305 F.3d 1303 (Fed. Cir. 2002) ............................................................41

*Ecolab, Inc. v. Envirochem, Inc.*,
  264 F.3d 1358 (Fed. Cir. 2001) ............................................................50

*EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*,
  766 F.3d 1338 (Fed. Cir. 2014) ............................................................46

*Forest Labs., Inc. v. Abbott Labs.*,
  339 F.3d 1324 (Fed. Cir. 2003) ............................................................ 38, 39

*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*,
  — F.3d —, 2015 WL 3893711 (Fed. Cir. June 25, 2015) ...................................52

*Highmark Inc. v. Allcare Health Mgmt. Sys.*,
  134 S. Ct. 1744 (2014) ............................................................ 38, 39, 60

*Insituform Technologies, Inc. v. Cat Contracting, Inc.*,
  161 F.3d 688 (Fed. Cir. 1998) ............................................................29

*Kilopass Tech., Inc. v. Sidense Corp.*,
  738 F.3d 1302 (Fed. Cir. 2013) ............................................................ 1, 9, 33, 38

*Kilopass Tech., Inc. v. Sidense Corp.*,
  No. 13-1193, D.I. 66 (Fed. Cir. Mar. 18, 2014) ....................................9

*Kilopass Technology, Inc. v. Sidense Corporation*,
  501 F. App'x 980 (Fed. Cir. 2013) .........................................................................1

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ...........................................................................47

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*,
  603 F.3d 943 (Fed. Cir. 2010) .............................................................................43

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  572 U.S. ___, 134 S. Ct. 1749 (2014) ......................................................... passim

*PPG Indus. v. Celanese Polymer Specialties Co.*,
  840 F.2d 1565 (Fed. Cir. 1988) ...........................................................................58

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*,
  781 F.2d 198 (Fed. Cir. 1986) .............................................................................39

*Schumer v. Lab. Computer Sys., Inc.*,
  308 F.3d 1304 (Fed. Cir. 2002) ...........................................................................59

*SFA Sys., LLC v. Newegg, Inc.*,
  No. 2014-1712, 2015 WL 4154110 (Fed. Cir. July 10, 2015) ............................61

*Sidense Corporation v. Kilopass Technology, Inc.*,
  Case No. 14-02238-SI (N.D. Cal.) (filed May 14, 2014) ......................................1

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
  932 F.2d 1453 (Fed. Cir. 1991) ...........................................................................58

*Special Devices, Inc. v. OEA, Inc.*,
  269 F.3d 1340 (Fed. Cir. 2001) ...........................................................................57

*Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*,
  489 U.S. 782 (1989) ..............................................................................................58

*V-Formation, Inc. v. Benetton Grp. SpA*,
  401 F.3d 1307 (Fed. Cir. 2005) ...........................................................................42

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .............................................................................51

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997) ................................................................... 29, 41, 43

**Statutes**

28 U.S.C. § 1292(c)(2) ................................................................ 3

28 U.S.C. § 1295(a)(1) ................................................................ 3

28 U.S.C. § 1338(a) .................................................................... 3

35 U.S.C. § 285 .............................................................. passim

42 U.S.C. § 1988 ........................................................................ 58

**Other Authorities**

S. Rep. No. 79-1503 (1946) ...................................................... 39

**Rules**

Federal Circuit Rule 36 ............................................................. 33

Federal Circuit Rule 47.5 ............................................................ 1

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Kilopass | Kilopass Technology, Inc. |
| Sidense | Sidense Corporation |
| Antitrust Action | *Sidense Corporation v. Kilopass Technology, Inc.*, Case No. 14-02238-SI (N.D. Cal.) (filed May 14, 2014) |
| '751 patent or '751 | U.S. Patent No. 6,940,751 |
| '757 patent or '757 | U.S. Patent No. 6,777,757 |
| '540 patent or '540 | U.S. Patent No. 6,856,540 |
| Kilopass Patents | U.S. Patent Nos. 6,940,751, 6,777,757, and 6,856,540 |
| Dentons | Dentons (f/k/a SNR Denton) |
| MoFo | Morrison & Foerster LLP |

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Kilopass states that there have been two prior appeals in this case:

(1) *Kilopass Technology, Inc. v. Sidense Corporation*, Case No. 2013-1009, decided April 10, 2013, by a panel of Circuit Judges Rader, Lourie, and O'Malley, reported at 501 F. App'x 980 (Fed. Cir. 2013); and

(2) *Kilopass Technology, Inc. v. Sidense Corporation*, Case No. 2013-1193, decided Dec. 26, 2013, by a panel of Circuit Judges Rader, Lourie, and O'Malley, reported at 738 F.3d 1302 (Fed. Cir. 2013).

Kilopass further reports that another action pending in the District Court for the Northern District of California, *Sidense Corporation v. Kilopass Technology, Inc.*, Case No. 14-02238-SI (N.D. Cal.) (filed May 14, 2014) (the "Antitrust Action"), may be directly affected by this Court's decision in this Appeal.  In particular, Sidense's complaint in the Antitrust Action asserts Sherman Act claims premised on Kilopass's prosecution of allegedly baseless infringement claims in the patent suit underlying this Appeal.  *See, e.g.*, A13478 ¶ 106 ("Kilopass has unlawfully attempted to monopolize the relevant market or submarkets by means of bringing, prosecuting and publicizing a sham objectively baseless lawsuit for patent infringement").  Sidense intends to rely on the district court's "objective baselessness" ruling in the fee order from which Kilopass has taken this Appeal,

A23, as collateral estoppel on that issue in the Antitrust Action. This Court's decision on the district court's "objective baselessness" ruling, among others, may therefore directly affect the Antitrust Action.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1338(a). The district court issued an Order Granting Defendant's Motion for Attorney's Fees on August 12, 2014 and a further Order Re: Attorneys' Fees Calculation on March 11, 2015. Kilopass appealed from those orders on March 25, 2015. On April 8, 2015, Sidense cross-appealed the district court's March 11, 2015 fees calculation order, and this Court consolidated the two appeals on April 10, 2015. This Court has jurisdiction over the consolidated appeals pursuant to 28 U.S.C. §§ 1292(c)(2) and 1295(a)(1).

*THIS PAGE CONTAINS CONFIDENTIAL MATERIAL*

## INTRODUCTION

This fee dispute arises from a lawsuit between two competitors in the market for semiconductor memory cells.  In 2001, Kilopass developed a new type of programmable memory cell that has just two external connections rather than three.  Kilopass applied for patents on that invention; those applications later issued as the patents-in-suit.  The patents explain that an important benefit of this two-connection design is that it makes the overall device smaller.

---

[1] Emphasis supplied unless otherwise noted.

*THIS PAGE CONTAINS CONFIDENTIAL MATERIAL*

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ A6255 ¶ 71.  The

district court concluded that replacement of the doped semiconductor region with

an STI region made the overall cell bigger.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████ This is the memory

cell design that Kilopass accused in this suit.  A6882.

After learning of Sidense's design, Kilopass commenced a years-long

investigation of a claim for patent infringement.  Because Kilopass was a small

company without an in-house lawyer, it relied on multiple law firms for advice

regarding its infringement claims.  After first consulting its prosecution counsel at

Perkins Coie, Kilopass asked patent litigators at Morrison & Foerster ("MoFo") to

provide an infringement analysis, and MoFo prepared claim charts laying out a

theory of infringement under the doctrine of equivalents, reasoning that Sidense's

use of an STI was equivalent to a first doped semiconductor region because it

likewise served as a floating channel stop. Kilopass retained a third firm, Dentons, to file suit.

Sidense prevailed on the patent infringement claims on summary judgment. The district court initially rejected Sidense's request for fees, noting that Kilopass had performed a "substantial" pre-filing investigation, including obtaining opinions from two different law firms, a forensic analysis of the accused product, and an independent analysis by its Chief Technology Officer. Sidense appealed. On appeal, this Court vacated the decision and remanded for further proceedings.

On remand, and following the Supreme Court's decision in *Octane Fitness*, Sidense filed a renewed motion for fees challenging the objective merit of Kilopass's infringement theories. Based on a legally flawed application of the doctrine of equivalents—under which the district court held that the allegedly equivalent structure must further the benefit attributed to ***other*** elements of the invention—the district court found Kilopass's suit objectively baseless at its inception and awarded Sidense $5.5 million in fees and non-taxable costs covering its expenditures over the entire patent case.

Unsatisfied with its recovery under Section 285, Sidense has brought a separate suit against Kilopass alleging Sherman Act *Handgards* claims and seeking, among other damages, the portion of its attorneys' fees that the district court refused to award. Sidense has announced its intent to rely on the district

6

court's erroneous baselessness finding as collateral estoppel on that same issue in the Antitrust Action.  A13599.  Sidense has also cross-appealed from the district court's fee quantification and seeks nearly $10 million in fees and costs.  Kilopass asks this Court to reverse the district court's finding that Kilopass's lawsuit was frivolous at its inception and to remand for further proceedings.

## STATEMENT OF ISSUES

1.  Did the district court legally err in requiring the function-way-result analysis to be based on the function of the invention as a whole rather than the function of the individual claim element at issue?

2.  Did the district court's flawed application of the doctrine of equivalents infect its discussion of the adequacy of Kilopass's pre-filing investigation?

3.  Is the award of $5,535,945.54 in fees and non-taxable costs warranted and proportionate to the extent that Kilopass's lawsuit was not frivolous at its inception?[2]

## STATEMENT OF THE CASE

In May 2010, after nearly five years of pre-filing investigation, Kilopass and its lawyers at Dentons filed suit against Sidense for infringement of the '751 patent. A month later, Kilopass amended its complaint to assert two additional patents with similar claims—the '757 and '540 patents. A177-79. Kilopass's patent case proceeded to a Markman hearing in August 2011. When the district court entered its Markman order later that month, it found for Kilopass on virtually every contested issue. A2971-72.

---

[2] Because the district court awarded both fees and non-taxable costs on the same grounds (*i.e.*, its exceptionality finding under 35 U.S.C. § 285), Kilopass's arguments for reversal of the attorneys' fee award apply with equal force to the district court's award of non-taxable costs. For simplicity, we refer herein to the district court's award of fees and non-taxable costs as its "fee award."

In July 2012, following expert discovery, Sidense moved for summary judgment on Kilopass's patent claims. The district court granted Sidense's summary judgment motion of noninfringement as to all asserted claims. A8852. Following motion practice on ancillary state law claims not directly at issue here, Kilopass ultimately appealed the noninfringement ruling, which this Court affirmed.

During the pendency of the merits appeal, both sides sought fees with respect to various issues. The district court denied both parties' fee requests. A13040-41. Sidense appealed to this Court. A13035-36.

On December 26, 2013 this Court vacated the district court's denial of Sidense's fees motion and remanded for further consideration with "particular attention" to the objective merits of Kilopass's claims, which the district court had not considered. *Kilopass*, 738 F.3d at 1311. On January 27, 2014 Sidense filed a petition for rehearing *en banc*, which this Court denied. *Kilopass Tech., Inc. v. Sidense Corp.*, No. 13-1193, D.I. 66 (Fed. Cir. Mar. 18, 2014).

On remand, Sidense sought "exceptional case" fees under 35 U.S.C. § 285. The district court granted the fees request. A13. Following an additional round of briefing on the amount of the fee award, the district court ordered sanctions of $5,535,945.54 in fees and non-taxable costs. A50.

On March 25, 2015, Kilopass appealed from the district court's fee entitlement and quantification orders. A13591. On April 8, 2015, Sidense cross-appealed the calculation of fees. A13594.

Meanwhile, following this Court's remand of the district court's original fee order, Sidense filed a new action against Kilopass asserting Sherman Act claims premised on Kilopass's prosecution of allegedly baseless infringement claims in this case. *See, e.g.*, A13479 ¶ 117. Although the district court stayed proceedings in the Antitrust Action pending its decision on Sidense's renewed motion for attorneys' fees, that stay has since expired and proceedings have recommenced. *See* A13586; A13598.

## STATEMENT OF THE FACTS

## I.    TECHNOLOGY BACKGROUND

### A.    Conventional MOSFETs

The invention of the asserted patents uses a type of transistor called a "metal-oxide-semiconductor field-effect transistor," or "MOSFET." A6051. A transistor is a device that uses a semiconductor material to switch or amplify an electrical signal. A7015-16. A conventional MOSFET[3] does this by controlling the flow of electrical current from a "source" region, through a channel in the

---

[3] In particular, the foregoing description relates to the structure and operation of the most common type of conventional MOSFET: an enhancement-mode MOSFET.

"substrate," to a "drain" region. The source and drain regions are formed by introducing impurities into the substrate to create "doped" regions that have different conductive properties than the remaining undoped substrate portions. Because the doped regions have a different type of conductivity than the substrate (as reflected by the p-type and n-type designations), current ordinarily will not flow from the source to the drain.[4] However, when a sufficient voltage is applied to the gate, the gate dielectric causes the conductivity type of the substrate surface immediately under the gate dielectric to invert (here, from p-type to n-type) such that it has the same conductivity type as that of the source and drain regions. This inverted portion of the substrate is called a "conductive channel" and allows current to flow from the source region to the drain region. Thus, a conventional MOSFET is connected to an external circuitry at *three* points: the source, the gate, and the drain. A6051.

---

[4] Here, because the substrate is of the "p-type" variety, the doped regions are "n+" regions. Alternatively, the substrate can be "n-type," in which cases, the doped regions are "p+" regions. In either case, the "n" and "p" regions have conductive properties that are inverse to one another. A7014-15 ¶ 23.

**Fig. 1: Conventional MOSFET**



## B.    The Patented Two-Connection Programmable Memory Cells

Although Kilopass's patented memory cells involve many of the standard components of a conventional MOSFET, the Kilopass inventors discovered a way to use those components in a different way.  A6234 ¶ 30.  As in conventional MOSFETs, the patented cells have an insulating gate dielectric sitting between the gate and the substrate.  *Id.*  But, instead of modulating the current between the source and drain regions (as in a conventional MOSFET), the Kilopass Patents use the gate for binary data storage.  *Id.*  When the gate dielectric is in its virgin, non-conducting state (as in a conventional MOSFET), that represents a "0."  *Id.*  To program a memory cell to a "1," high voltage is applied to the gate, which physically breaks down the gate dielectric (through a process called "gate oxide breakdown") and turns it into a conductor.  *Id.*  Thus, during a subsequent read

operation, the binary data stored in that cell can be determined by measuring the current across the gate dielectric—little to no current means that the gate dielectric is intact and that the cell thus stores a "0," while appreciable current means that the gate dielectric is broken and the cell stores a "1." *Id.* This usage of gate oxide breakdown formed the inventive backbone of the Kilopass Patents. A93-94.

Significantly, in the patented cells, the relevant current flows between the **gate** and the **source**, not between the **source** and **drain** (as it would in a conventional MOSFET). A6052-53. Because current does not flow through to the drain, the Kilopass inventors were able to eliminate the external connection at the drain, leaving just **two** external connections: one at the source and one at the gate. A6052. The doped semiconductor region that ordinarily would serve as a drain region is thus left "floating," *i.e.*, it is "not electrically connected to a voltage source." A6088.

By eliminating the third connection (*i.e.*, that which ordinarily would be coupled to the drain region), the Kilopass inventors were able to shrink the size of the memory cells relative to a conventional, three-connection MOSFET. A6056. Indeed, the asserted patents expressly distinguish Kilopass's prior three-connection designs on the grounds that their memory "cell size is relatively large. The present

invention provides a much smaller cell size, thereby allowing a higher cell density."[5] A114 at col. 4 ll. 44-47.

Claim 1 of the '751 patent is representative for purposes of this appeal. The particular claim terms relevant here are highlighted:

> 1.   A programmable memory cell useful in a memory array having column bitlines and row wordlines, the memory cell comprising:
>
> a transistor having a gate, a gate dielectric between the gate and over a substrate, and ***first and second doped semiconductor regions formed in said substrate adjacent said gate and in a spaced apart relationship to define a channel region*** therebetween and under said gate; and
>
> wherein the second doped semiconductor region of the transistor is connected to one of said row wordlines, and wherein said gate dielectric is formed such that the gate dielectric is more susceptible to breakdown near the first doped semiconductor region than said second doped semiconductor region.

A99 at col. 14 ll. 29-44.

It is undisputed that the "first and second doped semiconductor regions" of the claims respectively correspond to what would be called the drain and the

---

[5] The prior art Kilopass memory cells distinguished in the Kilopass Patents also differ in that each cell houses *two* transistors (a MOSFET-type transistor and a MOS data storage element), rather than the single transistor of the Kilopass Patents. *See* A13628 col. 15 ll. 14-37 (claiming a "memory cell" having both "a MOS Field effect transistor" and a "MOS data storage element").

source regions in a conventional MOSFET. Consistent with the patent's description of the drain region as "floating," A95 col. 5 l. 39, the claim does not include a connection to the first doped semiconductor region. Rather, the sole limitation on the first doped semiconductor region is that, along with the second doped semiconductor region, it must be "formed" in the "substrate adjacent [the] gate and in a spaced apart relationship to define a channel region therebetween [that is, between the two doped semiconductor regions] and under said gate"—just as the source and drain regions would be arranged in a conventional MOSFET (albeit without the electrical connection to the drain region, as depicted by the omission of a vertical "connection" line extending upward from the first doped semiconductor region).

**Fig. 2: Kilopass's patented invention**
*variable gate oxide (dielectric) thickness not depicted*

*THIS PAGE CONTAINS CONFIDENTIAL MATERIAL*

This unconventional nature of the cell's structure (as compared to a conventional MOSFET with three connections) is expressly disclosed:

> The memory cell 102 at, for example, the crosspoint of the first row $R_1$ and the first column $C_1$ includes a MOS transistor 104 having its gate connected to a column line $C_{1,}$ . . . its source connected to a row line $R_1$ . . . and its drain left floating connected to a drain of an adjacent memory cell 102. Alternatively, as will be seen below, *since there is no current through the drains*, the drains of adjacent devices need not be connected where a shallow trench isolation (STI) is used to isolate two memory cells.

A95 col. 5 ll. 33-44. Thus, the Kilopass inventors were clear that the first doped semiconductor region of the claims (*i.e.*, the "drain" region of a conventional semiconductor) need not have any conductive properties because it does not carry any current. A6237 ¶ 35.

## II.    KILOPASS'S PRE-FILING INVESTIGATION

It is undisputed that the accused Sidense designs ████████████████

████████████████████████████████████████████████████

A6880-81; A7031. It is likewise undisputed that, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ A6880-81 ████████████████████████████

████████████████████████████ A7146-49.

**Fig. 3: Sidense's accused product**
*variable gate oxide (dielectric) thickness not depicted*



## A.    Initial Investigation by Perkins Coie

The accused technology first came to Kilopass's attention in November 2005.  A11238.  While investigating Sidense's activities, Kilopass's patent counsel, Chun Ng of Perkins Coie, came across a Sidense PCT patent application that made clear that Sidense was using the same gate oxide breakdown, two-connection memory cell technology that Kilopass had patented.  A11178-236.  In all material respects, Sidense's PCT patent application was identical to Kilopass's patented design.  Indeed, in rejecting claims of Sidense's PCT application, the patent office found that it was anticipated by one of the Kilopass Patents:

> Claims 1-9 are rejected under 35 U.S.C. 102(e) as being anticipated by Peng . . . .  Peng discloses in figs. 16 and

> 22-25 an anti-fuse transistor formed on a semiconductor material comprising: . . . an isolation region (see N+ implant adjacent the Thinner Gox [gate oxide] shown in fig. 16) including [a] *floating diffusion region* [*i.e.*, the first doped semiconductor region of the claims] . . . .

A7256-57.[6]  Mr. Ng emailed a copy of the PCT application to Kilopass's founder, Dr. Peng.  In response, Dr. Peng commented on a particular aspect of the Sidense memory cell—the "split gate."   A split gate refers to a gate that can have differential voltages applied to each side of the gate, resulting in a breakdown of the oxide beneath it.  Dr. Peng noted that, because of Sidense's use of a split gate cell, the cell was "not self-aligned," and, thus, had a "practical cell size" larger than the cell that Kilopass marketed.  A10576.  It is undisputed, however, that the asserted claims are agnostic as to gate type.  A10580.  As a result, Mr. Ng told Dr. Peng that the split gate embodiment was not relevant to the infringement analysis because "we have pretty broad claims that I believe would cover any single poly gate oxide breakdown memory."  A10578.

---

[6] Although the examiner used different terminology, his reference to the "isolation region . . . including [a] floating diffusion region" necessarily refers to what the Kilopass Patents call the "first doped semiconductor region" because it is that semiconductor region that sits on the thinner side of the gate oxide region.  A99 col. 14  ll. 39-40 (defining the doped semiconductor region connected to the wordlines as the "second" region); A98 col. 12 ll. 29-34 (teaching "making the gate oxide near the floating N+ diffusion regions thinner than the gate oxide near the wordline N+ diffusion region").  The particular Peng reference cited by the examiner is the application that issued as the '751 patent, which is materially identical to the issued patent.  A13633.

Ten days later, Mr. Ng sent a letter to the President and CEO of Sidense advising him that Sidense's "non-volatile memory using breakdown of oxide layers" infringed Kilopass's patents. A10583. Mr. Ng accurately characterized the patents-in-suit as directed to "a programmable memory cell including a gate dielectric that is more susceptible to breakdown near one semiconductor region than another" and "a single transistor non-volatile memory cell using oxide breakdown." A10585. Sidense's patent attorney responded to the letter and expressed her opinion that Sidense's products did not infringe. According to Sidense's lawyer, Sidense transistors did not have (among other things) "first and second doped semiconductor regions formed in the substrate adjacent the gate." A10590. Sidense's letter did not claim that Sidense's use of a "split" gate provided a noninfringement basis. *Id.*

Upon receipt of the letter, in January 2006, Mr. Ng went back to his client and identified the need to examine Sidense's cells directly (something that Sidense refused to allow without the parties agreeing to what amounted to binding arbitration). A10600. He then proceeded to provide a three-page analysis of infringement based on the information available. A10600-02. He noted the possibility—later determined to be true—that Sidense had replaced the first doped semiconductor region constituting the floating drain in the Kilopass claims with a

"shallow trench isolation" (STI) region.  A10601.  He then stated that if this were true then Sidense "would NOT infringe our claims *literally*."  *Id.*

Kilopass continued to investigate Sidense's technology and to go back and forth with its patent counsel concerning its infringement case.  In a February 2008 exchange with Kilopass's director of marketing, Mr. Ng noted that Sidense had attempted to design around the Kilopass Patents to "avoid infringement" or "make our case much tougher."  A10604.  The Kilopass executive replied that despite its workaround attempts, Sidense would have "a very difficult legal argument to support in terms of their changes as 'real' changes to the cell art[.]"  *Id.*  However, Mr. Ng responded that, in contrast to another argument that Sidense had raised, he was "more worried" about the fact that Sidense's cell "uses an isolation on one side of the gate and not a floating doped region like we have."  *Id*.  These comments were "[f]ood for thought with regards to tomorrow's call with legal[.]"  *Id.*

### B.    Second Opinion from MoFo

In March 2008, Kilopass retained ligation counsel from MoFo to assess the strength of its infringement case against the Sidense memory cells.  A11487.  During a preliminary meeting on March 19, 2008, the MoFo lawyers opined that "Kilopass appears to have a valid claim that Sidense's NVM product is at least 'equivalent' to the invention claimed by claim 1 of the Kilopass's '751 patent, and

therefore that Sidense infringes that patent." *Id.* This view expressly assumed the fact on which Sidense now bases its claim to fees: that "Sidense's NVM product uses N+ and STI regions (as opposed to two N+ regions) to define the channel below the gate . . . ." *Id.*

The MoFo lawyers were then tasked with a "more detailed investigation and analysis to confirm our initial impressions" for presentation to the Kilopass board of directors on April 2. MoFo noted that the work would include: "a detailed review and analysis of at least (1) Kilopass's 1T patents and file histories, (2) Kilopass's 1.5T patents regarding any discussion of doped and STI regions, and (3) Sidense's patents and patent applications, their prosecution histories, and other public disclosures regarding Sidense's products[,]" as well as "some general research regarding key technical features and terms presented by Kilopass's patents." MoFo estimated that this work would take approximately 30 or 35 hours and would be completed by March 28. *Id.*

The MoFo lawyers then prepared a detailed claim chart—a result of 44 hours of work by lawyers at the firm, which was significantly more time than had been projected. A11494. The contemporaneous time entries describe the document as a "preliminary claim chart" and reflect extensive time spent on the infringement analysis. A11493-94.

With respect to literal infringement of the first doped semiconductor region limitation, MoFo included in the chart a "potential[ly] viabl[e]" argument, but was upfront that additional work was necessary to confirm the "viability of this argument," including "additional investigation, technical feedback from Kilopass and possibly input from an independent expert." A11497 n.1. With respect to its doctrine of equivalents theory, however, MoFo provided no such disclaimer. Instead, the chart confirmed that "Kilopass appears to have a reasonable argument that Sidense's field oxide region is equivalent to the doped region in claim 1 of the '751 patent, and therefore satisfies this limitation." A11497. The claim chart contained a detailed discussion of the doctrine of equivalents, including the function-way-result test and the "insubstantial change" test, and analyzed the Kilopass Patents and the Sidense technology under those standards. A11497-501. It concluded that, like the two doped semiconductor regions of the Kilopass claims, Sidense's pairing of a doped region and an STI region serves as "a channel stop, defining the limit of the channel for each cell." A11499. "Thus, in the context of claim 1 of the '751 patent, the field oxide region performs the same function and achieves the same result as the first doped region of claim 1 (*i.e.*, it is positioned in the same location and serves as a channel stop to define the channel region below the gate) in arguably the same way (by not carrying any current)." A11500. The claim chart also pointed out that the Patent Office had rejected a claim of a Sidense

PCT application that required the combination of "a diffusion region proximate to the first end of a the channel region" (*i.e.*, a doped semiconductor region) and "an isolation region proximate to the second end of the channel region" as anticipated by Kilopass's '751 patent-in-suit, further confirming the equivalence of the two structures. *Id.*

On March 27, the day before the analysis was due, and after MoFo had substantially exceeded the 30-35 hours it estimated it would need to conduct its "more in-depth research and analysis," Kilopass's then-CEO called MoFo and left a message instructing MoFo to stop work. MoFo received that instruction "late on the 27th," after it had already billed nine hours to work on the claim charts that day. The analysis was due to the client the following day. A11490. In response, MoFo acknowledged the CEO's apparent concerns about the budget and explained that "[w]e certainly understand that this is not a small expense for Kilopass." *Id.* By this time, MoFo had already exceeded the upper range of its budget by 30%. *Id.* MoFo then sent Kilopass the claim charts that the lawyers had spent forty-five hours preparing—on top of the 9.5 hours MoFo had spent on "analysis of [the] Kilopass patents and Sidense patent applications and literature" and a meeting with Kilopass concerning the technology at issue. A11493. Although the district court questioned whether Kilopass could reasonably rely on the claim charts in light of the request to stop work, there is nothing about MoFo's doctrine of equivalents

analysis that is incomplete on its face. Indeed, MoFo had planned to send the claim charts the following day. A11490.

### C. The Decision to Sue

Kilopass continued its investigation. Kilopass independently obtained an XMOS XS-1 chip embedded with Sidense memory cells and sent the chip to a forensic expert for reverse engineering and examination with an electron microscope. A11238. Kilopass's CTO subsequently prepared a presentation expressing his opinion that the '751 specification "teaches that the floating diffusions (1st doped) can be replaced with STI; the inventor therefore claims that the above 1T cell functions the same as the following one [in which the first doped region is replaced with an STI region][.]" A11275. He later prepared another presentation—this time for Kilopass's executive team—that included a function-way-result analysis similar to the MoFo analysis:

- **Equivalence tests**
  - The first doped region performs substantially the same function
    - Both are adjacent to the gate
    - Both are spaced apart from the 2nd doped region and used to define a channel region
    - Both are formed in the substrate
  - The STI performs the function of the first doped region in substantially the same way
    - Both are electrically floating
    - Both are used for isolation
  - The two cells are programmed and read by the same means and yield substantially the same result
    - Breakdown occurs over the channel in the thinner gate oxide region by applying a voltage differential across the gate and the 2nd doped region
    - After programming, current flows from the gate to the 2nd doped region
  - At column 5 row 40, the spec teaches that the floating diffusions (1st Doped) can be replaced with STI: The inventor therefore claims that the 1st doped region is equivalent to the STI region

A11296.[7]

Kilopass then engaged a third law firm to analyze its infringement claims: Dentons, led by Mark Hogge—the chair of Denton's patent litigation practice with 25 years of experience with such cases.  Dr. Luan's email transmitting the March 2010 presentation noted that "Mark's team is very comfortable with the reverse engineering work we did[,]" and that the attorneys were analyzing the patent claims at issue.  A11294.  Although the district court criticized Kilopass for not having disclosed to its counsel Mr. Peng's original concern that Sidense's split gate design would result in a larger practical cell size, there is no evidence that anyone at Kilopass or any of the lawyers who participated in the analysis contemplated the possibility that the overall cell size might be relevant to the doctrine of equivalents infringement analysis.  Nor would his comments as to the split-gate design facially seem relevant, since the claims indisputably are agnostic as to the *type* of gate. *See, e.g.*, A99 col. 14 l. 33 (claiming a "transistor having *a* gate").[8]

---

[7] Dr. Luan's presentation also included an argument that the Sidense memory cell literally infringed the '751 patent because in the '751 "the first doped region can be made by a self-aligned implant at the same step as the 2nd doped region and can be the same as the regular source/drain implant"—"[t]he STI requires extra process steps and as such is an extra element." *Id.*

[8] Consistent with the claims' gate agnosticism, Sidense did not identify its use of a "split" gate as a basis for noninfringement in its January 2006 letter responding to Mr. Ng's letter; nor, for that matter, did Sidense ultimately move for summary judgment based on the "gate" limitation. *See* A10590; A6876-77.

## III.    THE LAWSUIT AND REEXAMINATION

Kilopass filed suit on May 14, 2010, alleging infringement of the '751 patent.  A137-72.  Kilopass amended its complaint on June 18, 2010 to assert two additional patents with similar claims—the '757 and '540 patents—as well as certain business tort claims.  A173-82.

### A.    Infringement Contentions

Kilopass's detailed infringement contentions for the "first and second doped semiconductor region" limitation were consistent with the theories analyzed during the pre-filing investigation:

> Claim one covers situations where the "drain" or first doped region is floating, i.e., no current flows through the drains.  In such events a Shallow Trench Isolation (STI) can be used as a channel stop.  In making the shallow trench isolation, the p well substrate doping is changed near the trench wall causing the well known narrow channel effect.  That area is literally a first doped region forming the channel stop.  Also the STI is doped with N+ when the second doped area is formed and the N+/STI is formed in the substrate.  ***Additionally, the STI is the equivalent of the first doped region.  The function of the first doped region is to provide a channel stop.  The way it functions is to prevent current from the channel to flow in the area of the STI.  The result is that the end of the channel is defined.***  Sidense's STI performs substantially the same function, functions in substantially the same way, and achieves substantially the same result.

A6313.  Sidense did not ask for leave to file an early motion for summary judgment on Kilopass's infringement theory.

26

### B.   Claim Construction

The Court held a claim construction hearing on August 2, 2011.  Kilopass prevailed on virtually every contested issue.   The Court construed "doped semiconductor region" to mean "a region of semiconductor material to which impurities are added to modify the electron or hole concentration in that semiconductor[,]" rejecting Sidense's argument that the term be limited to MOS transistor structures.  A2970.[9]

### C.   Dr. Neikirk's Expert Report

Kilopass submitted an infringement expert report from Dr. Dean Neikirk, professor of computer and electrical engineering at the University of Texas— Austin.  A6037-113.  Dr. Neikirk opined that the use of STI was equivalent to the first doped semiconductor region.  In particular, Dr. Neikirk explained that its *function* is to define the channel region under the gate, the *way* the first doped

---

[9] Shortly after the lawsuit was filed, Sidense initiated an *inter partes* reexamination of the '751 patent, arguing that certain claims were invalid as anticipated by U.S. Patent No. 5,331,181 to Tanaka.  The protective order prevented litigation counsel from participating in the reexamination, so Kilopass was represented by different counsel before the USPTO.  A2653; A13384.  Kilopass's counsel made an argument in distinguishing prior art that was inconsistent with a different set of claim construction arguments (not involving the first doped semiconductor region) that it had successfully made to the district court.  Sidense filed a motion urging the district court to modify its claim construction of that different term and to adopt the constructions that Sidense had previously proposed.  A4109-24.  The district court found that, by adopting the examiner's distinction in the reexamination, Kilopass had disavowed claim scope.  A5603.

semiconductor region performs its function is by being in the substrate adjacent to the gate in a spaced-apart relationship with the second region, and the ***result*** is the delineation of the channel region.  A6070-71 ¶ 64.

Sidense claimed that this "geometric" explanation was "entirely different" than MoFo's "channel stop" explanation asserted in Kilopass's infringement contentions.  A13531-32.

### D.    Summary Judgment and Merits Appeal

Sidense then moved for summary judgment of non-infringement.  A6869-99. With respect to the "first doped semiconductor region," Sidense disputed Dr. Neikirk's application of the function-way-result test to conclude that the STI region of the Sidense memory cell was the equivalent of the "first doped semiconductor region" in the Kilopass Patents.  A6894-97.  Sidense argued that Dr. Neikirk's equivalence theory was inadmissible because asserting "geometric, rather than electrical" equivalence was "materially different" from the theory set forth in Kilopass's infringement contentions.  A6894-95.  In response, Kilopass clarified that the explanations were consistent with one another and with the identification of Sidense's STI as equivalent to the first doped semiconductor region.  While the "channel stop" explanation focused on the electrical paths created in the memory cell by the different structures and the "geometrical" explanation focused on the spatial arrangement of the structures, they described the

same phenomena from two closely related and interdependent perspectives because the geometric arrangement of structures is *how* a chip designer creates the electrical paths.  A7116.

Substantively, Sidense relied on this Court's holding in *Insituform Technologies, Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 693-94 (Fed. Cir. 1998), to argue that Dr. Neikirk's theory was circular and overbroad because it defined the "function" and the "way" in similar terms.  A6895-96.  Sidense also argued that Dr. Neikirk's equivalence theory "completely ignore[d] the fundamentally different electrical properties that STI (an insulator) and doped semiconductor regions have[,]" and that the STI region was not a semiconductor under the Court's claim construction.  A6896-97.

Finally, Sidense set forth in one paragraph the theory of non-infringement that it now asserts rendered Kilopass's case baseless all along:  that the function of the first doped semiconductor region was to "achieve high memory cell density," resulting in a smaller cell size.[10]  Sidense claimed that this advantage was

---

[10] Significantly, Sidense never demonstrated at summary judgment that, at the relevant time of infringement, the use of an STI necessarily would render the cells larger.  *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997) (doctrine of equivalents analysis to be measured as of time of infringement).  Instead, Sidense's expert asserted that it was known that a mask aligned process could result in a larger cell, all other things being equal.  However, his analysis relied on a comparison between two *older* Kilopass designs (one self-

recognized by the PTO examiner. A6897.[11]  As further support for this theory,

Sidense sought to spin statements by the inventor of the Kilopass Patents, Jack

Peng, to make it seem as if Kilopass considered, but decided against, using an STI

instead of a first doped semiconductor region because doing so would result in a

larger cell size. *See, e.g.*, A6897.  For example, citing an email from Peng to

Kilopass's patent counsel, Sidense argued: "Indeed, Kilopass chose not to

implement a cell that used STI instead of a first doped semiconductor region

specifically because *[it]* is not self-aligned, so [Sidense's] practical cell size will be

larger than our 1.5T cell.'" A6897 (citing A6408 (Nov. 19, 2005 Peng Email to

Ng)) (alterations by Sidense).   Upon inspection of the underlying quote,

however—without Sidense's hard-bracketed modifications—it is clear that, rather

than the STI, Peng was talking about an entirely different element of Sidense's

design: its "gate," which in the Sidense design is of the "split gate" variety. *See*

A6408 (Nov. 19, 2005 Peng Email to Ng) ("[B]ecause **this split gate Cell** is not

---

aligned, one not).  Because the size of STI changed over time, that analysis at most
established that the use of STI would have resulted in a larger cell size at the time
of the two designs he addressed, not that it would have such an impact at the time
of infringement.

[11] In reality, however, the examiner's statement confirmed that nothing intrinsic to
the first doped semiconductor region contributed to the smaller size of the patented
memory cell; rather, the cell size advantage came from the fact that the
semiconductor region was floating—*i.e.*, not electrically connected—just like
Sidense's STI.  A6862-63; *see* A6056 ¶ 35.

self-aligned, so their practical cell size will be larger than Our 1.5T cell.")
(Sidense's omission underlined). It is undisputed, however, that the asserted
claims are agnostic as to gate type. *See supra* Statement of the Facts § II.C;
A10580.

In response, Kilopass pointed out—as MoFo had noted in its pre-filing
analysis—that a Sidense patent application claiming a diffusion region and an
isolation region (*i.e.*, an STI region) had been rejected as anticipated by the '751
patent. A7127-28. Thus, Kilopass argued, the STI region necessarily must be at
least functionally equivalent to the first doped semiconductor region. Kilopass
also defended Dr. Neikirk's opinion as a proper application of the doctrine of
equivalents: "In the scheme of the claim and the functioning technology at issue,
the first doped semiconductor region and the STI each geometrically provide one
end to the channel that is in the substrate and delineated by the STI and the second
doped region." A7128. Kilopass further explained that the analysis of Sidense's
expert Dr. Gosney was premised on a legal error because Dr. Gosney "testified that
he performed his function-way-result analysis based on the function of the entire
patent" rather than focusing on individual claim elements. *Id*.

The district court ruled for Sidense on this "first doped semiconductor
region" limitation, finding that Dr. Neikirk's geometrical equivalence theory was a

new theory introduced in violation of the Local Patent Rules.[12]   The court also found that the equivalence theory "fails on the merits" because "by the definition set forth at Claim Construction, a semiconductor is not an insulator, nor its equivalent."  A8848-49.  In the court's view, Dr. Neikirk's equivalence theory would render the term "semiconductor" superfluous, and would be "simply providing an overly broad function-way-result of the claim element[.]"  A8850. And the court found that "Kilopass also ignores the not-insubstantial difference that its use of a first doped semiconductor region, rather than an STI, renders its memory cell smaller."  A8849.

The district court also granted summary judgment of noninfringement based on two other limitations of the Kilopass Patents.  As to the patents' requirement of "row wordlines" connected to the second doped semiconductor region, it found that a position taken by Kilopass's reexamination counsel during the pendency of the infringement litigation disavowed claim scope necessary to its infringement read against Sidense, and further disallowed Kilopass's attempt to reconcile the disavowal of claim scope with the earlier claim construction.  The district court also found that Sidense did not infringe the claims' "spaced apart relationship."

---

[12]   Kilopass does not challenge the district court's exercise of its discretion under the local rules to decline to consider what it considered a new "theory."  That exercise of discretion, however, has no bearing on whether the *objective* merits of Kilopass's case were baseless.

Kilopass appealed the summary judgment ruling of noninfringement to this Court, which affirmed *per curiam* under Federal Circuit Rule 36.

### E.    The Parties' Cross-Motions for Fees

While the merits appeal was pending, both parties sought fees with respect to various issues.  The court denied both requests.  A13040.  With respect to Sidense's motion for attorney's fees under 35 U.S.C. § 285,[13] the district court concluded that Sidense did not meet its burden of establishing that "Kilopass brought or maintained the prosecution of its patent infringement in bad faith." A13032.  The district court pointed out that Kilopass performed a "substantial" pre-filing investigation that included obtaining opinions from two different law firms, a forensic analysis of the accused product, and an independent analysis by its Chief Technology Officer.  *Id.*

Sidense appealed the denial of fees to this Court, which vacated and remanded for further consideration with "particular attention" to the objective merits of Kilopass's claims, which the district court had not considered.  *Kilopass Tech., Inc. v. Sidense Corp.*, 738 F3d 1302, 1311 (Fed. Cir. 2013).

---

[13] Sidense also brought a motion for attorney's fees with respect to the business tort claims that were dismissed after key evidence was excluded *in limine*.  A10516. This motion was denied.  A13032.

### F.    Sidense's Renewed Fees Motion

On remand, Sidense sought "exceptional case" fees under 35 U.S.C. § 285. A13485.  The district court granted the fees request.  A25.  The district court found "baseless" Kilopass's doctrine of equivalence theory on the grounds that it failed to account for "the size difference between the accused technology and the claimed invention" (notwithstanding that the claims contain no "size" limitations).  A23. The district court did not mention or revisit its earlier conclusion that Sidense had failed to demonstrate that "Kilopass brought or maintained the prosecution of its patent infringement in bad faith" or that it had conducted a "substantial" pre-filing investigation.  A13032.

Following an additional round of briefing on the amount of the fee award, the district court ordered sanctions of $5,535,945.54 in fees and non-taxable costs. A50.  In levying the $5.5 million sanction, the district court granted fees and costs for the entire case and made no attempt to trace fees to particular perceived transgressions.  *Id.*

On March 25, 2015, Kilopass appealed from the district court's fee entitlement and quantification orders.  A13591.  On April 8, 2015, Sidense cross-appealed from the district court's quantification order.  A13594.

## SUMMARY OF THE ARGUMENT

The district court's conclusion that the doctrine of equivalents case was frivolous was predicated on legal error. The district court concluded that, because one goal of the overall invention was to shrink the size of the memory cell, a structure could not be equivalent to the "first doped semiconductor region" if it rendered the overall cell larger. That is wrong as a matter of law: an accused claim element is equivalent if it performs substantially the same function in substantially the same way to achieve the same result *as the corresponding claim element*. The doctrine of equivalents does not require that each element separately further the result achieved by other aspects of the overall invention.

Consider a patent claim to a car chassis coupled to a novel lighter-weight engine. Could a truck chassis coupled to the same novel lighter-weight engine be deemed equivalent to the car chassis, even though the chassis of a truck is heavier than the chassis of a car? The answer is yes: the purpose of the *engine* is to be lighter, but that purpose cannot be read into the separate limitation directed to the chassis of the car. The truck with a lighter engine is lighter than a truck with a conventional engine and thus has obtained the benefit of the invention, which is to make the engine less heavy. However, the district court effectively answered that question in the negative, concluding that Sidense could not infringe under the doctrine of equivalents because the STI region was larger than a doped

semiconductor region, even though the Sidense design used two, not three, external connections. In other words, the district court disregarded the fact that Sidense was taking advantage of the benefit of the invention—a smaller size resulting from fewer external connections—because the Sidense cell with a floating drain consisting of an STI and two external connections was smaller than an otherwise identical prior art cell with three external connections would have been.

Even if the district court's conclusion on the doctrine of equivalents issue was correct, it was not so obviously correct that Kilopass's failure to predict before filing this lawsuit that the district court would later so rule renders its entire case frivolous. The fact that three different law firms addressed the doctrine of equivalents issue, the fact that (as the district court acknowledged) cell size is nowhere mentioned as a limitation in the claim, and the fact that size reduction in the patent is accomplished by reducing the number of electrical connections, not as a function of the first doped semiconductor region, all mean that Kilopass's doctrine of equivalents claim, even if wrong, was hardly frivolous.

Because the district court based its ruling on the totality of the circumstances, reversal of the district court's finding of objective frivolity necessitates a remand for reconsideration of the propriety of the exceptional case finding. Further, and independently, it requires remand for reconsideration of the proper amount of any fee award that survives. That is particularly true because the

district court awarded Sidense all the fees it incurred through the entire lawsuit. Controlling Supreme Court precedent requires courts to award only that portion of fees that would not have been incurred but for the conduct deemed exceptional. If the case was not frivolous at its inception, Sidense would be entitled to receive only those fees directly attributable to the basis for the fee award.

# ARGUMENT

## I.    STANDARD OF REVIEW

An award of attorneys' fees under 35 U.S.C. § 285 is reviewed for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744, 1747 (2014).

"The abuse-of-discretion standard does not preclude an appellate court's correction of a district court's legal or factual error: 'A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Highmark*, 134 S. Ct. at 1748 n.2. Thus, while fact finding is reviewed for clear error, this Court reviews de novo the legal principles applied, and overlooked, by the district court. *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1327 (Fed. Cir. 2003). When a district court's fee determination is "premised on an incorrect legal standard," the decision must be vacated and remanded for consideration under the correct law. *Kilopass*, 738 F.3d at 1310, 1317-18.

## II.    THE DISTRICT COURT'S EXCEPTIONALITY FINDING IS UNSUPPORTED

Under *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), a party is entitled to fees under Section 285 only in an "exceptional" case, *i.e.*, one that "stands out from the others" in relation to the legal and factual strength of a party's position and the reasonableness with which the case was

litigated. *Id.* Thus, a court must consider the totality of circumstances in deciding whether a particular patent case is sufficiently "rare" or "unusual" to warrant fee shifting. A court may consider "frivolousness, motivation, objective unreasonableness (both in factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Octane Fitness*, 134 S. Ct. at 1756 n.6 (citation omitted). Courts may also consider whether the case was litigated in an unreasonable manner. *Id.* at 1751. The court must then decide, within its equitable discretion, whether a case is "exceptional" and if so, whether to award any fees pursuant to Section 285. *See Octane Fitness*, 134 S. Ct. at 1756; *see also S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986) ("Even an exceptional case does not require in all circumstances the award of attorney fees.").

Exceptional means just that—out of the ordinary run of litigation. The Senate Report accompanying enactment of the original statute notes "[i]t is not contemplated that the recovery of attorney's fees will become an ordinary thing in patent suits." *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003) (citation and internal quotation marks omitted) (quoting S. Rep. No. 79-1503 (1946)).

The district court's exceptional case finding rests on two of *Highmark*'s considerations: (1) "frivolousness" and (2) the "unreasonable manner in which the

case was litigated." A23-24 ("This is a case that stands out from others with respect to the substantive strength of plaintiff's litigation position and the unreasonable manner in which the case was litigated."). According to the district court, the totality of these circumstances justified the exceptionality finding. A24.[14] Both the district court's finding of frivolousness, and its finding of an inadequate pre-filing investigation, are premised on legal error.

### A. Kilopass's Argument that the STI Was Equivalent to the "First Doped Semiconductor Region" Was Far from Frivolous

The district court's fee award addresses the alleged frivolousness of Kilopass's infringement theory at its inception with respect to just one claim element: the "first doped semiconductor region." *See* A15-23. The district court found Kilopass's doctrine of equivalents infringement theory—that an STI in Sidense's accused product is the equivalent of the claimed "first doped semiconductor region"—to be objectively baseless "because it did not take into account the size difference between the accused technology and the patents-in-suit." A22.[15] This determination was based on a legal error and was in any event

---

[14] The district court did not determine whether either of these bases, standing alone, would warrant an exceptional case finding.

[15] The district court also mentioned by way of background—but did not rely on or incorporate into its Section 285 analysis—its conclusion at summary judgment that "Kilopass had provided no evidence showing that insulators [like Sidense's STI] are the equivalent of semiconductors." A12 (in section titled "Procedural

clearly erroneous. In incorporating the invention's general size advantage into the "first doped semiconductor region" limitation in particular, the district court strayed from the Supreme Court's longstanding doctrine of equivalents, misread the intrinsic record, and relied on evidence that is immaterial as a matter of law. Kilopass's infringement theory under the doctrine of equivalents was coherent and well supported; it was certainly not objectively baseless.

### 1.    An STI can be equivalent to a doped semiconductor region in the context of this patent.

Under the doctrine of equivalents, a product that does not literally infringe the express language of a claim may nevertheless be found to infringe if there is "equivalence" between the elements of the accused product and the claimed elements of the patented invention. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 29 (1997). An element of an accused product is equivalent to a claim limitation "if the differences between the two are 'insubstantial' to one of ordinary skill in the art." *Eagle Comtronics, Inc. v. Arrow Commc'n Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir. 2002). Insubstantiality can be measured by comparing the accused product to the claim limitation to determine whether they "perform substantially the same function in substantially the same way to obtain

History"). But Kilopass's expert repeatedly explained—applying this Court's guidance regarding infringement under the doctrine of equivalents—that Sidense's STI performed the same role as the claimed first doped semiconductor region in the context of the invention. A6070-71 ¶¶ 62-64.

substantially the same result." *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1313 (Fed. Cir. 2005).

As Dr. Neikirk explained, the core—and novelty—of the claimed invention is a gate oxide breakdown programmable memory cell with only two electrical connections: one at the gate, and one at the second doped semiconductor region. A6051-56. The conductive properties of the first doped semiconductor region do not matter—"the first doped region really has no electrical purpose other than to form the end of the channel." A11239. Thus, the first doped semiconductor region truly is interchangeable with an STI region. Indeed, the PTO had earlier rejected a Sidense patent application with an "isolation region" (like an STI), rather than a "diffusion region" (like a doped semiconductor) as anticipated by the '751 patent, recognizing the equivalence of the two regions. A7256-57.

Dr. Neikirk opined that the STI region in the Sidense memory cells was equivalent to the first doped semiconductor region based on the language of the claim: (1) the function of the first doped semiconductor region was to define the channel region under the gate; (2) the way the first doped semiconductor region accomplished this was by being in the substrate adjacent to the gate in a spaced-apart relationship; and (3) the result was the formation of a channel region between the first and second doped semiconductor regions. A6069-71.

To be sure, an STI region is an insulator, not a semiconductor, but the doctrine of equivalents ***necessarily*** applies to accused instrumentalities that are outside the literal scope of the claims. *See Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 955 (Fed. Cir. 2010) (no bad faith where Plaintiff "made no attempt to conceal the fact" that the patents-in-suit rely on different means of performing claimed functions than the accused products, but attempted to persuade the factfinder that "despite [the] difference . . . [the] devices and methods were substantially equivalent to the claimed subject matter for purposes of the doctrine of equivalents."); *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356-57 (Fed. Cir. 2012) ("[T]he vitiation test cannot be satisfied by simply noting that an element is missing from the claimed structure or process because the doctrine of equivalents, by definition, recognizes that an element is missing that must be supplied by the equivalent substitute.")

### 2.    The district court's consideration of memory cell size in its doctrine of equivalents analysis was legal error.

The Supreme Court made clear in *Warner-Jenkinson* that both the insubstantial differences and function-way-result tests must be applied element by element. *Warner-Jenkinson*, 520 U.S. at 40. Accordingly, proof of infringement by equivalence requires "particularized testimony and linking argument on a limitation-by-limitation basis." *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1328-29 (Fed. Cir. 2007).

The district court's baselessness finding rests on its conclusion that "the 'result'" (in the function-way-result sense) of the first doped semiconductor region is "that it produces a higher density memory array." A20. This conclusion is legally erroneous because it ignores the doctrine of equivalents' element-by-element rule. Instead of properly analyzing whether the result of the STI was equivalent to the result of the first doped semiconductor region, the district court erroneously analyzed whether the result of the STI was equivalent to the result of the patented technology *as a whole*. In other words, the district court injected the size advantage obtained from reducing the number of electrical connections from three to two into the "first doped semiconductor region" limitation, even though that region itself has nothing to do with the reason for the reduction in cell size. In doing so, the district court breached the cardinal rule that the doctrine of equivalents analysis is to be applied limitation by limitation.

"[I]dentification of the elements of the function, way, result test," must focus "solely" on "the claim and the explanation of it found in the written description of the patent, as well as in some cases the patent's prosecution history." *AquaTex Indus., Inc.*, 479 F.3d at 1328 (citation and internal quotation marks omitted). Nothing in the intrinsic record, however, links the invention's smaller size relative to the prior art to its use of a first doped semiconductor region.

Critically, the district court's only support for its finding that the "result" of the first doped semiconductor region was a smaller cell size was the fact that the Kilopass Patents distinguish certain of Kilopass's older designs on that basis:

> However, in each of the memory cells described above, the cell size is relatively large. The present invention provides a much smaller cell size, thereby allowing a higher density.

A95 col. 5 ll. 5-26. But this passage contains no mention of any claim element, much less the particular structure of the first doped semiconductor region.

Indeed, the related applications distinguished in the passage above demonstrate that the "result" of the first doped semiconductor region necessarily cannot be a reduction in cell size because *those larger-celled designs* _also_ *contain the "first doped semiconductor region" element* that, according to Sidense, "results" in a smaller cell size:

> a MOS field effect transistor having a gate, a gate dielectric underlying the gate, and *first and second doped semiconductor regions* underlying both the gate dielectric and the gate in a spaced apart relationship to define a channel region therebetween . . . .

A13629 (U.S. Patent Application No. 09/955,641, Claim 1). Apart from having a connected drain region (in contrast to the floating drain region of the asserted patents), these prior art designs claim a MOSFET-type structure that is virtually identical to that of the asserted patents. *Compare id. with* A117 col. 10 ll. 36-53. Thus, the only intrinsic evidence on which the district court relied not only lacks

support for linking cell size to the first doped semiconductor region—it conclusively demonstrates the error of ascribing that advantage to that limitation.

The district court's statement that "Kilopass never disputed that the use of a 'first doped semiconductor region' allows it to achieve higher density by combining the first doped semiconductor regions of adjacent cells rather than using STI regions" is similarly inapposite. First, combining the drain regions of adjacent cells is merely one disclosed embodiment of the patented invention; indeed, it is undisputed that the claims do not *require* that that adjacent doped regions be linked. *See* A99 at col. 14 ll. 30-44. It is axiomatic that features of an embodiment should not be read into the claims. *EPOS Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1341 (Fed. Cir. 2014). Second, nothing in the claims or specification suggests that using a doped semiconductor as the *material* in that part of the claimed structure, as distinct from some other material, confers the smaller size advantage. To the contrary, and as noted by the examiner, it is the elimination of the third connection to each memory cell by virtue of the drain region being "floating"—*i.e.*, not electrically connected—that rendered the invention smaller than the prior art. A6862-63; *see also* A6056 ¶ 35 ("The key reason for a larger cell size of the devices shown [in the inventor's other cited patent applications] is that they actually use three lines . . . to address each cell, and three connections to transistors in a cell . . . . In contrast, the patents in suit require only two lines to

address each memory cell, with only two connections made to each device in the memory array, which enhance the density of the memory device."). Significantly, this oversight of the *manner* in which the claimed invention achieves higher density is the only explanation for the district court's misreliance on *LizardTech, Inc. v. Earth Res. Mapping, Inc.* A20, *citing* 424 F.3d 1336, 1343-44 (Fed. Cir. 2005) ("While it is true that not every advantage of the invention must appear in every claim, it would be peculiar for the claims to cover prior art that suffers from precisely the same problems that the specification focuses on solving."). Contrary to the district court's reasoning, *LizardTech* did not require that the district court inject into the first doped semiconductor region's function-way-result test the size advantage over the prior art because the basis for that advantage *already* was reflected in the text of the claims, which require only two connections (rather than the three of the prior art). *See, e.g.*, A99 at col. 14 ll. 29-44.

Dr. Neikirk accurately explained the role of the first doped semiconductor region in the claimed invention. Its *function* is to define the channel region under the gate—the claims say so. *Compare* A6069-70 ¶ 62 *with* A99 col. 14 ll. 34-38. The *way* the first doped semiconductor region performs its function is by being in the substrate adjacent to the gate in a spaced-apart relationship with the second region; this language also comes directly from the claims. *Compare* A6070 ¶ 63

*with* A99 col. 14 l. 36. The *result* is the delineation of the channel region. A6070-71 ¶ 64.

Significantly Dr. Neikirk was not the only person who saw that the first doped semiconductor region delineates the channel region. In the briefing below, Kilopass pointed out—as MoFo had done in its pre-filing analysis—that a Sidense patent application covering Sidense's attempted design-around had been rejected as anticipated by Kilopass's '751 patent. In particular, the examiner of Sidense's application determined that Kilopass's first doped semiconductor region anticipated what Sidense called "an isolation region." *See supra* Statement of Facts § II.A; A7256-57. In Sidense's products, that "isolation region" is the STI. That the examiner specifically identified the first doped semiconductor region of Kilopass's design as the basis for the anticipation rejection because it performs the isolation at the core of Dr. Neikirk's and MoFo's equivalents explanations confirms that Kilopass's claims were not objectively meritless.

Sidense nevertheless derided this "geometric" explanation of delineation as "entirely different" than what it called the "channel stop" explanation asserted in Kilopass's infringement contentions.[16] A13531-32. But the two explanations were

---

[16] The court relied on the alleged difference between the channel stop and geometric explanations in granting summary judgment in favor of Sidense, holding that the reformulation violated a local rule requiring a patentee to state its

completely consistent with one another and with the identification of Sidense's STI as equivalent to the first doped semiconductor region. The "channel stop" explanation focused on the electrical paths created in the memory cell by the different structures, while the "geometrical" explanation focused on the spatial arrangement of the structures.

Both explanations were directed to the same underlying point. Kilopass originally explained that the doped semiconductor regions prevent the flow of electric current—like a levee is designed to prevent floods (function) by stopping the flow of water to its high side (way) which is kept dry (result). But like water sometimes breaks through levees, current sometimes travels through the doped semiconductor region. Sidense tried to use this observation to undermine the entire "channel stop" theory:

> [T]he Kilopass drains do not serve as "channel stops" since they do not function to prevent the creation of unwanted (parasitic) conductive channels. To the contrary, the merged (i.e. shorted) drains provide conductive channels between adjacent pairs of memory cells through which problematic, unwanted current flows in a variety of operating conditions.

A13528.

---

infringement theory with specificity early in the litigation. The court also mentioned the differing formulations in its analysis regarding the fee award. A21 n.12. Kilopass does not challenge the district court's exercise of its discretion under the local rules to decline to consider what it considered a new "theory."

Avoiding this pedantry, Dr. Neikirk anchored his analysis in the language of the specification and the claims, which describe the memory cell's structures spatially—like defining levees as "two things in a spaced apart relationship delineating a riverway." This framing comports with the principle that inventions claimed in structural terms generally resist functional limitation. *See Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation.") In any case, the fact that Dr. Neikirk chose to express the same idea in different language does not mean that Kilopass's original analysis was incorrect. And it certainly does not support the conclusion reached by the district court—that the original analysis was frivolous.

Further undermining the doctrine of equivalents finding, the district court committed an independent legal error in relying on a statement by Kilopass's inventor about Kilopass's products in its identification of the "first doped semiconductor region" limitation's function, way, and result. Such extrinsic evidence is irrelevant as a matter of law under *AquaTex*. *AquaTex*, 479 F.3d at 1327-28 (holding that the function-way-result inquiry "leaves no room for consideration of the patentee's product" but rather must be based on the patent claims and written description). *AquaTex* is in that respect consistent with the principle that "the inventor's subjective intent as to claim scope, when unexpressed

in the patent documents," has no effect in determining the meaning of his patent's claims. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

The extrinsic evidence did not support the court's conclusion in any event. Specifically, the district court relied on an email from the inventor of the Kilopass Patents, Dr. Peng, who wrote, upon examining Sidense's PCT application:

> Why we did not implement this cell in our product, because this split gate Cell is not self-aligned, so their practical cell size will be larger than Our 1.5T cell. . . .

A10576. This email does not even mention the "first doped region" limitation, much less say what function it performed. Instead, this email concerns Sidense's use of a split gate design to permit the application of charge to the gate directly to break down the oxide beneath it.[17] But it is undisputed that Kilopass's claims are agnostic to gate type. Consistent with that, Sidense did not move for summary judgment on the basis of the "gate" limitation. *See* A8842. Nor did Sidense seek leave to file an early summary judgment motion with respect to the positions it accuses of being frivolous—a fact which further undercuts the baselessness

---

[17] As discussed in section III.D of the Statement of the Facts above, Sidense's summary judgment briefing manipulated this quote to suggest that Dr. Peng identified Sidense's STI—and not the split-type gate—as the basis for the cell size difference. The actual email makes no mention of an STI (or, for that matter, the first doped semiconductor region of the claims).

finding. *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, — F.3d —, 2015 WL 3893711, at *2 (Fed. Cir. June 25, 2015) (affirming on this basis a district court's finding that claims were not objectively baseless).

On the merits, Sidense's summary judgment motion, which it filed in the normal course following expert discovery, did not even attempt to dispute that its STI was equivalent to a doped semiconductor region under the spatial, "geometric" framing. Instead it attacked the framing as "circular" and for ignoring what it considered to be the "key" function of the first doped semiconductor region ("to make the memory cells small"). A6879. The district court nevertheless adopted Sidense's positions, leaning heavily on Sidense's argument regarding memory cell size. A23. In doing so, the district court committed clear legal error.

## B. The District Court's Erroneous Doctrine of Equivalents Analysis Infects Its Analysis of Kilopass's Pre-Suit Investigation

This is not a case where the plaintiff plunged into a patent lawsuit without doing its research or consulting competent lawyers to ensure that its legal positions have merit. Instead, Kilopass spent nearly five years poring through documents, consulting lawyers, and reverse engineering the accused product in an attempt to assess the strength of its case.

Notwithstanding this substantial undertaking, the district court discounted Kilopass's pre-filing investigation on the grounds that Kilopass and its lawyers failed to adequately account for the larger practical cell size of Sidense's accused

split gate memory cells relative to the memory cell of the asserted patents.  *See* A18-20.  According to the district court, Kilopass was required to account for this fact in its pre-suit analysis because either the "function" or the "result" (in function-way-result parlance) of the "first doped semiconductor region" is to reduce the size of the patented cells:

> Even assuming MoFo and Kilopass were correct and the "function" of the first doped semiconductor is to provide a channel stop—not to reduce the cell size—to prevail under the 'function-way-results' [*sic*] test, Kilopass would still be required to show that the element in the accused product that performs this 'function' obtains the same 'results.'  Kilopass never disputed that the use of an STI rather than a first doped semiconductor, *results* in a larger sized memory cell.

A20 (emphasis in original).  Thus, the district court's conclusions concerning Kilopass's pre-suit investigation turned on the court's erroneous assumption that, even if the element in question was not directed to reducing cell size, it had to reduce cell size in order to have the same "result."  As demonstrated above, the district court's injection of the general size-reduction benefit of the patented invention into the doctrine of equivalents analysis of the "first doped semiconductor region" limitation was clear legal error.  *See supra* Argument

53

§ II.A.2.    This legal error infected the entirety of the district court's pre-suit investigation finding.[18]

Because the cell size advantage was legally irrelevant to whether Sidense's STI could infringe by equivalence, it not surprising that there is little in the pre-suit investigation record concerning this issue.  Indeed, Sidense's relegation of the size advantage issue to a single paragraph towards the end of its summary judgment motion confirms that this issue was not so fatal to Kilopass's infringement claim as to render it entirely devoid of merit.  A6897.

Stripped of the district court's legally erroneous doctrine of equivalents analysis, nothing in its analysis of Kilopass's pre-suit investigation can properly support an exceptionality finding, as demonstrated below.

*First*, the district court states that "it was not reasonable for Kilopass to rely on the MoFo opinion because it was not complete. . . ."  A21.  According to the district court, "there is no evidence in the record showing that MoFo's analysis was complete" when Kilopass instructed MoFo to stop work, "nor is there any evidence that Kilopass considered MoFo's preliminary infringement chart in deciding to bring suit against Sidense."  A18.

---

[18]  As discussed in footnote 10 above, it also is unremarkable that the impact of Sidense's STI on cell size was not a focus of the pre-suit investigation given lack of evidence even in the summary judgment record that, at the relevant time of infringement, the use of an STI necessarily would render the cells larger.

As a threshold matter, this flips Sidense's evidentiary burden on its head. It is well-established that the *absence* of evidence does not constitute affirmative evidence necessary to satisfy Sidense's burden, even under *Octane*'s preponderance standard. *Octane Fitness*, 134 S. Ct. at 1758.

More fundamentally, the statement simply is not accurate. Where a theory in MoFo's detailed claim chart required further investigation, the chart expressly called attention to that fact by identifying the additional work necessary to confirm predicate facts. *See supra* Statement of the Facts § II.B. With respect to the critical "first doped semiconductor region" doctrine of equivalents analysis, however, the chart contained no such disclaimer. Coupled with the time MoFo invested—which exceeded by nearly 30% it original estimate for the work it thought necessary for its "more detailed investigation and analysis"—and the detail in MoFo's analysis of the issue, the absence of a disclaimer is persuasive circumstantial evidence that MoFo's analysis of this issue was complete. A11487; A11490. In short, there is nothing in the chart itself to suggest that MoFo did not complete the work—certainly not the fact that MoFo labeled the infringement chart "preliminary," since that is the way it was described throughout the billing records. The fact that the chart may not have been in "final" condition to (for example) serve at the post-fact-discovery "final contention" stage of a lawsuit does not mean that it was not a competent analysis on which Kilopass could reasonably rely.

And, critically, any alleged shortcomings in MoFo's doctrine of equivalents analysis are irrelevant because, as demonstrated above, the district court was wrong to conclude that cell size is relevant to Kilopass's equivalents theory.

It also is not true that there is no evidence that Kilopass relied on MoFo's analysis when deciding to bring suit. As the district court elsewhere recognized, the infringement contentions Kilopass served early on in the case closely track the infringement theories set forth in MoFo's chart. A27. More basically, why would Kilopass have gone to the trouble of retaining MoFo, meeting with them, and incurring substantial fees if not to obtain work product upon which it could rely?

***Second***, the district court found that it was unreasonable for Kilopass to rely on the MoFo opinion because Kilopass had allegedly withheld relevant evidence from MoFo. A21. In particular, the district court found that MoFo's analysis "does not show that it took into account the statements from Mr. Peng, the lead inventor on all three patents-in-suit, regarding the practical cell size difference between the patents-in-suit and Sidense's memory cells" resulting from Sidense's use of a "split gate" design. A19. According to the district court, "these statements would appear to be relevant to MoFo's doctrine of equivalents analysis." *Id*. As demonstrated above, however, these statements are irrelevant to the doctrine of equivalents analysis as a matter of law because it was legal error to import the general benefit of smaller cell size into the "result" element of the

function-way-result analysis of the "first doped semiconductor region."  *See supra*

Argument § II.A.2.  Indeed, Mr. Peng's comments about the split gate design are

irrelevant for the additional reason that the asserted claims simply claim a "gate,"

are thus agnostic about the *type* of gate, and thus literally read on Sidense's split

gate design.  *See id.*

## III.  EVEN IF THIS COURT WERE TO DECLINE TO DISTURB THE EXCEPTIONALITY FINDING, REMAND IS REQUIRED FOR A PROPER FEE ASSESSMENT

If this Court rejects the district court's analysis of the doctrine of

equivalents, it should remand the entire fee award for reconsideration because the

totality of the circumstances is different.  But, even if a fee award were still

appropriate, the district court's award of fees and costs for the entire case cannot

stand.  Fees are not awarded to cover all costs, but only costs incurred as a result of

wrongful conduct.  *See Fox v. Vice*, 131 S. Ct. 2205, 2215 (2011) (unless the

prevailing party's fees were "but for" caused by the wrongful conduct, they are not

recoverable); *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1344 (Fed. Cir.

2001) ("[T]he amount of the attorney fees depends on the extent to which the case

is exceptional.").  Because the district court declined to trace fees to Kilopass's

allegedly wrongful conduct, this Court must remand for further proceedings if it

affirms the exceptionality finding on the basis of the district court's findings

concerning the manner in which Kilopass litigated this case or on account of

Kilopass's disclaimer of claim scope in the PTO proceedings, which occurred well after claim construction (and just a few months prior to the district court's summary judgment ruling).

In *Fox*, the Supreme Court set the governing principles concerning the allocation of fee awards where some, but fewer than all, of a litigant's claims were improper. The Court explained that the purpose of the sanction in favor of a litigant who had to defend against a baseless claim is "to relieve a defendant of expenses attributable to frivolous charges."[19] 131 S. Ct. at 2214. In *Fox*, 594 F.3d 423, 428-29 (5th Cir. 2010), the Fifth Circuit affirmed the district court's award of attorneys' fees for the entire case, even though some of the plaintiff's claims were found non-frivolous. The Supreme Court reversed, holding that the defendant was only entitled to the fees that were exclusively attributable to the frivolous claims. 131 S. Ct. at 2215. "But if the defendant would have incurred those fees anyway, to defend against *non*-frivolous claims, then a court has no basis for transferring the expense to the plaintiff." *Id.* As the Court explained, a "standard allowing

---

[19] In *Fox*, the defendant sought sanctions under 42 U.S.C. § 1988, but the reasoning applies with equal force here. Indeed, Section 285 has long been interpreted in light of Supreme Court cases applying the sanction provision for federal civil rights actions. *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782 (1989). *See, e.g.*, *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1459 (Fed. Cir. 1991); *PPG Indus. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1570 (Fed. Cir. 1988).

more expansive fee-shifting would furnish windfalls to some defendants, making them better off because they were subject to a suit including frivolous claims." *Id.* The dispositive question is whether "the costs would have been incurred in the absence of the frivolous allegation." *Id.* at 2216. If so, as a matter of law they are ***not*** recoverable. *Id.* ("[T]he defendant may not receive compensation for any fees that he would have paid in the absence of the frivolous claims"). *Id*. at 2218.

Thus, a "trial court must determine whether the fees requested would not have accrued but for the frivolous claim. And the appeals court must determine whether the trial court asked and answered that question, rather than some other." *Id*. at 2216-17; *see also id*. at 2218 ("A trial court has wide discretion when, but only when, it calls the game by the right rules.").

Here, the need for tracing is even stronger than in *Fox*. The district court's objective baselessness findings related to an alternative theory that provided a non-frivolous basis for the case as a whole. Because Kilopass's doctrine of equivalents theory was non-baseless, it had a viable infringement claim regardless of the objective merits of its literal infringement theory. *See Schumer v. Lab. Computer Sys., Inc.*, 308 F.3d 1304, 1314 n.7 (Fed. Cir. 2002) (explaining that infringement may occur under the doctrine of equivalents even when it has been found that there is no literal infringement). In a footnote, the district court also suggested that "the strength or weakness of Kilopass's claims for literal infringement is evidence as to

whether Kilopass litigated the present action in an unreasonable manner." A15 n.6. Although Kilopass's literal infringement theory with respect to the "first doped semiconductor region" was not without its challenges, that theory was withdrawn at the outset of expert discovery and Sidense did not attempt to show any incremental harm attributable to its assertion. Accordingly, under *Fox*'s claim-by-claim approach, the merits of Kilopass's literal infringement case is not itself a sufficient basis to award fees for the entire case. *See Fox*, 131 S. Ct. at 2215 (holding that the defendant was only entitled to the fees that were exclusively attributable to frivolous claims).

Tracing is likewise required with respect to the fees attributable to the district court's findings concerning the manner in which Kilopass litigated this case. *See Highmark*, 134 S. Ct. 1744 (2014) (holding that, under Section 285, a prevailing party is entitled to only the amount necessary to "compensate a party for the "extra legal effort to counteract the misconduct[.]") (citation omitted); *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1553-54 (Fed. Cir. 1989) ("Since any injustice present in this case is based upon LKB's bad faith and misconduct during litigation, the penalty imposed must in some way be related to bad faith and misconduct. . . . [T]he amount of fees awarded to the 'prevailing party' should bear some relation to the extent to which that party actually

prevailed.").[20]    Because the district court's theories of litigation conduct were expressly directed to very specific legal issues that arose late in the case, even were this Court to affirm the district court in its entirety on that issue, doing so could not justify the award of Sidense's entire attorneys' fees and non-taxable costs.    At most, it could justify awarding the expenses incurred in asserting the prosecution disclaimer theory, an argument which did not even arise until after claim construction was completed.

The district court declined to connect its award of fees to expenses Sidense incurred as a result of any particular alleged misconduct.    To the contrary, it forthrightly refused to do so, holding that "as the defendant in this case, Sidense would not have incurred any legal costs were it not for Kilopass's claims of infringement.  Sidense is therefore entitled to all reasonable attorneys' fees arising out of the patent-related litigation."  A37.  As support for this refusal it cited only an unpublished, nonprecedential decision from this Court.  A38.  This Court cannot overrule the Supreme Court's requirement in *Fox*, and certainly not in a nonprecedential decision.

---

[20] *SFA Sys., LLC v. Newegg, Inc.*, No. 2014-1712, 2015 WL 4154110, at *5 (Fed. Cir. July 10, 2015) (holding that this Court's pre-*Octane* case law was not disturbed by *Octane* as it relates to fees awarded on the basis of litigation misconduct).

The district court's failure to follow controlling law in apportioning fees based on the harm actually caused requires remand notwithstanding the district court's findings on litigation conduct.

## CONCLUSION

For all the above reasons, the district court's "exceptional case" finding, and its award of all attorneys' fees and costs based thereon, should be reversed and remanded.

Dated:  July 28, 2015                          Respectfully submitted,

                                               DURIE TANGRI LLP


                                    By:  *Daralyn J. Durie*
                                         Daralyn J. Durie

                                         *Counsel for Plaintiff-Appellant*
                                         *Kilopass Technology, Inc.*

**<u>Table of Contents</u>**
**Addendum to Brief**

Order Granting Defendant's Motion for Attorney's Fees
(ECF No. 427) filed Aug. 12, 2014 .........................................................................A1-A25


Order re: Attorneys' Fees Calculation
(ECF No. 461) filed Mar. 11, 2015.........................................................................A26-A50

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| KILOPASS TECHNOLOGY INC., | No. C 10-02066 SI |
|---|---|
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR ATTORNEY'S FEES** |
| v. | |
| SIDENSE CORPORATION, | |
| Defendant. | |

Defendant Sidense Corporation's renewed motion for attorney's fees came on for oral argument on August 1, 2014. Docket No. 417. Having considered the parties' motion papers, pleadings and arguments, the Court GRANTS defendant's renewed motion for attorney's fees.[1]

## BACKGROUND

### I.   The Parties

Kilopass Technology Inc. ("Kilopass") and Sidense are competitors in the embedded non-volatile memory ("NVM") market. Memory cells use transistors to store information. NVM memory consists of memory devices that retain their information (or state) when power is removed. Kilopass markets technology used to create its 1.5T NVM memory technology. Sidense has a competing 1T-Fuse product, the design and

---

[1] On July 25, 2014, Kilopass filed objections to Exhibits 16, 17, 22, and 23 to the Declaration of Robert Tadlock filed in support of Sidense's reply brief. Docket No. 422. Kilopass argues that the filing of these exhibits was procedurally improper because they were filed in Sidense's reply brief, giving Kilopass no chance to respond to this evidence. *Id.* Kilopass states that if the Court considers this new evidence, then Kilopass should have the opportunity to respond to the evidence in writing or at oral argument. *Id.* On August 1, 2014, the Court held a hearing on the matter. Therefore, Kilopass was given an opportunity to address these exhibits during oral argument. Accordingly, the Court OVERRULES Kilopass's objections to the exhibits.

United States District Court
For the Northern District of California

technology of which it licenses to its customers, who in turn use those designs to build embedded memory cells.

*Kilopass Tech., Inc. v. Sidense Corp.*, 738 F.3d 1302, 1317-18 (Fed. Cir. 2013).

## II.    The Patents-in-Suit

In the present action, Kilopass accused Sidense of infringing U.S. Patent Nos. 6,940,751 ("the '751 patent"), 6,777,757 ("the '757 patent"), and 6,856,540 ("the '540 patent"). The patents-in-suit all generally relate to non-volatile memory devices and arrays of such devices. Docket No. 250-1, Hutchins Decl. Ex. 10 ¶ 10 (Neikirk Expert Report). The specifications for each of the patents-in-suit explain that previous NVM designs resulted in memory cells where "the cell size is relatively large." '751 Patent at 5:25-26; '757 Patent at 4:45; '540 Patent at 4:50. In contrast, the invention described in the patents "provides a much smaller cell size, thereby allowing a higher density." '751 Patent at 5:26-27; '757 Patent at 4:46-47; '540 Patent at 4:51-52.

The programmable memory cell disclosed in the patents is comprised of a transistor located at the cross point of a column bitline and a row wordline. *See* '751 Patent (Abstract).

> Each transistor has a "gate" connected to [the] column bitline and a "source" connected to [the] row wordline. '751 patent col. 5 ll. 32-40. Opposite the source is a "drain" that is not connected to any bitlines or wordlines. *Id.* Beneath the gate is a substrate separated from the gate by a dielectric oxide. *Id.* col. 7 l. 17. The dielectric oxide is engineered to "break down" when a sufficient voltage is applied to the gate. *Id.* col. 7 ll. 14-16. If the gate oxide breaks down, a conductive link forms between the source and drain, allowing current to flow through the transistor. *Id.* col. 7 ll. 16-20. The flow of current indicates that the transistor is in a programmed state, while the absence of current flow indicates that it is in a non-programmed state. *Id.*

*Kilopass*, 738 F.3d at 1304.

Claim 1 of the '751 patent, which is representative of the patents-in-suit, claims the following (terms relevant to Sidense's motion in bold):

1. A programmable memory cell useful in a memory array having column bitlines and row wordlines, the memory cell comprising:

a transistor having a gate, a gate dielectric between the gate and over a substrate, and **first and second doped semiconductor regions** formed in said substrate adjacent said gate and in a spaced apart relationship to define a channel region therebetween and under said gate; and

**wherein the second doped semiconductor region of the transistor is connected to one of said row wordlines**, and wherein said gate dielectric is formed such that the gate

2

A2

dielectric is more susceptible to breakdown near the first doped semiconductor region
than said second doped semiconductor region.

'751 Patent at 14:30-44 (emphasis added).

Two claim limitations are relevant to the present motion. First, all the asserted claims of the patents-in-suit require "the second doped region to be connected to a row wordline, but Sidense's 1T-Fuse product connects the second doped region to the column bitline." *Kilopass*, 738 F.3d at 1305 (citing *Kilopass Tech., Inc. v. Sidense Corp.*, No. C 10-02066 SI, 2012 WL 3545286, at *7 (N.D. Cal. Aug. 16, 2012)). Second, all of the asserted claims of the patents-in-suit require "first and second doped semiconductor regions." "Sidense's 1T-Fuse cells, however, utilize a shallow trench isolation ('STI') region for the transistor drain instead of a first doped region." *Id.* (citing *Kilopass*, 2012 WL 3545286, at *10).

## III.   Kilopass's Pre-Filing Investigation

The following summary of Kilopass's pre-filing investigation is largely taken from the Federal Circuit's opinion in this matter. *See Kilopass*, 738 F.3d at 1305-07. In 2005, Kilopass's founder and an inventor on all three of the patents-in-suit, Jack Peng, reviewed an international patent application submitted by Sidense that was directed to protecting Sidense's competing 1T-Fuse memory cell. Mr. Peng believed that the 1T-Fuse was similar to Kilopass's patented cells, except that Sidense used a split gate implementation. Mr. Peng contacted a patent attorney, Mr. Chun Ng, at the law firm Perkins Coie to discuss potential infringement. In an e-mail to the Perkins attorney, Mr. Peng explained that "[Kilopass] did not file [a] dedicated patent for this split gate implementation" and that "we should [have] . . . a long time ago even though we were very busy." Docket No. 420-1, Durie Decl. Ex. 24 at A10576, A10580. According to Peng, it was not a priority to Kilopass at that time because Sidense's "split gate [memory cell] is not self-aligned, so their practical cell size will be larger than [Kilopass's] 1.5T cell." *Id.* at A10576.

The Perkins counsel nonetheless believed that there was a sufficient basis to challenge Sidense with infringement contentions "in a friendly way . . . to see what their reaction is." Docket No. 420-1, Durie Decl. Ex. 24 at A10578 ("[W]e have pretty broad claims that I believe would cover any single

United States District Court
For the Northern District of California

3

**A3**

United States District Court
For the Northern District of California

1   poly gate oxide breakdown memory."). On November 28, 2005, the Perkins counsel sent a letter to

2   Sidense advising that it "should be interested in obtaining a license to Kilopass'[s] patents" or otherwise

3   "provide [Kilopass] with an explanation of how these products avoid the claims" of the patents-in-suit,

4   inter alia. Docket No. 420-1, Durie Decl. Ex. 23 at A10583-86.

5       Sidense responded on January 20, 2006, stating: "[I]t is our opinion that no products produced

6   by Sidense, nor their methods of operation, fall within the scope of the claims." Docket No. 420-1,

7   Durie Decl. Ex. 23 at A10590. Specifically, Sidense noted:

8       [The independent claims of the '751 patent and '757 patent] each require that the
        transistor have (1) *first and second doped semiconductor regions* formed in the substrate
9       adjacent the gate; and (2) *a second doped semiconductor region connected to the row
        wordline*. . . . Such elements are not present in Sidense's memory cell transistors. For
10      at least these reasons, . . . we do not believe any license of these patents is necessary.

11  *Id.* (emphases added). Sidense also proposed that it was "prepared to consider a third-party

12  examination, on a confidential basis" to confirm whether Sidense's products infringed, "provided

13  [Kilopass] agreed to pay the costs of same and to be bound by any findings in this regard." *Id.* at

14  A10593.

15      After reviewing Sidense's response, the Perkins counsel sent the following e-mail to Peng and

16  Kilopass's CEO on January 20, 2006:

17      Here is my report on Sidense's response to our charge of infringement.

18      I still believe given our knowledge of Sidense's technology, that they infringe our
        patents. Please keep in mind that I am assuming that their memory design is the same
19      as detailed in their patent application . . . . Note that it is possible that Sidense may have
        changed their memory design to be different from what is shown in their patent
20      application. . . .

21      . . .

22      . . . In speaking with Jack [Peng] earlier today, we speculated that Sidense may have
        eliminated the first doped region (112 in Figure 4) and replaced it with a shallow trench
23      isolation [STI] of some sort. . . . [I]f in fact they have eliminated the first dope region
        (112), then they would NOT infringe our claims literally. If that is the case, then we
24      would have to go through a "reissue" proceeding in the patent office that may take 2
        years in order to modify our claims to include the situation where there is no first doped
25      region.

26      . . .

27      **The most crucial bit of information we need to find out is the design of their
        memory cell. We have been . . . assuming that their patent application shows their
28      memory cell. This is not always the case and it would be good if we could find out**

United States District Court
For the Northern District of California

1    **definitively how their memory cell is constructed. I still feel strongly about our case if they are using the memory cell described in their patent application.**

2    Docket No. 420-1, Durie Decl. Ex. 23 at A10600-02 (emphasis in original). "That e-mail made clear

3    that: (1) the analysis by Perkins counsel up to that point had been based on the assumption that the

4    design of Sidense's 1T-Fuse cell was the same as the cell described in Sidense's international patent

5    application; and (2) if that assumption was incorrect and Sidense had in fact replaced the first doped

6    region (i.e., the drain) with an STI region, then Sidense 'would NOT infringe [the] claims literally.'"[2]

7    *Kilopass*, 738 F.3d at 1306 (quoting *id.* at A10601).

8        In June 2007, a Kilopass employee obtained a diagram of Sidense's 1T-Fuse cell at a

9    presentation, which confirmed that Sidense had replaced the drain with an STI. The Perkins counsel

10    then sent the following e-mail to Kilopass officials: "My preliminary review of all the Sidense materials

11    indicates that *they have redesigned their memory cell to avoid infringement of our patents. Or at least*

12    *make our case much tougher.*" Docket No. 420-1, Durie Decl. Ex. 24 at A10604 (emphasis added).

13    Counsel also noted that Sidense employed an opposite wordline and bitline configuration, viz., the gate

14    of each transistor was connected to a row wordline and the source was connected to a column bitline.

15    *Id.* Counsel stated that he was "not so worried about the interchange of the bit line and word line," but

16    that he was "more worried about the fact that [Sidense's cell] uses an [STI] on one side of the gate and

17    not a [drain]." *Id.*

18        "Despite that advice from its Perkins patent counsel that Sidense did 'NOT infringe [the] claims

19    literally,' and that Kilopass's case was 'much tougher,' Kilopass retained the law firm of Morrison

20    Foerster ("MoFo") to conduct another analysis." *Kilopass*, 738 F.3d at 1306. On March 19, 2008,

21    counsel from MoFo, Mr. Shane Brun, e-mailed Kilopass's CEO the following:

22        As we mentioned during the meeting, assuming Sidense's NVM product uses . . . [an]
23        STI region[] (as opposed to two N+ regions) to define the channel below the gate . . . ,
            Kilopass appears to have a valid claim that Sidense's NVM product is at least
24        "equivalent" to the invention claimed by claim 1 of Kilopass's '751 patent, and therefore
            that Sidense infringes that patent.

25        As we also discussed, the next step is for us to conduct a more detailed investigation and
            analysis to confirm our initial impressions, which you asked us to complete before your
26        April 2nd meeting with Kilopass's Board.

27

28    [2] In addition, despite the Perkins counsel's advice that Kilopass institute reissue proceedings, Kilopass never sought a reissue of the patents-in-suit.

5

**A5**

Docket No. 420-1, Durie Decl. Ex. 28 at A11487 (emphases added). MoFo estimated that this "more detailed investigation" would take approximately 30-35 hours at a cost of approximately $17,250-$20,125 and would be completed by Friday, March 28th. *Id.*

MoFo then immediately began its "more detailed investigation" in order to meet Kilopass's deadline. However, eight days later, on March 27, 2008, Kilopass instructed MoFo to stop all work on the project. *See* Docket No. 420-1, Durie Decl. Ex. 28 at A11490. The reason is unclear, but MoFo subsequently sent Kilopass an invoice for 44 hours of work at a cost of $20,125 "relating to Kilopass's investigation of potential infringement claims against Sidense." *Id.* at A11490. The invoice was accompanied by "a preliminary infringement chart for the '751 patent reflecting [MoFo's] analysis." *Id.*

The infringement chart provided an analysis concerning the doctrine of equivalents and concluded that "Kilopass appears to have a reasonable argument that Sidense's field oxide region is equivalent to the doped region in claim 1 of the '751 patent, and therefore satisfies this limitation." Docket No. 420-1, Durie Decl. Ex. 28 at A11497. "[I]n the context of claim 1 of the '751 patent, the field oxide region performs the same function and achieves the same result as the first doped region of claim 1 (i.e., it is positioned in the same location and *serves as a channel stop* to define the channel region below the gate) in arguably the same way (by not carrying any current)." *Id.* at A11500 (emphasis added). With regard to literal infringement, the MoFo counsel opined:

> [I]f "doped region" is defined as an area on the semiconductor where the electrical properties have been changed, it may be difficult to argue that the field oxide region is a doped region . . . . If, however, "doped region" could reasonably be defined more broadly as simply an area to which a dopant is applied, then we may be able to argue that the field oxide region is a "doped region." Determining the potential viability of this argument will require additional investigation, technical feedback from Kilopass and possibly input from an independent expert.

*Id.* at A11497.

"Although MoFo's preliminary infringement chart opined favorably to Kilopass regarding the doctrine of equivalents, there is no evidence in the record that MoFo's analysis was complete at that time, nor is there any evidence that Kilopass considered MoFo's preliminary infringement chart in deciding to bring suit against Sidense." *Kilopass*, 738 F.3d at 1307. Moreover, there is no evidence in

United States District Court
For the Northern District of California

6

**A6**

1   the record showing that Kilopass informed MoFo about the Perkins counsel's prior analysis or Mr.
2   Peng's prior statements about the size differences between Sidense's memory cells and Kilopass's
3   memory cells. "Kilopass retained MoFo to conduct an infringement analysis but terminated that
4   relationship only eight days later. It does not appear that Kilopass was aware of how much work MoFo
5   had done up to that point or that MoFo was even in the process of completing an infringement chart.
6   In other words, it appears that Kilopass officials had already set their mind prior to learning of MoFo's
7   infringement analysis." *Id.*

8        In October 2008, Kilopass hired a new CEO, Charlie Cheng. In a presentation on October 7,
9   2008 to the Kilopass board of directors, Mr. Cheng listed as a plan for October Q4: "Get ready to sue
10  Sidense." Docket No. 417-6, Tadlock Decl. Ex. 3 at A10626. In another presentation to the Kilopass
11  Board, Mr. Cheng noted that for Kilopass to grow it would need to "Take out Sidense." *Id.* at A10671.
12  Also in 2008, Kilopass performed a "Competitor Analysis" of Sidense's memory cell. Docket No. 366,
13  Tadlock Decl. Ex. 12 at 1. The analysis stated that Sidense's memory cell array was "much larger (2X)"
14  than a comparable Kilopass memory cell array. *Id.*

15       In 2009, a team of engineers led by Kilopass's CTO, Dr. Luan, sent an exemplary Sidense
16  memory device to a third-party for reverse-engineering. After receiving the results, the CTO created
17  a slide presentation for a meeting of Kilopass's board noting that Kilopass had retained the law firm
18  SNR Denton ("Denton") to investigate potential infringement against Sidense. The CTO also stated that
19  the Denton "[a]ttorneys don't have a conclusion yet as to the reading of 1st doped region and STI
20  region" and that their "formal analysis [was] in progress." Docket No. 420-1, Durie Decl. Ex. 27 at
21  A11296. However, in the CTO's opinion, "[f]rom an engineer's perspective," Sidense infringed
22  Kilopass's patents under the doctrine of equivalents. *Id.*

24  IV.   **Procedural History**

25       On May 14, 2010, Kilopass filed the present action against Sidense asserting infringement of

United States District Court
For the Northern District of California

7

A7

United States District Court
For the Northern District of California

1    the '751 patent.[3]  Docket No. 1.  On June 18, 2010, Kilopass filed a first amended complaint adding

2    allegations of infringement of the '757 and '540 patents.  Docket No. 6.  On October 14, 2010, Kilopass

3    filed a second amended complaint.  Docket No. 38.  On December 13, 2010, the Court granted in part

4    and denied in part Sidense's motion to dismiss the second amended complaint, leaving six causes of

5    action in the case: three patent infringement claims asserting infringement of the '751, '757, and '540

6    patents, one false advertisement and disparagement claim, one intentional interference with prospective

7    economic relations claim, and one unfair competition claim.  Docket No. 50; *see also* Docket No. 234

8    (Third Amended Complaint).

9         In its infringement contentions, Kilopass accused Sidense of infringing claims 1, 3, 5, 6, 9, 12,

10   and 14 of the '751 patent, claims 1, 2, 5, 7, 8, 13, and 14 of the '757 patent, and claims 1, 3, 5, and 6 of

11   the '540 patent.  Docket No. 420, Durie Decl. Ex. 12 at A6308.  Kilopass's infringement contentions

12   included allegations of both literal infringement and infringement under the doctrine of equivalents.  *Id.*

13   at A6307.  With respect to the "column bitlines and row wordlines" claim limitation, the contentions

14   asserted that the accused products merely "switch[] the terms 'wordlines' and 'bitlines' to create an

15   artificial distinction.  Columns and rows are a matter of perspective only."  *Id.* at A6311.  With respect

16   to the "first and second doped semiconductor region" claim limitation, the contentions asserted the

17   "channel stop" theory of infringement that was contained in Morrison & Foerster's preliminary analysis.

18   Kilopass asserted that "the STI is the equivalent of the first doped region.  The function of the first

19   doped region is to provide a channel stop.  The way it functions is to prevent current from the channel

20   to flow in the area of the STI.  The result is that the end of the channel is defined.  Sidense's STI

21   performs substantially the same function, functions in substantially the same way, and achieves the [*sic*]

22   substantially the same result."  *Id.* at A6313.  Kilopass also asserted that the first doped semiconductor

23   region limitation was literally present in the accused device because the device's Shallow Trench

24   Isolation ("STI") "is literally a first doped region forming the channel stop."  *Id.*

25        The Court held a claim construction hearing on August 1 and 2, 2011.  Kilopass originally

26

27        [3] In 2011, Kilopass sent letters and emails to several Sidense customers informing them of the
     lawsuit and requesting that they obtain a license to Kilopass's patents.  Docket No. 417-18, Tadlock
28   Decl. Ex. 14.

8

**A8**

1    argued at the claim construction stage that wordlines and bitlines are interchangeable terms. *See* Docket
2    No. 113 at 6 ("[O]ne of ordinary skill in the art would understand that the current flows can be detected
3    in both the bitline and the wordline, again showing the interchangeability of the two, and with the
4    naming of 'bitline' or 'wordline' being simply a matter of perspective."). As interchangeable terms,
5    Kilopass proposed they be defined identically as "a line that connects to one terminal of each memory
6    cell in a memory array." *Id.* at 5, 6.

7         On August 31, 2011, the Court issued a claim construction order construing disputed terms from
8    the '751, '757, and '540 patents. Docket No. 147. The Court did not adopt Kilopass's proposed
9    construction for the terms "bitline" and "wordline," but largely found in its favor. The Court noted that
10   wordlines and bitlines always appeared orthogonal to one another in a memory array, and thus the Court
11   declined to "define two different terms to mean precisely the same thing when they are not identical."
12   *Id.* at 9. However, the Court limited the differences between bitlines and wordlines to their positions
13   in relation to one another: the Court defined the term "bitline/column bitline" as "a line orthogonal to
14   the row wordline that connects to a terminal of each memory cell in a memory array," and the term
15   "wordline/row wordline" as "a line orthogonal to the column bitline that connects to a terminal of each
16   memory cell in a memory array." *Id.*

17        Concurrent with this litigation, on December 7, 2010, Sidense filed with the United States Patent
18   & Trademark Office ("PTO") requests for *inter partes* reexamination of Kilopass's patents-in-suit.
19   Sidense argued to the PTO that Kilopass's '751 patent was anticipated by an earlier patent, Tanaka et
20   al. (U.S. Patent No. 5,331,181) ("Tanaka"). In Tanaka, unlike Kilopass's '751 patent but like Sidense's
21   memory cell, the doped semiconductor region is connected to a bitline. The patent examiner in the PTO
22   proceeding issued an Action Closing Prosecution and ruled that Kilopass overcame Tanaka because "it
23   is well known to one of ordinary skill in the art at the time of the invention that the bitlines and
24   wordlines have a distinct functional effect on the operation of memory devices and thus are not
25   interchangeable." *See* Docket No. 207-5, Khaliq Decl., Ex. 4 at 6 (Feb. 18, 2011 USPTO Office
26   Action). After Sidense appealed that decision to the PTO's Board of Patent Appeals and Interferences
27   (the "BPAI"), Kilopass filed a brief explicitly agreeing with the Patent Examiner's finding:

28        With respect to claims 5 and 11, the Patent Owner agrees with the Examiner that Tanaka

9

**A9**

does not show a gate formed from a column bit line. As can been seen [*sic*] in Figure 2(b) of Tanaka, the gates of the transistors are coupled to row wordlines. Therefore claims 5 and 11 are not anticipated by Tanaka.

Docket No. 192-3, Hutchins Decl. Ex. 7 at 8 (Kilopass's Jan. 6, 2012 BPAI Brief).

The position Kilopass took before the BPAI was clearly irreconcilable with its "interchangeability" position that it took before this Court. In a May 1, 2012 Order, the Court found that by taking the contrary position it did before the BPAI, Kilopass clearly and unmistakably disavowed claim scope where the gates of the transistors are connected to row wordlines.[4] *See* Docket No. 224 at 8-11 (citing *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (noting that a patentee can disavow claim scope "by clearly characterizing the invention in a way to try to overcome rejections based on prior art"); *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.")). On May 15, 2012, Kilopass filed a motion for leave to file a motion for reconsideration of the Court's order finding disavowal of claim scope. Docket No. 228. Kilopass sought reconsideration based on a supplemental statement it filed with the PTO on May 2, 2012 stating that it made an error in its statement agreeing with the PTO Examiner and that the terms bitline and wordline are interchangeable. *Id.* at 5-11. On May 24, 2012, the Court denied Kilopass's motion for leave to file a motion for reconsideration. Docket No. 235. In denying the motion, the Court stated:

> The Court finds that [Local Rule 7-9(b)(2)] does not apply where the "new material fact" is merely a party's attempt to undo a strategic position for which it has been penalized. It was in Kilopass's interest to argue that wordlines are different from bitlines in its BPAI brief; however, after that position damaged its case in this Court, Kilopass sought to reverse its position before the BPAI. Moreover, Kilopass vigorously opposed Sidense's motion for estoppel and claim disavowal that brought Kilopass's incongruous position to the attention of the Court. Nowhere in its opposition did Kilopass suggest that it made a mistake in the BPAI brief. *See* Kilopass's Opp. to Sidense's Mot. for Recon., Dkt. 207. Instead, Kilopass argued that its "position at the PTO was fully consistent with its earlier position" and that it "did not persuade the Court to adopt a claim construction position that would create a risk of inconsistent judicial rulings." *Id.* at 6-9. Only after the Court found that Kilopass adopted inconsistent positions and disavowed claim scope, did Kilopass re-characterize its BPAI position as error and file a submission with the USPTO to "correct an error made without deceptive intent." *See*

---

[4] In its briefing on this issue, Kilopass argued that its position at the PTO was fully consistent with its earlier position during claim construction and that its "positions have been grossly and purposefully mischaracterized." Docket No. 207 at 6-8.

United States District Court
For the Northern District of California

A10

dkt. 228-7. This type of gamesmanship is not the purpose for which Civil Local Rule 7-9 allows for reconsideration.

*Id.* at 5-6.

On August 16, 2012, the Court granted Sidense's motion for summary judgment of non-infringement of the patents-in-suit. Docket No. 272. In the order, the Court found that there was no genuine issue of material fact that Sidense's technology does not satisfy (1) the "row wordlines" connected to the "second doped semiconductor region" claim limitation; (2) the "first doped semiconductor region" claim limitation; and (3) the "spaced apart relationship" claim limitation. *See id.* at 7-17. With respect to the "row wordlines" connected to the "second doped semiconductor region" claim limitation, the Court noted that it was undisputed that Sidense's technology has a row wordline connected to the gate and a column bitline connected to the second doped semiconductor region, the opposite configuration of the patents-in-suit. *Id.* at 7-8. Moreover, Kilopass had disavowed claim scope for transistors with gates connected to wordlines. *Id.* at 10. In addition, the Court rejected Kilopass's attempt to introduce a new theory of infringement, defining the term bitlines as simply lines that provide higher voltage. *Id.* at 10-11. With respect to the "first doped semiconductor region" claim limitation, the Court noted that the parties agreed that Sidense's memory cell has only one doped "semiconductor region," the "second doped semiconductor region." *Id.* at 11. "The parties also agree that Sidense does not have a 'first doped semiconductor region' and thus this limitation is not literally infringed." *Id.* The Court then rejected Kilopass's argument that the STI contained in Sidense's memory cells is the equivalent of a first doped semiconductor region. First, the Court noted that Kilopass had impermissibly "amended its infringement contentions with respect to the doctrine of equivalents far past the applicable deadlines without Court approval."[5] *Id.* at 12. In its April 4, 2011 infringement contentions, Kilopass asserted the "channel stop" theory of equivalency, arguing that the function of the first doped region is to provide a channel stop and that it does this by preventing current from the channel to flow in the area of the STI. *Id.* But, on April 13, 2012, Kilopass filed its expert report on infringement by Dr. Neikirk, asserting a different equivalency theory. In the report Dr. Neikirk asserted:

---

[5] The Court noted that: "Kilopass's assertion of a new theory of equivalence is particularly inappropriate in light of evidence that Kilopass has known for many years that Sidense does not literally infringe its patents." Docket No. 272 at 13 n.8.

[T]he function of the first and second regions is clearly stated: *to geometrically delineate or define a channel region between them.* . . . The way in which each region functions to geometrically delineate or define a channel region is by being separated from each other in a cross section of the device, by being in the substrate, and by being adjacent to the gate. . . . The result produced by the two regions required by this claim limitation is to create or delineate a defined region of the device that is a channel region.

Docket No. 420-1, Durie Decl. Ex. 13 at A6070, ¶¶ 62-64. "This equivalence theory focuses on the geometry of the cell, rather than the electrical properties of the 'channel stop.'" Docket No. 272 at 13. Because Kilopass had failed to properly amend its infringement contentions to include this new theory of equivalency, summary judgment of this limitation was appropriate. *Id.* In addition, the Court rejected Kilopass's new equivalency theory on the merits. The Court found that Kilopass had provided no evidence showing that insulators are the equivalent of semiconductors. *Id.* at 14 ("The uncontroverted evidence demonstrates that there is a non-trivial difference between insulators and semiconductors."). The Court also noted that the patents-in-suit's use of a first doped semiconductor rather than an STI, renders the memory cells smaller. *Id.* This represented a non-insubstantial difference between the patents-in-suit and the accused technology, and it also meant that the accused technology did not achieve the same results as the patents-in-suit. *Id.* at 14-15.

On October 2, 2012, the Court granted Kilopass's motion to dismiss its remaining claims for false advertising, intentional interference with prospective economic relations, and unfair competition with prejudice, and the Court entered judgment in the action. Docket Nos. 327, 328. Kilopass appealed the Court's order granting Sidense's motion for summary judgment of non-infringement. Docket No. 330. On April 10, 2013, the Federal Circuit summarily affirmed the Court's order granting Sidense's motion for summary judgment. *Kilopass Tech., Inc. v. Sidense Corp.*, 501 Fed. Appx. 980 (Fed. Cir. 2013).

While that appeal was pending, the parties filed cross-motions for attorney's fees. Kilopass moved for sanctions and attorney's fees under 28 U.S.C. § 1927. Docket No. 337. Sidense moved for attorney's fees under 35 U.S.C. § 285 of the Patent Act and 15 U.S.C. § 1117(a) of the Lanham Act. Docket No. 339. On December 18, 2012, the Court denied the parties' motions for attorney's fees. Docket No. 370. With respect to Sidense's request for attorney's fees under 35 U.S.C. § 285, the Court held that "Sidense ha[d] not met its burden of establishing with 'clear and convincing evidence' that

United States District Court
For the Northern District of California

12

A12

1  Kilopass brought or maintained the prosecution of its patent infringement in bad faith." *Id.* at 5 (citing
2  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012) ("Absent litigation
3  misconduct or misconduct in securing the patent, a district court can award attorney fees under § 285
4  only if the litigation is both: (1) brought in subjective bad faith; and (2) objectively baseless.")).

5        Sidense appealed the Court's denial of attorney's fees under 35 U.S.C. § 285. Docket No. 372.
6  On December 26, 2013, the Federal Circuit vacated the Court's order denying Sidense's motion for
7  attorney's fees. *Kilopass*, 738 F.3d at 1317-18. In the order, the Federal Circuit explained that a
8  determination of whether the patentee acted in subjective bad faith must take into account the totality
9  of the circumstances and does not require a showing that the patentee had actual knowledge that its
10 claims are baseless. *See id.* at 1309-12. The Federal Circuit also explained that "[o]bjective
11 baselessness alone can create a sufficient inference of bad faith to establish exceptionality under § 285,
12 unless the circumstances as a whole show a lack of recklessness on the patentee's part." *Id.* at 1314.
13 Accordingly, the Federal Circuit remanded the action for this Court to consider "whether Kilopass's
14 doctrine of equivalents theory was objectively baseless, and then, whether the totality of the
15 circumstances demonstrates that Kilopass acted with subjective bad faith. If the district court
16 determines that the case is exceptional after applying the correct legal standards, it should then
17 determine, in its discretion, whether to award attorneys' fees under § 285." *Id.* at 1317.

18       After the case was remanded, on April 29, 2014, the Supreme Court issued its decision in *Octane
19 Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), setting forth the standard for
20 determining whether a case is "exceptional" under 35 U.S.C. § 285. By the present motion, Sidense
21 renews its motion for attorney's fees pursuant to 35 U.S.C. § 285. Docket No. 417.

22

23                              **LEGAL STANDARD**

24       "Section 285 of the Patent Act authorizes a district court to award attorney's fees in patent
25 litigation." *Octane Fitness*, 134 S. Ct. at 1752. Section 285 provides: "The court in exceptional cases
26 may award reasonable attorney fees to the prevailing party." 35 U. S. C. § 285. "When deciding
27 whether to award attorney fees under § 285, a district court engages in a two-step inquiry." *MarcTec,*
28 *LLC v. Johnson & Johnson*, 664 F.3d 907, 915 (Fed. Cir. 2012). First, the court must determine whether

United States District Court
For the Northern District of California

13

**A13**

United States District Court
For the Northern District of California

1   the prevailing party has proven that the case is exceptional. *Id.* "If the district court finds that the case
2   is exceptional, it must then determine whether an award of attorney fees is justified." *Id.* at 916 (citing
3   *Cybor Corp. v. Fas Techs. Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc)).

4          In *Octane Fitness*, the Supreme Court held that "an 'exceptional' case is simply one that stands
5   out from others with respect to the substantive strength of a party's litigating position (considering both
6   the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."
7   *Octane Fitness*, 134 S. Ct. at 1756 (stating that "exceptional" means "uncommon," "rare," or "not
8   ordinary"). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise
9   of their discretion, considering the totality of the circumstances." *Id.* In determining whether to award
10   fees, district courts may consider a nonexclusive list of factors, including frivolousness, motivation,
11   objective unreasonableness (both in the factual and legal components of the case) and the need in
12   particular circumstances to advance considerations of compensation and deterrence. *Id.* at 1756 n.6.
13   "[A] case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set
14   itself apart from mine-run cases to warrant a fee award." *Id.* at 1757. There is no precise rule or
15   formula for determining whether to award attorney's fees, but instead equitable discretion should be
16   exercised in light of the above considerations. *Id.* at 1756.

17          Entitlement to fees under § 285 must be shown by a preponderance of the evidence. *See Octane
18   Fitness*, 134 S. Ct. at 1758. A district court's determination of whether to award attorney's fees under
19   35 U.S.C. § 285 is reviewed for abuse of discretion. *Highmark Inc. v. Allcare Health Mgmt. Sys.*, 134
20   S. Ct. 1744, 1749 (2014).

21
22                                              **DISCUSSION**
23   **I.      Whether the Case is Exceptional**

24          After consideration of the totality of the circumstances in this action, the Court concludes that
25   the present action is "one that stands out from others" with respect to both the substantive strength of
26   Kilopass's litigating position and the unreasonable manner in which the case was litigated. Thus, the
27   Court, exercising its sound discretion, finds that the present action is an "exceptional" case under 35
28   U.S.C. § 285. *See Octane Fitness*, 134 S. Ct. at 1756.

1    **A.    Kilopass's Claims for Literal Infringement of the Patents-In-Suit[6]**

2        As an initial matter, the Court notes that in its infringement contentions, Kilopass asserted both

3    literal infringement and infringement under the doctrine of equivalents of the patents-in-suit. Kilopass

4    did this despite the fact that it had no reasonable basis for accusing Sidense of literal infringement. To

5    the contrary, Kilopass was advised by the Perkins counsel in 2006 that if Sidense had eliminated the first

6    doped region and replaced it with an STI, then Sidense's technology "would NOT infringe [Kilopass's]

7    claims literally." Docket No. 420-1, Durie Decl. Ex. 23 at A10600-02. By at least early 2008, Kilopass

8    was able to confirm that Sidense had in fact replaced the drain with an STI, meaning that it did not

9    literally infringe the patents-in-suit. *See id.* Ex. 24 at A10604-05. MoFo speculated that it might be able

10    to present a reasonable argument that the first doped region was literally present in Sidense's

11    technology. However, MoFo cautioned Kilopass that to properly assess the potential viability of this

12    argument it needed to engage in an additional investigation, obtain technical feedback from Kilopass,

13    and potentially obtain input from an independent expert. Docket No. 420-1, Durie Decl. Ex. 28 at

14    A11497. Kilopass instructed MoFo to stop all work before this additional investigation was performed.

15    Accordingly, Kilopass proceeded with claims for literal infringement in this action despite the fact that

16    one counsel had instructed Kilopass that there was no literal infringement and a different counsel had

17    only speculated that there may be literal infringement, but stated that further research needed to be

18    performed.[7] Indeed, the objective baselessness of Kilopass's claims for literal infringement is supported

19

20        [6] At the hearing, Kilopass argued that it is improper for the Court to consider Kilopass's assertion
21    of literal infringement of the patents-in-suit because its literal infringement claims do not serve as the
    basis for Sidense's motion for attorney's fees, and Sidense has not attempted to show that it suffered
22    any separate harm specifically due to the literal infringement claims. The Court disagrees. The
    Supreme Court has instructed that in determining whether a case is "exceptional" under § 285, a district
23    court should consider the totality of the circumstances. *Octane Fitness*, 134 S. Ct. at 1756. One of the
    circumstances in this case is that Kilopass asserted both claims for literal infringement and infringement
24    under the doctrine of equivalents. Moreover, the strength or weakness of Kilopass's claims for literal
    infringement is evidence as to whether Kilopass litigated the present action in an unreasonable manner.

25        [7] Prior to filing the lawsuit, Kilopass's CTO also provided an analysis of whether Sidense's
26    technology literally infringed the '751 patent. Docket No. 420-1, Durie Decl. Ex. 27 at A11296. Aside
    from the fact that he is not an attorney and his analysis was from "an engineer's perspective," *id.*, the
27    CTO does not appear to have concluded in his analysis that there was literal infringement. In the
    analysis, the CTO only states what his arguments concerning literal infringement would be, but does
28    not opine as to the meritoriousness of these arguments. Further, in the summary section of his analysis,
    he only opines that there is "at least equivalent" infringement of the '751 patent. *Id.*

United States District Court
For the Northern District of California

1   by the fact that by the time the action reached the summary judgment stage, Kilopass dropped its
2   assertion of literal infringement and agreed that the accused product does not literally infringe the
3   patents-in-suit because it does not possess a "first doped semiconductor region."[8]  Docket No. 272 at
4   11. The Court recognizes that valid infringement claims may be asserted under either a theory of literal
5   infringement or a theory of infringement under the doctrine of equivalents. *See Schumer v. Lab.*
6   *Computer Sys.*, 308 F.3d 1304, 1314 n.7 (Fed. Cir. 2002) (explaining that infringement may occur under
7   the doctrine of equivalents even when it has been found that there is no literal infringement). But, the
8   fact that Kilopass asserted entirely baseless claims of literal infringement in this action is evidence that
9   it litigated this action in an unreasonable manner.

10       In addition, with respect to the claim limitation requiring that the second doped region be
11  connected to a row wordline, the Court notes that Kilopass had a reasonable argument at the outset of
12  the case that this limitation was literally present in Sidense's technology.  Kilopass's argument relied
13  on it obtaining favorable constructions from the Court for the terms "wordline" and "bitline," and it
14  succeeded in doing so. *See* Docket No. 147 at 9. However, Kilopass then proceeded to take a position
15  before the BPAI that was clearly irreconcilable with the "interchangeability" position it took before this
16  Court during claim construction.[9] *See* Docket No. 192-3, Hutchins Decl. Ex. 7 at 8; Docket No. 224 at
17  8-11. In its opposition to the present motion, Kilopass argues that this statement was a mistake and was
18  the result of the fact that the protective order in this case prevented litigation counsel from coordinating
19  with reexamination counsel. Docket No. 420 at 10, 16. However, the Court has already rejected
20  Kilopass's argument that the statement to the BPAI was a mistake. In its opposition to Sidense's motion
21  for disclaimer, Kilopass did not argue that the statement was a mistake. Rather, Kilopass argued that
22  its position before the BPAI was fully consistent with its earlier position before this Court during claim
23  construction and that its "positions have been grossly and purposefully mischaracterized." Docket No.

24

25       [8] Kilopass's infringement expert, Dr. Neikerk, stated during his deposition that none of the
26  asserted claims were infringed literally. Docket No. 417-11, Tadlock Decl. Ex. 8 at 25:9-19, 25:23-26:12.

27       [9] The Court notes that in its opposition to the present motion for attorney's fees, Kilopass appears
28  to concede that the position it took before the BPAI was contrary to the position it took before this
  Court. Docket No. 420 at 10.

United States District Court
For the Northern District of California

207 at 6-8. It was only after the Court entered its order finding a disavowal of claim scope on May 1, 2012 that Kilopass began to claim that the prior statement was a mistake and attempted to correct its error before the BPAI. *See* Docket No. 228 at 5-11; Docket No. 228-7, Khaliq Decl. Ex. E. Moreover, the Court notes that Kilopass's present argument – blaming the alleged mistake on the inability of litigation counsel and reexamination counsel to coordinate with each other due to the protective order – was not contained in either Kilopass's motion for leave to file a motion for reconsideration of the Court's disclaimer order or Kilopass's reply brief in support of that motion. *See* Docket Nos. 228, 233. The present argument is brand new. Thus, Kilopass's assertion that the prior statement was a mistake resulting from the protective order in this case is simply not credible. Moreover, as the Court noted in its order denying Kilopass's motion for leave to file a motion for reconsideration, Kilopass's attempt to argue one thing to this Court, then argue a different thing to the BPAI, and then attempt to change its position before the BPAI only after it resulted in an unfavorable ruling from this Court amounts to "gamesmanship." Docket No. 235 at 6. The gamesmanship that Kilopass engaged in with respect to this claim limitation is also evidence showing that it has litigated this action in an unreasonable manner.[10]

## B.    Kilopass's Claim for Infringement of the Patents-In-Suit Under the Doctrine of Equivalents

A review of the record also demonstrates that Kilopass never had a legitimate basis for asserting that Sidense infringed the patents-in-suit under the doctrine of equivalents.

The doctrine of equivalents holds that even if an accused product does not literally infringe the asserted claims of a patent, the product may infringe if the differences between the element of the accused product at issue and the claim limitation at issue are insubstantial. *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1015-16 (Fed. Cir. 1998). Whether equivalency exists may be determined based on the "insubstantial differences" test or based on the "function-way-result" test,

---

[10] The Court also notes that at the summary judgment stage, Kilopass attempted to present a new theory of infringement with respect to this claim limitation that improperly attempted to redefine the term "bitline" and would have rendered the Court's May 1, 2012 disavowal order meaningless. Docket No. 272 at 10-11.

17

**A17**

United States District Court
For the Northern District of California

1    which asks whether the element of the accused device "'performs substantially the same function in
2    substantially the same way to obtain the same result.'" *TIP Systems, LLC v. Phillips & Brooks/Gladwin,*
3    *Inc.,* 529 F.3d 1364, 1376 (Fed. Cir. 2008) (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.,*
4    520 U.S. 17, 38-40 (1997)). "The essential inquiry is whether 'the accused product or process contain[s]
5    elements identical or equivalent to each claimed element of the patented invention[.]'" *Id.* at 1367-77.

6        The Court first notes that there is no evidence in the record showing that the Perkins counsel ever
7    engaged in any analysis to determine whether Sidense's technology infringed the patents-in-suit under
8    the doctrine of equivalents. The only conclusions that the Perkins counsel appeared to reach was that
9    Sidense's technology did not literally infringe the patents-in-suit and that Kilopass should seek a reissue
10   of the patents. *See* Docket No. 420-1, Durie Decl. Ex. 23 at A10600-02, Ex. 24 at A10604-05.
11   Therefore, the Perkins counsel did not provide Kilopass with any advice upon which it could have
12   reasonably relied to assert that Sidense infringed the patents-in-suit under the doctrine of equivalents.

13       Kilopass argues that it is entitled to rely on MoFo's infringement analysis opining that Sidense's
14   technology infringed the patents-in-suit under the doctrine of equivalents. Docket No. 420 at 21-22.
15   But, there is no evidence in the record showing that MoFo's analysis was complete at the time Kilopass
16   instructed MoFo to stop all work, nor is there any evidence that Kilopass considered MoFo's
17   preliminary infringement chart in deciding to bring suit against Sidense. *See Kilopass,* 738 F.3d at 1307.
18   Kilopass argues that there is no evidence in the record showing that MoFo did not complete its work
19   and its infringement analysis. Docket No. 420 at 7, 21-22. But, this is simply not true. That Kilopass
20   had to tell MoFo to stop working is evidence showing that, at that time, MoFo was continuing to
21   perform work and had not completed its analysis. If MoFo had finished its work, then there would have
22   been no need for Kilopass to instruct them to stop working. Further, the record shows Kilopass
23   instructed MoFo to stop work on March 27, 2008 even though MoFo had estimated that its analysis
24   would not be completed until the next day, March 28, 2008. *See* Docket No. 420-1, Durie Decl. Ex. 28
25   at A11487. Moreover, the Court notes that MoFo's billing records reflect that on March 27, 2008, the
26   day Kilopass instructed MoFo to stop working, the attorneys were "[p]repar[ing] preliminary
27   infringement analysis for Sidense's 1-1T [*sic*] fuse cell; [performing] research in support of same," and
28   performing "[r]esearch regarding application of the doctrine of equivalents to patents for integrated

United States District Court
For the Northern District of California

18

A18

United States District Court
For the Northern District of California

1    circuits." *Id.* at A11493. Therefore, the billing record shows that not only was MoFo working on its

2    infringement analysis when Kilopass instructed it to stop working, but it was performing research

3    related to the potential application of the doctrine of equivalents—a critical issue in this case.

4         Kilopass also argues that there is no evidence showing that it withheld relevant evidence from

5    MoFo. Docket No. 420 at 21. The Court disagrees. MoFo's infringement analysis does not show that

6    it took into account the statements from Mr. Peng, the lead inventor on all three patents-in-suit,

7    regarding the practical cell size difference between the patents-in-suit and Sidense's memory cells.[11]

8    *See* Docket No. 420-1, Durie Decl. Ex. 24 at A10576 (stating that the reason why Kilopass did not

9    implement Sidense's cell design "in our product, [is] because [Sidense's] split gate cell is not

10    self-aligned, so their practical cell size will be larger than our 1.5T cell."). These statements would

11    appear to be relevant to MoFo's doctrine of equivalents analysis, in determining whether there was a

12    substantial difference between the limitation in patents-in-suit and the element in the accused technology

13    and whether the relevant element of the accused technology achieved the same results as the relevant

14    limitation in the patents-in-suit. Kilopass argued at the hearing that at the time MoFo performed its

15    analysis, Kilopass and MoFo could not have known that Mr. Peng's statements about the size difference

16    between the memory cells would become an important issue years later in the litigation. The Court

17    disagrees. Both tests for determining infringement under the doctrine of equivalents revolve around the

18    differences between the claimed invention and the accused product. The "insubstantial differences" test

19    asks whether the differences between the elements at issue are insubstantial. *See Voda v. Cordis Corp.*,

20    536 F.3d 1311, 1326 (Fed. Cir. 2008). The "function-way-result" test asks does the different element

21    in the accused product perform substantially the same function in substantially the same way to obtain

22    the same results as the claimed element. *See TIP Systems*, 529 F.3d at 1376. Therefore, to allow MoFo

23    to properly perform this analysis, it should have been apprised of any potentially substantial differences

24    between the accused product and the invention disclosed in the patents-in-suit, such as the difference

25    in cell size.

26         In defense of MoFo's doctrine of equivalents analysis, Kilopass argues that there is nothing in

27

28    [11] The Court also notes that there is no evidence in the record showing that Kilopass provided MoFo with the Perkins counsel's prior analysis and opinions.

United States District Court
For the Northern District of California

1  the claims about cell size. This may be true, but there is language in the specifications distinguishing

2  and criticizing the prior art by stating that "in each of the memory cells described above, the cell size

3  is relatively large. The present invention provides a much smaller cell size, thereby allowing a higher

4  density." '751 Patent at 5:23-26; '757 Patent at 4:45-47; '540 Patent at 4:49-52. "While it is true that

5  not every advantage of the invention must appear in every claim, it would be peculiar for the claims to

6  cover prior art that suffers from precisely the same problems that the specification focuses on solving."

7  *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343-44 (Fed. Cir. 2005) (citation

8  omitted); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)

9  ("[W]e have used disclaimer to limit a claim element to a feature of the preferred embodiment when the

10  specification described that feature as a 'very important feature . . . in an aspect of the present

11  invention,' and disparaged alternatives to that feature."); *CVI/Beta Ventures v. Tura LP*, 112 F.3d 1146,

12  1160 (Fed. Cir. 1997) ("In construing claims, the problem the inventor was attempting to solve, as

13  discerned from the specification and the prosecution history, is a relevant consideration."). Kilopass

14  has never disputed the fact that the use of a "first doped semiconductor region" allows it to achieve

15  higher density by combining the first doped semiconductor regions of adjacent cells rather than using

16  STI regions. *See* Docket No. 272 at 14. As the Court noted in its order granting summary judgment of

17  non-infringement: "In the nanometer world of memory cells, a feature allowing for higher density and

18  smaller size is more than an ancillary benefit; it is one of the central purposes of the design. The use

19  of the first doped semiconductor over an STI therefore represents more than an insubstantial difference."

20  *Id.* at 15 ("the 'result' [of the first doped semiconductor region is] that it produces a higher density

21  memory array"). Kilopass also argues that Sidense is wrong and reducing cell size is not the function

22  of the first doped semiconductor region. Docket No. 420 at 18. But, this argument fails to consider that

23  the "function" of the claimed limitation is only one part of the "function-way-results" test. Even

24  assuming MoFo and Kilopass were correct and the "function" of the first doped semiconductor is to

25  provide a channel stop—not to reduce the cell size—to prevail under the "function-way-results" test,

26  Kilopass would still be required to show that the element in the accused product that performs this

27  "function" obtains substantially the same "results." Kilopass never disputed that the use of an STI rather

28  than a first doped semiconductor, *results* in a larger sized memory cell. *See* Docket No. 272 at 14.

United States District Court
For the Northern District of California

1    Moreover, the weakness of MoFo's theory of infringement is supported by the fact that by the

2  time the action reached the expert discovery stage, Kilopass and its infringement expert were unwilling

3  to rely on MoFo's "channel stop" theory of infringement and instead attempted to assert a new theory

4  of infringement under the doctrine of equivalents.[12] Kilopass argues that the evolution of its theory of

5  infringement as to the doctrine of equivalents does not show bad faith. Docket No. 420 at 23-24. The

6  Court recognizes that a party may revise its theory of infringement in an action without acting in bad

7  faith. *See Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GMBH*, 603 F.3d

8  943, 955 (Fed. Cir. 2010) (finding no bad faith where the patentee revised its theory of infringement in

9  light of the district court's claim construction ruling). But, here, Kilopass has not presented the Court

10  with any legitimate reason for why it had to change its theory of infringement so late in the litigation

11  and without following the proper procedures for seeking amendment of its contentions. Kilopass does

12  not argue that the change was necessitated by the Court's claim construction order or its disavowal order

13  or by the receipt of discovery that contained new nonpublic information about the accused technology.

14  Instead, it simply appears that Kilopass, its infringement expert, or both did not like the theory of

15  infringement that was contained in Kilopass's infringement contentions and decided to try a different

16  theory at the expert discovery stage, hoping it would be better.

17    In conclusion, it was not reasonable for Kilopass to rely on the MoFo opinion because it was not

18  complete and because Kilopass had failed to provide MoFo with all relevant facts allowing MoFo to

19  perform a proper analysis. Moreover, the opinion was never confirmed by an independent technical

20

21    [12] In its opposition, Kilopass argues that the gist or thrust of Dr. Keikirk's doctrine of equivalents
22  analysis is the same as MoFo's analysis. Docket No. 420 at 11, 23-24. The Court disagrees. The record
shows that Dr. Neikirk's theory of infringement under the doctrine of equivalents was a new theory that
23  differed from MoFo's theory of infringement. In their infringement analysis, the MoFo attorneys opined
that the function of the first doped region was to "serve[] as a channel stop to define the channel regional
24  below the gate." Docket No. 420-1, Durie Decl. at A11500. In contrast, Dr. Neikirk opined that the
function of the first doped semiconductor region is "to geometrically delineate or define a channel
25  region between [the first and second regions]." Docket No. 420-1, Durie Decl. Ex. 13 at A6070 ¶¶ 62-
64. Moreover, Dr. Neikirk stated that his infringement analysis was not based on Kilopass's
26  infringement contentions, which included MoFo's "channel stop" theory of infringement. Docket No.
417-11, Tadlock Decl. Ex. 8 at 27:3-5. Dr. Neikirk also stated that he had no opinion as to whether the
27  first doped region functions as a channel stop and that it was not part of what he believed was the
function of the first doped region, and stated that the first doped region only serves a structural function
28  and that it does not serve any particular electrical function. *See id.* at 30:11-32:13, 34:12-35:4; Docket
No. 421-3, Tadlock Decl. at 40:6-41:14.

21

A21

1  expert.[13] In addition, the opinion was objectively baseless because it did not take into account the size
2  difference between the accused technology and the patents-in-suit.

3  Kilopass also argues that it was entitled to rely on the doctrine of equivalents analysis performed
4  by its CTO, Dr. Luan. Docket No. 420 at 23. However, there is no evidence in the record showing that
5  Kilopass's CTO was an attorney or properly understood the legal requirements for proving infringement
6  under the doctrine of equivalents. Further, there is no evidence in the record showing that Kilopass's
7  CTO ever showed his analysis to counsel to confirm whether his analysis and conclusion were correct.[14]
8  *See Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1329 (Fed. Cir. 2011) (explaining that a reasonable
9  pre-suit investigation "requires *counsel* to perform an objective evaluation of the claim terms when
10 reading those terms on the accused device" (emphasis added)). Indeed, Dr. Luan noted that his
11 conclusions were from "an engineer's perspective." Docket No. 420-1, Durie Decl. Ex. 27 at A11296.
12 Moreover, as Kilopass's CTO, Dr. Luan had a stake in the outcome, and, therefore, his analysis lacked
13 objectivity. *See Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d
14 1559, 1580-81 (Fed. Cir. 1992) (finding infringement analysis was not objective where it was based in
15 part on information obtained, not from an independent expert, but from a person "who had a stake in
16 the outcome"). Kilopass notes that it did not rely on Dr. Luan's analysis alone, and it argues that its
17 reliance on Dr. Luan's analysis in addition to MoFo's analysis shows that Kilopass had non-baseless
18 claims with which it could proceed and shows that it was acting in good faith. But, there is no evidence
19 in the record showing that Dr. Luan relied on or attempted to confirm MoFo's prior analysis when he
20 performed his own analysis. Moreover, Dr. Luan's analysis differed from MoFo's prior analysis. The
21 MoFo attorneys opined that the function of the first doped region was to "serve[] as a channel stop to

22

23     [13] Kilopass asserts that the MoFo infringement analysis was later confirmed by the analysis that
   its CTO, Dr. Luan, performed. As Dr. Luan is a Kilopass employee, he is not an *independent* technical
24 expert. In addition, there is no evidence in the record showing that Dr. Luan relied on or attempted to
   confirm MoFo's prior infringement analysis when he performed his own analysis.

25     [14] Kilopass notes in its opposition that Dr. Luan stated in an email that "Mark's team [at the
   Denton law firm] is very comfortable with the reverse engineering work we did." Docket No. 42 at 8.
26 However, in that same email, Dr. Luan notes that the law firm was still in the process of analyzing the
   claims of the patents-in-suit. Docket No. 420-1, Durie Decl. Ex. 27 at A11294. There is no evidence
27 in the record showing that the law firm ever completed this analysis or evidence showing the
   conclusions of that analysis. Indeed, there is no evidence in the record showing the opinions and
28 analysis of the Denton law firm prior to the initiation of the present action.

United States District Court
For the Northern District of California

22

A22

1  define the channel regional below the gate." Docket No. 420-1, Durie Decl. At A11500. Nowhere in
2  his analysis does Dr. Luan opine that the first doped region's function is to provide a channel stop. *See*
3  Docket No. 420-1, Durie Decl. Ex. 27 at A11296.

4      In sum, during its pre-filing investigation and the present lawsuit, Kilopass relied on and
5  presented three different theories of infringement under the doctrine of equivalents: MoFo's theory, Dr.
6  Luan's theory, and Dr. Neikirk's theory. Kilopass argues that the gist of these theories is essentially the
7  same. The Court disagrees. But, even assuming they are essentially the same, all three theories were
8  objectively baseless because none of them took into account the size difference between the accused
9  technology and the claimed invention. During the litigation, Kilopass never disputed that the use of a
10  "first doped semiconductor region" allows it to achieve higher density by combining the first doped
11  semiconductor regions of adjacent cells rather than using STI regions. *See* Docket No. 272 at 14. Yet,
12  none of the infringement theories explained how it was possible that the resulting size difference could
13  be considered only an insubstantial difference in light of the patents' criticism of the prior art and Mr.
14  Peng's prior statements. In addition, none of the theories explained how the accused technology's STI
15  obtained the same results as the patents-in-suit's first doped semiconductor region in light of the
16  resulting difference in cell size. Accordingly, the Court concludes that Kilopass's claims for
17  infringement under the doctrine of equivalents were objectively baseless, and that Kilopass did not have
18  a reasonable basis for asserting that Sidense infringed the patents-in-suit under the doctrine of
19  equivalents when it filed the present action.

20

21      **C.    Conclusion**

22      In sum, Kilopass failed to conduct an adequate pre-filing investigation prior to filing the present
23  action. Its pre-filing investigation essentially consisted of getting an opinion from one counsel that there
24  was no literal infringement and getting an incomplete opinion from a different counsel as to
25  infringement under the doctrine of equivalents. The theories of infringement that Kilopass asserted
26  during the present action against Sidense were objectively baseless, and its claims for literal
27  infringement were exceptionally meritless. Moreover, Kilopass litigated the present action in an
28  unreasonable manner by failing to conduct an adequate pre-filing investigation, shifting its theories of

United States District Court
For the Northern District of California

23

**A23**

1  infringement late in the litigation and without following the proper procedures for amendment of
2  contentions, and engaging in conduct that at times amounted to gamesmanship. This is a case that
3  stands out from others with respect to the substantive strength of plaintiff's litigating position and the
4  unreasonable manner in which the case was litigated. Accordingly, based on the totality of the
5  circumstances in the present action, the Court, exercising its sound discretion, concludes that the present
6  action is an "exceptional" case under 35 U.S.C. § 285.[15] *See Octane Fitness*, 134 S. Ct. at 1756.

7

8  **II.     Whether the Court Should Award Attorney's Fees**

9          Having found that the present action is an "exceptional" case under § 285, the Court must now
10  "determine whether an award of attorney fees is justified." *MarcTec*, 664 F.3d at 916. "The decision
11  whether or not to award fees is still committed to the discretion of the trial judge, and 'even an
12  exceptional case does not require in all circumstances the award of attorney fees.'" *Modine Mfg. Co.*
13  *v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). In determining whether to award attorney's
14  fees, the trial judge may consider "the closeness of the case, the tactics of counsel, the conduct of the
15  parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as
16  between winner and loser." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed.
17  Cir. 1986).

18          As explained above, Kilopass asserted infringement claims that were objectively baseless,
19  including literal infringement claims that were particularly meritless. Kilopass relied on these baseless
20  claims to force Sidense to engage in a long and expensive patent litigation. Further, Kilopass litigated
21  the present action in an unreasonable manner, engaging in conduct that at times amounted to
22  gamesmanship. Based on these factors, the Court, exercising its sound discretion, concludes that an

23

24

25      [15] The Court notes that its conclusion that the present case is "exceptional" under § 285 is not
based on Sidense's arguments: (1) that Kilopass acted improperly by asserting patents on technology
26      that Kilopass never used; and (2) that Sidense lost customers as a result of the lawsuit. Kilopass has not
provided the Court with any authority showing that the fact that the patentee does not practice the
27      invention is relevant to the determination of whether a case is "exceptional" under § 285. Further, the
evidence presented by Sidense is insufficient to establish that it lost any current or potential customers
28      as a result of Kilopass's lawsuit. *See* Docket No. 418-3, Wania Decl. ¶¶ 2-3. In addition, the Court does
not reach any conclusions as to Kilopass's motives in filing the present action.

*(left margin)* United States District Court / For the Northern District of California

1    award of attorney's fees in the present action is appropriate.[16]

2

3                                  **CONCLUSION**

4         For the foregoing reasons, the Court GRANTS defendant's renewed motion for attorney's fees.

5    Docket No. 417. In addition, the Court sets forth the following briefing schedule on the appropriate

6    amount of attorney's fees to be awarded:

7    1.   Sidense must file its opening brief on the appropriate amount of attorney's fees by **August 29,**

8         **2014**.

9    2.   Kilopass must file its opposition brief by **September 12, 2014**.

10   3.   Sidense may file a reply brief by **September 19, 2014**.

11   4.   The Court will hold a hearing on the appropriate amount of attorney's fees on **Friday, October**

12        **17, 2014 at 9:00 a.m.**

13

14   **IT IS SO ORDERED.**

15

16   Dated: August 12, 2014

17                                                   SUSAN ILLSTON
                                                     United States District Judge

18

19

20

21

22

23

24         [16] In its opposition, Kilopass argues that the Court should decline to award attorney's fees based
     on principles of equity. Docket No. 420 at 24. Kilopass notes that the Court stated in its prior order
25   denying attorney's fees that both sides were "disingenuous and obdurate" in their litigation conduct.
     *Id.* Kilopass argues that Sidense, therefore, comes with unclean hands and may not receive an award
26   of attorney's fees under traditional principles of equity. *Id.* However, the passage cited by Kilopass was
     in reference to the parties' conduct with respect to their business tort claims. Docket No. 370 at 4. The
27   statement was unrelated to Sidense's defense of Kilopass's patent infringement claims. Sidense's
     conduct with respect to its business tort claims is not a proper basis for the denial of attorney's fees
28   under § 285.

United States District Court
For the Northern District of California

| | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KILOPASS TECHNOLOGY, INC.,

    Plaintiff,

v.

SIDENSE CORPORATION,

    Defendant.

Case No. 10-cv-02066-SI

**ORDER RE: ATTORNEYS' FEES CALCULATION**

Currently pending before the Court is Sidense's supplemental motion regarding attorneys' fees calculation. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court rules as follows.

**BACKGROUND**

The Court has provided a detailed factual background of this case in its order from August 12, 2014. Docket No. 427. Therefore, the Court limits its background discussion to the procedural history and a description of the contingency fee agreements at issue.

**I.    Procedural History**

On May 14, 2010, Kilopass filed the present action against Sidense asserting infringement of the '751 patent.[1] Docket No. 1. On June 18, 2010, Kilopass filed a first amended complaint

---

[1] In 2011, Kilopass sent letters and emails to several Sidense customers informing them of the lawsuit and requesting that they obtain a license to Kilopass's patents. Docket No. 417-18,

**A26**

1    adding allegations of infringement of the '757 and '540 patents. Docket No. 6. On October 14,
2    2010, Kilopass filed a second amended complaint. Docket No. 38. On December 13, 2010, the
3    Court granted in part and denied in part Sidense's motion to dismiss the second amended
4    complaint, leaving six causes of action in the case: three patent infringement claims asserting
5    infringement of the '751, '757, and '540 patents, one false advertisement and disparagement
6    claim, one intentional interference with prospective economic relations claim, and one unfair
7    competition claim. Docket No. 50; *see also* Docket No. 234 (Third Amended Complaint).

8        In its infringement contentions, Kilopass accused Sidense of infringing claims 1, 3, 5, 6, 9,
9    12, and 14 of the'751 patent, claims 1, 2, 5, 7, 8, 13, and 14 of the '757 patent, and claims 1, 3, 5,
10   and 6 of the '540 patent. Docket No. 420, Durie Decl. Ex. 12 at A6308. Kilopass's infringement
11   contentions included allegations of both literal infringement and infringement under the doctrine
12   of equivalents. *Id.* at A6307. With respect to the "column bitlines and row wordlines" claim
13   limitation, the contentions asserted that the accused products merely "switch[] the terms
14   'wordlines' and 'bitlines' to create an artificial distinction. Columns and rows are a matter of
15   perspective only." *Id.* at A6311. With respect to the "first and second doped semiconductor
16   region" claim limitation, the contentions asserted the "channel stop" theory of infringement that
17   was contained in Morrison & Foerster's preliminary analysis. Kilopass asserted that "the STI
18   [Shallow Trench Isolation] is the equivalent of the first doped region. The function of the first
19   doped region is to provide a channel stop. The way it functions is to prevent current from the
20   channel to flow in the area of the STI. The result is that the end of the channel is defined.
21   Sidense's STI performs substantially the same function, functions in substantially the same way,
22   and achieves the [*sic*] substantially the same result." *Id.* at A6313. Kilopass also asserted that the
23   first doped semiconductor region limitation was literally present in the accused device because the
24   device's STI "is literally a first doped region forming the channel stop." *Id.*

25       The Court held a claim construction hearing on August 1 and 2, 2011. Kilopass originally
26   argued at the claim construction stage that wordlines and bitlines are interchangeable terms. *See*

27
28   Tadlock Decl. Ex. 14.

United States District Court
Northern District of California

2

**A27**

Docket No. 113 at 6 ("[O]ne of ordinary skill in the art would understand that the current flows can be detected in both the bitline and the wordline, again showing the interchangeability of the two, and with the naming of 'bitline' or 'wordline' being simply a matter of perspective."). As interchangeable terms, Kilopass proposed they be defined identically as "a line that connects to one terminal of each memory cell in a memory array." *Id.* at 5, 6.

On August 31, 2011, the Court issued a claim construction order construing disputed terms from the '751, '757, and '540 patents. Docket No. 147. The Court did not adopt Kilopass's proposed construction for the terms "bitline" and "wordline," but largely found in its favor. The Court noted that wordlines and bitlines always appeared orthogonal to one another in a memory array, and thus the Court declined to "define two different terms to mean precisely the same thing when they are not identical." *Id.* at 9. However, the Court limited the differences between bitlines and wordlines to their positions in relation to one another: the Court defined the term "bitline/column bitline" as "a line orthogonal to the row wordline that connects to a terminal of each memory cell in a memory array," and the term "wordline/row wordline" as "a line orthogonal to the column bitline that connects to a terminal of each memory cell in a memory array." *Id.*

Concurrent with this litigation, on December 7, 2010, Sidense filed with the United States Patent & Trademark Office ("PTO") requests for *inter partes* reexamination of Kilopass's patents-in-suit. Sidense argued to the PTO that Kilopass's '751 patent was anticipated by an earlier patent, Tanaka et al. (U.S. Patent No. 5,331,181) ("Tanaka"). In Tanaka, unlike Kilopass's '751 patent but like Sidense's memory cell, the doped semiconductor region is connected to a bitline. The patent examiner in the PTO proceeding issued an Action Closing Prosecution and ruled that Kilopass overcame Tanaka because "it is well known to one of ordinary skill in the art at the time of the invention that the bitlines and wordlines have a distinct functional effect on the operation of memory devices and thus are not interchangeable." *See* Docket No. 207-5, Khaliq Decl., Ex. 4 at 6 (Feb. 18, 2011 USPTO Office Action). After Sidense appealed that decision to the PTO's Board of Patent Appeals and Interferences (the "BPAI"), Kilopass filed a brief explicitly agreeing with the Patent Examiner's finding:

United States District Court
Northern District of California

> With respect to claims 5 and 11, the Patent Owner agrees with the Examiner that
> Tanaka does not show a gate formed from a column bit line. As can been seen [*sic*]
> in Figure 2(b) of Tanaka, the gates of the transistors are coupled to row wordlines.
> Therefore claims 5 and 11 are not anticipated by Tanaka.

Docket No. 192-3, Hutchins Decl. Ex. 7 at 8 (Kilopass's Jan. 6, 2012 BPAI Brief).

The position Kilopass took before the BPAI was clearly irreconcilable with its "interchangeability" position that it took before this Court. In a May 1, 2012 Order, the Court found that by taking the contrary position it did before the BPAI, Kilopass clearly and unmistakably disavowed claim scope where the gates of the transistors are connected to row wordlines.[2] *See* Docket No. 224 at 8-11 (citing *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) (noting that a patentee can disavow claim scope "by clearly characterizing the invention in a way to try to overcome rejections based on prior art"); *Spectrum Intern., Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.")). On May 15, 2012, Kilopass filed a motion for leave to file a motion for reconsideration of the Court's order finding disavowal of claim scope. Docket No. 228. Kilopass sought reconsideration based on a supplemental statement it filed with the PTO on May 2, 2012 stating that it made an error in its statement agreeing with the PTO Examiner and that the terms bitline and wordline are interchangeable. *Id.* at 5-11. On May 24, 2012, the Court denied Kilopass's motion for leave to file a motion for reconsideration. Docket No. 235. In denying the motion, the Court stated:

> The Court finds that [Local Rule 7-9(b)(2)] does not apply where the "new material
> fact" is merely a party's attempt to undo a strategic position for which it has been
> penalized. It was in Kilopass's interest to argue that wordlines are different from
> bitlines in its BPAI brief; however, after that position damaged its case in this
> Court, Kilopass sought to reverse its position before the BPAI. Moreover, Kilopass
> vigorously opposed Sidense's motion for estoppel and claim disavowal that

---

[2] In its briefing on this issue, Kilopass argued that its position at the PTO was fully consistent with its earlier position during claim construction and that its "positions have been grossly and purposefully mischaracterized." Docket No. 207 at 6-8.

United States District Court
Northern District of California

1
2
3
4
5
6
7

> brought Kilopass's incongruous position to the attention of the Court. Nowhere in its opposition did Kilopass suggest that it made a mistake in the BPAI brief. *See* Kilopass's Opp. to Sidense's Mot. for Recon., Dkt. 207. Instead, Kilopass argued that its "position at the PTO was fully consistent with its earlier position" and that it "did not persuade the Court to adopt a claim construction position that would create a risk of inconsistent judicial rulings." *Id.* at 6-9. Only after the Court found that Kilopass adopted inconsistent positions and disavowed claim scope, did Kilopass re-characterize its BPAI position as error and file a submission with the USPTO to "correct an error made without deceptive intent." *See* dkt. 228-7. This type of gamesmanship is not the purpose for which Civil Local Rule 7-9 allows for reconsideration.

8   *Id.* at 5-6.

9   On August 16, 2012, the Court granted Sidense's motion for summary judgment of non-

10  infringement of the patents-in-suit. Docket No. 272. In the order, the Court found that there was

11  no genuine issue of material fact that Sidense's technology does not satisfy (1) the "row

12  wordlines" connected to the "second doped semiconductor region" claim limitation; (2) the "first

13  doped semiconductor region" claim limitation; and (3) the "spaced apart relationship" claim

14  limitation. *See id.* at 7-17. With respect to the "row wordlines" connected to the "second doped

15  semiconductor region" claim limitation, the Court noted that it was undisputed that Sidense's

16  technology has a row wordline connected to the gate and a column bitline connected to the second

17  doped semiconductor region, the opposite configuration of the patents-in-suit. *Id.* at 7-8.

18  Moreover, Kilopass had disavowed claim scope for transistors with gates connected to wordlines.

19  *Id.* at 10. In addition, the Court rejected Kilopass's attempt to introduce a new theory of

20  infringement, defining the term bitlines as simply lines that provide higher voltage. *Id.* at 10-11.

21  With respect to the "first doped semiconductor region" claim limitation, the Court noted that the

22  parties agreed that Sidense's memory cell has only one doped "semiconductor region," the

23  "second doped semiconductor region." *Id.* at 11. "The parties also agree that Sidense does not

24  have a 'first doped semiconductor region' and thus this limitation is not literally infringed." *Id.*

25  The Court then rejected Kilopass's argument that the STI contained in Sidense's memory cells is

26  the equivalent of a first doped semiconductor region. First, the Court noted that Kilopass had

27  impermissibly "amended its infringement contentions with respect to the doctrine of equivalents

28

United States District Court
Northern District of California

5

**A30**

United States District Court
Northern District of California

1    far past the applicable deadlines without Court approval."[3]   *Id.* at 12.   In its April 4, 2011

2    infringement contentions, Kilopass asserted the "channel stop" theory of equivalency, arguing that

3    the function of the first doped region is to provide a channel stop and that it does this by

4    preventing current from the channel to flow in the area of the STI.   *Id.*   But, on April 13, 2012,

5    Kilopass filed its expert report on infringement by Dr. Neikirk, asserting a different equivalency

6    theory.   In the report Dr. Neikirk asserted:

> [T]he function of the first and second regions is clearly stated: *to geometrically*
> *delineate or define a channel region between them. . . .* The way in which each
> region functions to geometrically delineate or define a channel region is by being
> separated from each other in a cross section of the device, by being in the substrate,
> and by being adjacent to the gate. . . . The result produced by the two regions
> required by this claim limitation is to create or delineate a defined region of the
> device that is a channel region.

13   Docket No. 420-1, Durie Decl. Ex. 13 at A6070, ¶¶ 62-64.

14        "This equivalence theory focuses on the geometry of the cell, rather than the electrical

15   properties of the 'channel stop.'"  Docket No. 272 at 13.  Because Kilopass had failed to properly

16   amend its infringement contentions to include this new theory of equivalency, summary judgment

17   of this limitation was appropriate.  *Id.*  In addition, the Court rejected Kilopass's new equivalency

18   theory on the merits.  The Court found that Kilopass had provided no evidence showing that

19   insulators are the equivalent of semiconductors.  *Id.* at 14 ("The uncontroverted evidence

20   demonstrates that there is a non-trivial difference between insulators and semiconductors.").  The

21   Court also noted that the patents-in-suit's use of a first doped semiconductor rather than an STI,

22   renders the memory cells smaller.  *Id.*  This represented a non-insubstantial difference between the

23   patents-in-suit and the accused technology, and it also meant that the accused technology did not

24   achieve the same results as the patents-in-suit.  *Id.* at 14-15.

25        On October 2, 2012, the Court granted Kilopass's motion to dismiss its remaining claims

---

27   [3] The Court noted that: "Kilopass's assertion of a new theory of equivalence is particularly
     inappropriate in light of evidence that Kilopass has known for many years that Sidense does not
28   literally infringe its patents."  Docket No. 272 at 13 n.8.

6

**A31**

1    for false advertising, intentional interference with prospective economic relations, and unfair

2    competition with prejudice, and the Court entered judgment in the action. Docket Nos. 327, 328.

3    Kilopass appealed the Court's order granting Sidense's motion for summary judgment of non-

4    infringement. Docket No. 330. On April 10, 2013, the Federal Circuit summarily affirmed the

5    Court's order granting Sidense's motion for summary judgment. *Kilopass Tech., Inc. v. Sidense*

6    *Corp.*, 501 Fed. Appx. 980 (Fed. Cir. 2013).

7         While that appeal was pending, the parties filed cross-motions for attorney's fees.

8    Kilopass moved for sanctions and attorney's fees under 28 U.S.C. § 1927. Docket No. 337.

9    Sidense moved for attorney's fees under 35 U.S.C. § 285 of the Patent Act and 15 U.S.C.

10   § 1117(a) of the Lanham Act. Docket No. 339. On December 18, 2012, the Court denied the

11   parties' motions for attorney's fees. Docket No. 370. With respect to Sidense's request for

12   attorney's fees under 35 U.S.C. § 285, the Court held that "Sidense ha[d] not met its burden of

13   establishing with 'clear and convincing evidence' that Kilopass brought or maintained the

14   prosecution of its patent infringement in bad faith." *Id.* at 5 (citing *MarcTec, LLC v. Johnson &*

15   *Johnson*, 664 F.3d 907, 916 (Fed. Cir. 2012) ("Absent litigation misconduct or misconduct in

16   securing the patent, a district court can award attorney fees under § 285 only if the litigation is

17   both: (1) brought in subjective bad faith; and (2) objectively baseless.")).

18        Sidense appealed the Court's denial of attorney's fees under 35 U.S.C. § 285. Docket No.

19   372. On December 26, 2013, the Federal Circuit vacated the Court's order denying Sidense's

20   motion for attorney's fees. *Kilopass*, 738 F.3d at 1317-18. In the order, the Federal Circuit

21   explained that a determination of whether the patentee acted in subjective bad faith must take into

22   account the totality of the circumstances and does not require a showing that the patentee had

23   actual knowledge that its claims are baseless. *See id.* at 1309-12. The Federal Circuit also

24   explained that "[o]bjective baselessness alone can create a sufficient inference of bad faith to

25   establish exceptionality under § 285, unless the circumstances as a whole show a lack of

26   recklessness on the patentee's part." *Id.* at 1314. Accordingly, the Federal Circuit remanded the

27   action for this Court to consider "whether Kilopass's doctrine of equivalents theory was

28   objectively baseless, and then, whether the totality of the circumstances demonstrates that

United States District Court
Northern District of California

7

**A32**

1    Kilopass acted with subjective bad faith.  If the district court determines that the case is
2    exceptional after applying the correct legal standards, it should then determine, in its discretion,
3    whether to award attorneys' fees under § 285."  *Id.* at 1317.

4      After the case was remanded, on April 29, 2014, the Supreme Court issued its decision in
5    *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014), setting forth the
6    standard for determining whether a case is "exceptional" under 35 U.S.C. § 285.  By the present
7    motion, Sidense renews its motion for attorney's fees pursuant to 35 U.S.C. § 285.  Docket No.
8    417.

9      On August 12, 2015, the Court deemed the case "exceptional," and found that an award of
10    attorneys' fees was warranted. Docket No. 427. In holding as such, the Court found that "the
11    present action is 'one that stands out from others' with respect to both the substantive strength of
12    Kilopass's litigating position and the unreasonable manner in which the case was litigated." *Id.* at
13    14. The Court characterized Kilopass' claims of literal infringement as "objectively baseless" and
14    "exceptionally meritless." *Id.* at 16, 23.

15      Now before the Court are the parties' briefs concerning the appropriate amount of
16    attorneys' fees to be awarded.

17

18    **II.    Description of Contingency Agreements**

19      Sidense originally agreed to a traditional fee arrangement, whereby it agreed to pay
20    Kilpatrick Townsend & Stockton's ("KTS") hourly rates, less a 10% discount for prompt payment.
21    Docket No. 435-2, Def. Mot. at 1. At the outset, the projected budget for the litigation was set at
22    $5.44 million. *Id.* On June 18, 2010, Kilopass amended its complaint to assert infringement of two
23    additional patents, and alleged four additional business tort claims, Docket No. 6, and Sidense
24    filed petitions to reexamine all three patents. Docket No. 76. As the scope of the litigation
25    expanded, Sidense sustained financial hardship as a result of the negative publicity. Docket No.
26    448-1, Wania Decl. ¶ 3. In response, Sidense decided to seek out additional investments from
27    venture capital firms, and renegotiated its fee agreement with KTS. Def. Mot. at 1.

28      The Contingent Fee Agreement ("CFA") called for Sidense to pay 50% of KTS's hours

United States District Court
Northern District of California

1  billed on a monthly basis. *Id.* at 2; Docket 448-3, Cook Decl. Exh. A. The remaining 50% would
2  be left unpaid until the end of the case, "at which time it would be tied to a performance-based
3  multiplier that would vary according to the degree of counsel's success or failure in the district
4  court." Def. Mot. at 2. The multipliers ranged from zero, for the least desirable outcome, to a
5  multiplier of 2.5 for the most desirable outcome. *Id.* at 2-3. The Court's grant of summary
6  judgment on non-infringement and dismissal of the remaining claims in Sidense's favor, Docket.
7  No. 328, triggered the 2.5x multiplier under the CFA, effectively requiring Sidense to pay 175%
8  of KTS's standard rates. Def. Mot. at 3.

9      Sidense and KTS then entered into a Supplemental Contingent Fee Agreement
10  ("Supplemental CFA") to govern the ensuing appeal. The agreement provided that:

> "(1) Kilpatrick Townsend would receive a sum equal to its legal
> services hours multiplied by its standard hourly rates "off the top" of
> any §285 proceeds received from Kilopass, plus 40% of any
> remainder; and (2) Sidense would pay Kilpatrick Townsend up to
> $200,000 for legal fees invoiced by Kilpatrick Townsend for legal
> services performed in connection with Sidense's appeal of the
> district court's denial of Sidense's §285 attorneys' fee award and
> any proceedings on remand, which would be credited as advance
> payment on Sidense's "success fee" obligation stemming from
> Kilpatrick Townsend's "complete success" in the underlying
> lawsuit."

Mot. At 3; *see also* Cook Decl. Exh. B.

## LEGAL STANDARD

The award of attorney fees under § 285 must be reasonable. The Supreme Court has said
that "[t]he 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting
jurisprudence. [It has] established a 'strong presumption' that the lodestar represents the
'reasonable' fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). Ascertaining what
constitutes a "reasonable" fee requires determining "the number of hours reasonably expended on
the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis

United States District Court
Northern District of California

9

**A34**

1    on which to make an initial estimate of the value of a lawyer's services." *Pennsylvania v.*
2    *Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986). Supreme Court "case
3    law construing what is a 'reasonable' fee applies uniformly to all" federal fee shifting statutes that
4    permit the award of reasonable fees. *Dague*, 505 U.S. at 562.

5         "In determining a reasonable hourly rate, the district court should be guided by the rate
6    prevailing in the community for similar work performed by attorneys of comparable skill,
7    experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir.
8    1986), *amended on other grounds by* 808 F.2d 1373 (9th Cir. 1987) (citing *Blum v. Stenson*, 465
9    U.S. 886, 895 n.11); *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1349 (Fed. Cir.
10   2008) ("to determine an award of attorneys' fees, a court in general should use the forum rate in
11   the lodestar calculation.").

12        In determining a reasonable amount of time spent, the Court should only award fees based
13   on "the number of hours reasonably expended on the litigation" and exclude "hours that are
14   excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 433-34
15   (1983). "There is no precise rule or formula for making these determinations." *Id.* at 436. "The
16   court necessarily has discretion in making this equitable judgment." *Id.* at 437.

17        Federal Circuit precedent controls the calculation of attorney's fees in patent cases.
18   *Bywaters v. United States*, 670 F.3d 1221, 1227-28 (Fed. Cir. 2012) ("we have consistently
19   applied our law to claims for attorneys' fees under section 285 of the Patent Act because section
20   285 relates to an area of substantive law within our exclusive jurisdiction."). However, district
21   courts have "'considerable discretion' in determining the amount of reasonable attorney fees under
22   § 285." *Homeland Housewares, LLC v. Hastie2Market, LLC*, 2013-1537, 2014 WL 4400184 (Fed.
23   Cir. Sept. 8, 2014) (internal citations omitted)

24

25                                          **DISCUSSION**

26   I.    **Partial Fee Awards**

27        Kilopass argues that Sidense should not be awarded full attorneys' fees because Congress
28   did not design § 285 as a mechanism to fully compensate a prevailing party in all aspects of the

1    litigation. Docket No. 447, Pl. Opp'n at 4. Kilopass further argues that, at most, the Court should

2    award "fees only for work directly and reasonably flowing from the conduct that formed the basis

3    for the Court's decision to find the case exceptional." *Id.* at 13.

4        In 1946, Congress amended the Patent Act to add an attorneys' fee provision. Act of

5    August 1, 1946, § 1, 60 Stat. 778, 35 U.S.C. § 70 (1946 ed.). Codified today as 35 U.S.C. § 285, it

6    provides that "[t]he court in exceptional cases may award reasonable attorney fees to the

7    prevailing party." As the statutory language suggests, the award of attorneys' fees is discretionary,

8    and a district court may decide not to award fees even in an exceptional case. *Modine Mfg. Co. v.*

9    *Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) ("The decision whether or not to award fees

10   is still committed to the discretion of the trial judge, and 'even an exceptional case does not

11   require in all circumstances the award of attorney fees.'"). Congress' policy objective in enacting

12   § 285 was two-fold: (1) to provide a deterrent to frivolous or unnecessary patent litigation, and (2)

13   to serve a compensatory purpose for parties injured by such litigation. *Raylon, LLC v. Complus*

14   *Data Innovations, Inc.*, 700 F.3d 1361, 1372-73 (Fed. Cir. 2012) (internal citations omitted)

15   ("Section 285 was enacted to address a patent-specific policy rationale, awarding fees in

16   exceptional cases in which sanctions were necessary to deter the improper bringing of clearly

17   unwarranted suits. The purpose of the statute has been described by this court as compensation to

18   the prevailing party for its monetary outlays in the prosecution or defense of the suit."); *Mathis v.*

19   *Spears*, 857 F.2d 749, 758 (Fed. Cir. 1988) (internal quotations omitted) ("Congress authorized

20   awards of attorney fees to prevailing defendants to enable the court to prevent a *gross injustice* to

21   an alleged infringer.") (emphasis in original).

22       While awarding attorneys' fees under § 285 is limited to "exceptional cases," there is

23   nothing in the legislative history or applicable case law to suggest that — once a determination

24   that a case is "exceptional" has been made — courts should balk at awarding full fees. To the

25   contrary, §285 is a means to "*make whole* a party injured by an egregious abuse of the judicial

26   process." *Mathis*, 857 F.2d at 758 (emphasis added); *see also Cent. Soya Co. v. Geo. A. Hormel &*

27   *Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983), *citing Codex Corp. v. Milgo Elec. Corp.*, 541 F. Supp.

28   1198, 1201 (D. Mass. 1982) ("The compensatory purpose of § 285 is best served if the prevailing

United States District Court
Northern District of California

11

**A36**

1   party is allowed to recover his reasonable expenses in prosecuting the entire action.").

2       However, the Federal Circuit has identified certain circumstances in which full fees may

3   not be warranted: (1) when litigation misconduct is the sole basis for deeming a case

4   "exceptional," and (2) cases where the injured party only partially prevails on the patent claims at

5   issue.[1] *Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1553-54 (Fed. Cir. 1989)

6   ("Since any injustice present in this case is based upon LKB's bad faith and misconduct during

7   litigation, the penalty imposed must in some way be related to bad faith and misconduct... [T]he

8   amount of fees awarded to the 'prevailing party' should bear some relation to the extent to which

9   that party actually prevailed."); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 831 (Fed. Cir. 1992)

10  ("when attorney fees under 35 U.S.C. § 285 are awarded solely on the basis of litigation

11  misconduct, the amount of the award must bear some relation to the extent of the misconduct.").

12      Neither of these circumstances applies to this case. While Kilopass was found to have

13  engaged in litigation misconduct, that was not the sole basis for deeming the case exceptional.

14  Sidense ultimately prevailed on every claim asserted by Kilopass, which the Court characterized

15  as "exceptionally meritless" and "objectively baseless." Docket No. 427 at 23. Sidense should be

16  compensated for all patent-related litigation expenses it would not have had to undertake, but for

17  Kilopass' misconduct. As the defendant in this case, Sidense would not have incurred any legal

18  costs were it not for Kilopass' claims of infringement. Sidense is therefore entitled to all

19  reasonable attorneys' fees arising out of the patent-related litigation. This holding fulfills § 285's

20  dual goal of deterrence and restitution.

21      Finally, the Court finds unpersuasive Kilopass' suggestion that the Court should award

22  "fees only for work directly and reasonably flowing from the conduct that formed the basis for the

23

United States District Court
Northern District of California

24      [1] Kilopass cites *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1390 (Fed.

25  Cir. 2008) for the proposition that "the award of the total amount of a fee request is unusual." Pl.
    Opp'n at 4. This snippet overlooks the *Takeda* court's full statement: "[a]lthough the award of the

26  total amount of a fee request is unusual, we have stated that such an award may be imposed and
    affirmed." *Id.* Additionally, in making this assertion the *Tadeka* court cites to *Beckman*, which

27  provides for partial fee awards only in the two limited circumstances mentioned above. In fact,
    the *Takeda* opinion affirmed the district court's award of $16,800,000, including full fees sought

28  plus expert fees assessed as a sanction.

Court's decision to find the case exceptional." Pl. Opp'n at 13. The Federal Circuit has recently rejected this precise argument:

> Sorensen argues that the district court's fee calculation was not sufficiently rooted in the conduct that the court found exceptional. The district court, Sorensen contends, should have limited the award to the costs that Homeland incurred in responding to specific acts of litigation misconduct. We decline, however, to require such granularity from the district court, particularly because it is the 'totality of the circumstances,' and not just discrete acts of litigation conduct, that justify the court's award of fees.

*Homeland Housewares, LLC v. Hastie2Market, LLC*, 2013-1537, 2014 WL 4400184 (Fed. Cir. Sept. 8, 2014).

Therefore this Court need not parse through Kilopass' actions to determine the cost associated with every discrete instance of "exceptional" conduct. Furthermore, this Court has already noted the striking dearth of merit to Kilopass' claims for both literal infringement and infringement under the doctrine of equivalents; thus, such a detailed analysis might not produce a drastically different result in this case.

## II.   The Contingency Agreement

The parties disagree over whether the terms of the CFA may be taken into account for purposes of calculating the lodestar. Kilopass argues that contingency agreements may not be considered when calculating the lodestar, and that Sidense's suggestion to the contrary is nothing more "than a transparent attempt to inflate the upper-end of its fee range in the hope that it will make $5M appear like a reasonable compromise." Pl. Opp'n at 9. Conversely, Sidense argues that since "the goal of lodestar is to determine 'the reasonable hourly rate,' that is, 'the rate a paying client would be willing to pay,' *Claudio v. Mattituck-Cutchogue Union Free Sch. Dist.*, it would be error to ignore the agreement that embodies the precise concept. 2014 WL 1514235, *13 (E.D.N.Y. Apr. 16, 2014)." Def. Mot. at 5.

The attorney-client fee arrangement can often provide valuable indication of the prevailing

United States District Court
Northern District of California

13

A38

1  reasonable rate in the community. *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) ("The presence
2  of a pre-existing fee agreement may aid in determining reasonableness."). The Federal Circuit has
3  held that a contingency fee agreement which required the client to pay the greater of the attorneys'
4  hourly rate or one-third of any damages recovered "may be taken into account in the lodestar
5  calculation." *Bywaters* 670 F.3d at 1231.   Indeed, "negotiation and payment of fees by
6  sophisticated clients are solid evidence of their reasonableness in the market." *Prospect Energy*
7  *Corp. v. Dallas Gas Partners, LP*, CIV.A. H-10-1396, 2011 WL 5864292 (S.D. Tex. Nov. 22,
8  2011) *aff'd sub nom. Dallas Gas Partners, L.P. v. Prospect Energy Corp.*, 733 F.3d 148 (5th Cir.
9  2013), *citing Bleecker Charles Co. v. 350 Bleecker St. Apartment Corp.*, 212 F. Supp. 2d 226, 230
10  (S.D.N.Y. 2002); *see also Blum v. Stenson*, 465 U.S. 886, 896, nt. 11(1984) ("the critical inquiry
11  in determining reasonableness is now generally recognized as the appropriate hourly rate. And the
12  rates charged in private representations may afford relevant comparisons.")

13       Kilopass relies heavily on *City of Burlington v. Dague*, 505 U.S. 557 (1992) to argue that
14  the Court may not take the CFA into account for purposes of calculating the lodestar.[2] Pl. Opp'n.
15  at 7. In *Dague*, the Court held that an enhancement *above* the lodestar may not be justified by the
16  risk associated with the contingency nature of the attorney fee agreement. *Id.* at 567. This is an
17  issue markedly different from the one faced by this Court, which is whether a particular hybrid
18  contingency agreement may be used in establishing a "reasonable" rate for purposes of calculating
19  the lodestar. The holding of *Dague* concerns the mischief that arises when factors purportedly
20  justifying enhancements to the lodestar rate are redundant of factors that are already subsumed in
21  the lodestar calculation. *Dague* and other cases forbid this double counting. *See Perdue v. Kenny*
22  *A. ex rel. Winn*, 559 U.S. 542, 553 (2010) ("We have noted that the lodestar figure includes most,
23  if not all, of the relevant factors constituting a 'reasonable' attorney's fee, and have held that an
24  enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation.")

25

26       [2] Kilopass also argues that the CFA is not a fee agreement at all, but is "in effect" a "loan
    from its lawyers at a usurious 150%," and criticizes Sidense's failure to "take an equity investment
27  or a more conventional loan at a much lower interest rate.".. Pl. Opp'n at 8. This hindsight
    argument is unpersuasive, raises far more questions than it answers and, if adopted, would raise
28  the specter of collateral fee litigation as extensive as the underlying patent litigation itself.

United States District Court
Northern District of California

1   (internal citations omitted). However, *Dague* does not disturb the holdings in *Blanchard*[3] and

2   *Bywaters* which tell us that fee arrangements may be used to determine the lodestar in the first

3   instance.

4        In sum, while "a contingency agreement cannot be used as a positive or negative multiplier

5   after reasonable fees have been determined . . . [t]he Court may consider a contingency fee

6   agreement when determining [a] reasonable fee to the extent it is representative of the prevailing

7   rate in the relevant community." *Fisher v. City of San Diego*, 12-CV-1268-LAB-NLS, 2013 WL

8   4401387 at * 1, nt. 1 (S.D. Cal. Aug. 14, 2013) (internal citations omitted). The fact that Sidense

9   and KTS entered into a variable-rate hybrid contingency agreement instead of a more traditional

10  contingency agreement is not a basis for holding that *Blanchard* and *Bywaters* do not apply.[4] The

11  Court may therefore consider the CFA in determining the lodestar.

12       In so holding, the Court recognizes the risk that, in the future, parties could structure

13  attorneys' fee agreements in anticipation of fee shifting litigation, such that the agreements would

14  no longer be a legitimate reflection of the prevailing rate in the community. However, that is not

15  the case here. First, while it is unclear from the record whether Sidense would have been able to

16  pay its fees under the original agreement, its decision to renegotiate its fee agreement with KTS

17  was in large part motivated by financial strain arising out of the litigation instituted by Kilopass.

18  Wania Decl. ¶ 3; Def. Mot. at 1. Second, the CFA was entered into at a time when the case law

19  governing attorneys' fee shifting under § 285 imposed a significantly higher burden on the party

20

21

---

22  [3]   While *Blanchard* holds that a private fee agreement may be used as a "factor" in
    determining reasonableness, it also stresses that a fee agreement "standing alone, is not
23  dispositive" of the reasonable rate, and furthermore, that it may not "impose an automatic ceiling"
    on the reasonable rate. *Id.* at 93.

24  [4]   The Supreme Court has recently distinguished *Dague* and its progeny from cases
25  involving hybrid fee agreements such as the one in this case. *See Perdue*, 559 U.S. at 556-57 ("An
    attorney who agrees, at the outset of the representation, to a *reduced hourly rate* in exchange for
26  the opportunity to earn a performance bonus is in a position far different from an attorney in a
    § 1988 case who is compensated at the *full prevailing rate* and then seeks a performance
27  enhancement in addition to the lodestar amount after the litigation has concluded.") (emphasis in
    original).
28

United States District Court
Northern District of California

1    requesting fees,[5] therefore making it unlikely that Sidense was confident it would ever recover its

2    fees. Third, Sidense executed two promissory notes in favor of KTS, making it financially liable

3    regardless of whether it could recover fees under § 285. Wania Decl. ¶¶ 8-9; Cook Decl., Exhs. D,

4    E. Fourth, Sidense was represented by independent counsel when negotiating the CFA with KTS,

5    allowing it to exert its bargaining power,[6] while mitigating the risk of a potential conflict of

6    interest. Wania Decl. ¶ 5. These facts persuade the Court that the CFA may be relied upon in

7    determining the "reasonable" rate. The mere fact that Sidense and KTS chose to tether the rate to

8    pre-specified litigation outcomes does not render the CFA inherently unreliable or

9    unrepresentative of the prevailing reasonable rate in this jurisdiction.

10

11   **III.    Lodestar Analysis**

12       **A.    Adequate Documentation**

13       The party seeking fees bears the initial burden of establishing the hours expended litigating

14   the case and must provide detailed time records documenting the tasks completed and the amount

15   of time spent. *Hensley v. Eckerhardt*, 461 U.S. 424, 434 (1983); *Welch v. Met. Life Ins. Co.*, 480

16   F.3d 942, 945–46 (9th Cir. 2007). "Where the documentation of hours is inadequate, the district

17   court may reduce the award accordingly." *Hensley*, 461 U.S. at 433. The district court may also

18   exclude any hours that are excessive, redundant, or otherwise unnecessary. *Id.* at 434. However,

19   the party seeking fees need not provide comprehensive documentation to prevail. *Id.* at 437 nt. 12

20   ("Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time

21   was expended. But at least counsel should identify the general subject matter of his time

22   expenditures."); *Hiken v. Dep't of Def.*, No. C 06-02812 JW, 2012 WL 3686747, at *6 (N.D. Cal.

23   Aug. 21, 2012), *quoting Ackerman v. W. Elec. Co.*, 643 F. Supp. 836, 863 (N.D. Cal. 1986) *aff'd*,

24

25       [5] *Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1382 (Fed. Cir. 2005)

26   ("Thus, the underlying improper conduct and the characterization of the case as exceptional must
     be established by clear and convincing evidence.")

27

28       [6] Sidense was able to negotiate the upper multiplier from 3x down to 2.5x. Wania Decl.
     ¶ 4.

United States District Court
Northern District of California

16

**A41**

860 F.2d 1514 (9th Cir. 1988) ("the Ninth Circuit requires only that the affidavits be sufficient to enable the court to consider all the factors necessary to determine a reasonable attorney's fee award."); *PPG Indus., Inc. v. Celanese Polymer Specialties Co.*, 840 F.2d 1565, 1570 (Fed. Cir. 1988) (holding that the trial court abused its discretion in refusing to award fees based on lack of documentation when counsel failed to keep contemporaneous time records, but furnished affidavits and hundreds of pages of corroborative business records). Furthermore, "a district court itself has experience in determining what are reasonable hours and reasonable fees, and should rely on that experience and knowledge if the documentation is considered inadequate." *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1459 (Fed. Cir. 1991) (internal citations omitted). In this district, a party seeking attorney's fees must also comply with Civil Local Rule 54-5(b) which requires, among other things, (1) "a statement of the services rendered by each person for whose services fees are claimed together with a summary of the time spent by each person," (2) "a statement describing the manner in which time records were maintained," and (3) "[a] brief description of relevant qualifications and experience and a statement of the customary hourly charges of each such person or of comparable prevailing hourly rates or other indication of value of the services."

Kilopass argues that Sidense's failure to provide "billing records" "makes it impossible" for the Court to determine what fees are associated with compensable activities, and which fees are reasonable. Pl. Opp'n. at 9. The Court disagrees and finds that Sidense has adequately documented its request for attorneys' fees. In support of its motion, Sidense has provided a detailed declaration from a co-lead attorney, two expert reports, a log of invoice and expense records, an economic report summarizing prevailing rates in the community, and publications evaluating KTS' effectiveness relative to other IP firms. The Court finds these documents – which are discussed in greater detail *infra* – are sufficient to enable the Court to evaluate all relevant factors necessary to determining the lodestar.

## B.   Reasonable Rates

"To inform and assist the court in the exercise of its discretion, the burden is on the fee

17

**A42**

United States District Court
Northern District of California

1  applicant to produce satisfactory evidence — in addition to the attorney's own affidavits — that

2  the requested rates are in line with those prevailing in the community for similar services by

3  lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S.

4  886, 896, nt. 11 (1984). In establishing the reasonable hourly rate, the court may take into account:

5  (1) the novelty and complexity of the issues; (2) the special skill and experience of counsel; (3) the

6  quality of representation; and (4) the results obtained. *Davis v. Prison Health Servs.*, C09-2629 SI,

7  2012 WL 4462520 (N.D. Cal. Sept. 25, 2012), *citing Cabrales v. County of Los Angeles*, 864 F.2d

8  1454, 1464 (9th Cir.1988); *City of Riverside v. Rivera*, 477 U.S. 561, 562 (1986) ("Where a

9  plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee, and

10  the fee award should not be reduced simply because the plaintiff failed to prevail on every

11  contention raised in the lawsuit.").

12       While Kilopass complains about Sidense's failure to provide all of its billing records, it

13  does not appear to object to the hourly rates charged by its attorneys. Nonetheless, the Court

14  reviews these rates to ensure they are reasonable.

15       KTS is a well-respected firm in the area of patent litigation. In 2004, The American

16  Lawyer published an article counting KTS among the top fifteen litigation firms the country. Cook

17  Decl. ¶ 10; *see also Id.* Exh. G. (KTS's "entire litigation department would barely fill a conference

18  room at some firms. Yet since 2002 the San Francisco-based firm has racked up more than its

19  share of impressive victories."). In 2012, BTI Consulting Group conducted a survey of corporate

20  general counsels showing KTS was among the top ten firms respondents mentioned when asked

21  which firm they considered to be the best suited to help them in the area of IP litigation. *Id.* ¶ 10;

22  *see also Id.* Exh. H. BTI also conducted a survey of over 300 in-house attorneys, and found KTS

23  to be among the top twenty IP litigation firms in 2014. *Id.* ¶ 10; *see also Id.* Exh. I. In 2014, *U.S.*

24  *News & World Report* named KTS a first tier firm in the area of IP litigation. *Id.* ¶ 10; *see also Id.*

25  Exh. K. Sidense's expert, Charles Renfrew, stated that "[he is] familiar with the quality of the

26  lawyers representing Sidense in the case. The firm is among the best of the litigation firms in the

27  San Francisco Bay Area." Docket No. 339-1, Renfrew Decl. ¶ 26.

28       In July of 2013, the American Intellectual Property Law Association (AIPLA) released an

United States District Court
Northern District of California

18

A43

1  economic survey detailing attorneys' fee rates for IP litigators in the United States, stratifying the
2  data by a number of factors including seniority, geographical location, technical specialization,
3  age, gender, and race. Cook Decl., Exh. L. The report shows that the first quartile, median and
4  third-quartile hourly rates for a partner in the San Francisco area are $500, $680, and $825,
5  respectively. *Id.* The report also shows that the first quartile, median and third-quartile hourly rates
6  for an associate in the San Francisco area are $321, $513, and $576, respectively.

7      The hourly rates of KTS attorneys are as follows[7]: Roger Cook (Sr. Litigation Partner,
8  $750-830), Barmak Sani (Prosecution Partner, $500-565), Robert Tadlock (Sr. Litigation
9  Associate, $390-520), Eric Hutchins (Sr. Litigation Associate, $370-425), Joshua Lee (Jr.
10  Litigation Associate, $275-345), Sara Giardina (Jr. Litigation Associate, $285-350), Kevin
11  O'Brien (Jr. Litigation Associate, $315-325). *See* Cook Decl. The Court has reviewed the relevant
12  biographical information for each of these individuals, which includes, among other things, their
13  years of legal experience, the nature of their responsibilities in this matter, and their professional
14  qualifications and accolades. Cook Decl. ¶¶ 39-44, 50. In all but one case the hourly rates charged
15  are below the median hourly rate for IP attorneys in the San Francisco area.[8] Given the reputation
16  of the firm, the qualifications and responsibilities of these particular attorneys, the complexity of
17  this case, the outstanding results obtained, and based upon Sidense's expert declaration,[9] Renfrew
18  Decl. ¶ 27, the Court finds these hourly rates to be "in line with those prevailing in the community
19  for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum*
20  *v.* 465 U.S. at 896, nt. 11.

21      Sidense also requests to be compensated for the work of one "Other Associate" at an

22

23      [7] Each attorney's hourly rate increased over the course of this multi-year litigation. For
24  simplicity, the Court provides a range of the highest and lowest rate charged.

25      [8] Between January and August of 2014, Roger Cook billed an amount $5 higher than the
   third quartile hourly rate; however, given that Sidense typically received a 10% discount for early
26  payment, this rate would be below the third-quartile rate on a post-discount basis.

27      [9] This expert declaration was signed on October 2, 2012 and attached to a previous motion
   for attorneys' fees. The Court therefore only relies on it to the extent its assertions remain
28  applicable to the present motion.

United States District Court
Northern District of California

1    hourly rate of $260, and one "Other Partner" at a rate of $590. Cook Decl. ¶¶ 16, 31. The Court is

2    unable to assess the qualifications or responsibilities of these individuals. The Court hereby

3    reduces Other Associate's hourly rate to $200; and reduces Other Partner's rate is reduced to $500,

4    the lowest rate billed by any partner.

5        Sidense also seeks fees for the work done by various paralegals and one patent agent, with

6    hourly rates ranging from $160 to $270. It has provided qualifications and responsibilities for

7    some, but not others. The Court finds the rates reasonable for the patent agent and paralegals for

8    whom Sidense has provided qualifications and responsibilities.[10] *Elder v. National Conference of*

9    *Bar Examiners* 2011 WL 4079623 (N.D.Cal.), at * 4, nt. 4 (finding $245/hr. to be a reasonable

10    rate for paralegals in 2011). However, for paralegals for whom it has failed to provide any

11    description of their qualifications or responsibilities, the Court reduces their hourly rate to $185,

12    the lowest rate billed by any paralegal.

13        Sidense also requests fees for various "library staff" and "litigation support persons," but

14    fails to name any of these individuals or provide a list of their responsibilities or qualifications.

15    Without this information the Court cannot determine whether their work is compensable or simply

16    overhead, and therefore declines to award fees for the services rendered by these individuals.

17        Finally, Sidense requests fees associated with its contingency bonus under the CFA.

18    However, Sidense has failed to provide evidence that the prevailing rates in the community for

19    attorneys of similar ability and expertise are variable in nature, and linked to pre-specified

20    litigation outcomes. In the absence of such evidence, the Court will not award Sidense a fee

21    approximating its "contingency bonus." *See Perdue* 559 U.S. at 556 ("As we have noted, the

22    lodestar was adopted in part because it provides a rough approximation of general billing

23    practices, and accordingly, if hourly billing becomes unusual, an alternative to the lodestar method

24    may have to be found. However, neither respondents nor their *amici* contend that that day has

25    arrived."); *Beckman Instruments, Inc. v. LKB Produkter AB*, 703 F. Supp. 408, 411 (D. Md. 1988)

26

27        [10] Those individuals are George Korsh (patent agent), Erin McKinney (primary paralegal),
28    Olufunmilayo Dumlao (secondary paralegal), Rhondda Ashby (primary paralegal), and Steven
      Bassett (primary paralegal). Cook Decl. ¶¶ 45-47, 51-52.

*aff'd in part and vacated in part on other grounds*, 892 F.2d 1547 (Fed. Cir. 1989) ("the Court will not grant the request for $75,178.75 for fees withheld. That represents an amount plaintiff's attorneys agreed to bill only if a favorable outcome were obtained. As such, it represents a bonus rather than standard fees. The Court is of the opinion 'reasonable attorney fees' should reflect standard rates, not agreed upon bonuses.").

### C.    Reasonable Hours

All KTS personnel are required to maintain contemporaneous records showing the amount of time spent on every billable task, as well as descriptions of their work. Cook Decl. ¶ 12. These records form the basis for the various tables provided by KTS which summarize the amount of time spent by its employees in this matter. *Id.* Cook also personally reviewed all invoices before they were sent to Sidense to ensure "time charged accurately reflected work performed," and that employees were performing tasks whose complexity was commensurate with their seniority. *Id.* ¶ 13. Cook was personally responsible for assigning work to KTS personnel in this matter. *Id.*

In various tables throughout the Cook Declaration, Sidense summarizes the rates charged and hours billed of every KTS employee, for each stage of the litigation including: (1) pre-judgment (May 2010 to October 2012), (2) motion for attorneys' fees (October 2012 to December 2012), (3) appeal to the Federal Circuit (October 2012 to April 2013), (4) appeal from denial of attorneys' fees, and (5) renewed motion for attorneys' fees on remand (January 2014 to August 2014). *Id.* ¶¶ 16-31.

Sidense requests compensation for 12,453 "adjusted hours" of services rendered. *Id.* ¶ 33. The gross hours were adjusted downward by thousands of hours to account for a number of factors. Sidense excluded all hours spent on non-patent related issues (1,588 hours or $498,522.13 in fees) *Id.* at ¶¶ 17, 21. Sidense also removed time billed by partners other than those discussed above to "remove any question that this time might have been duplicative of charges by [Roger Cook]... or Barmak Sani" ($72,000 in fees or approximately 110 hours) *Id.* ¶ 18. All hours billed representing Sidense customers who were served with subpoenas by Kilopass were deducted ($70,000 in fees or approximately 223 hours) *Id.* ¶ 20. All hours billed for "time spent dealing

1    with Kilopass' marketplace campaign of misinformation" and for some Sidense motions that were

2    denied were deducted ($325,000 in fees). *Id.* ¶ 19. Sidense also removed all hours associated with

3    the 10% discount it typically received for prompt payment ($226,958.95 or 630.4 hours). *Id.* ¶¶ 17,

4    24, 28-31.

5          The Court finds that Sidense has made a "a good faith effort to exclude from [its] fee

6    request hours that are excessive, redundant, or otherwise unnecessary." *Hensley* 461 U.S. at 434.

7    The Court also finds that the total number of adjusted hours billed reflects only work performed

8    on the patent litigation in this case. *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem.*

9    *Corp.*, 407 F.2d 288, 297 (9th Cir. 1969) (internal citation omitted) ("The authority to award

10    attorney's fees found in [§ 285] is limited to the patent side of the case. If an action combines

11    patent and nonpatent claims, no award of fees pursuant to section 285 can be allowed for litigating

12    the nonpatent issues."). Upon reviewing the invoices and summary tables, and taking into account

13    the considerable motion practice and discovery necessitated to litigate this case, the Court finds

14    that the 12,453 hours expended were indeed reasonable. Therefore, after making the deductions

15    discussed above (see B. Reasonable Rates, *supra*), the Court awards Sidense attorneys' fees

16    totaling $5,315,315.01. [11]

17          Sidense urges the Court that it is entitled to an enhancement to the lodestar rate to account

18    for the actual costs and fees incurred under the CFA. It is true that once the lodestar has been

19    calculated, courts may adjust it based on twelve factors outlined in *Johnson v. Georgia Highway*

20    *Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). [12] *Bywaters* 670 F.3d at 1229-30. However,

21

22        [11] According to a 2013 AIPLA survey, the first quartile, median, and third quartile
litigation fees (inclusive of all costs and expenses) in IP cases in San Francisco with a total amount

23    at stake of over $25 million are $4 million, $5.25 million, and $9.5 million, respectively. Cook
Decl. Exh. L. Sidense asserts that approximately $60 million was at stake in this case. Def. Mot. at

24    6; Cook Decl. Exh. M. Therefore this award is in line with similar cases in this jurisdiction.

25        [12] These factors are: (1) the time and labor required to represent the client or clients; (2)
the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal

26    services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee
charged for those services in the relevant community; (6) whether the fee is fixed or contingent;

27    (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the
results obtained; (9) the experience, reputation, and ability of the lawyer; (10) the undesirability of

28    the case; (11) the nature and length of the professional relationship with the client; and (12)
awards in similar cases.

United States District Court
Northern District of California

1    we are told that such adjustments should take place "in only 'rare' and 'exceptional' cases." *Id.,*

2    *citing Perdue* 559 U.S. at 552. The Court finds that there are no such circumstances present in this

3    case, as the lodestar fully accounts for all factors relevant to determining a reasonable fee. The

4    fact that Sidense chose -- or was forced to -- to adopt a high-risk-high-return fee arrangement

5    midway through the litigation is not a proper basis to make an enhancement to the lodestar. *See*

6    *Dague* 505 U.S. at 565 ("An attorney operating on a contingency-fee basis pools the risks

7    presented by his various cases: cases that turn out to be successful pay for the time he gambled on

8    those that did not. To award a contingency enhancement under a fee-shifting statute would in

9    effect pay for the attorney's time (or anticipated time) in cases where his client does not prevail.").

10

11        **D. Costs**

12        Sidense seeks reimbursement for a number of nontaxable costs pursuant to Rule 54. A

13    party seeking to recover costs and expenses need not document its request with "page-by-page

14    precision, [however] a bill of costs must represent a calculation that is reasonably accurate under

15    the circumstances." *Summit Tech., Inc. v. Nidek Co.*, 435 F.3d 1371, 1380 (Fed. Cir. 2006).

16    Sidense has provided totals of each type of cost for which it seeks reimbursement, and has

17    provided a list of itemized invoices for costs incurred. Cook Decl. Exh. F.

18        The Court awards Sidense the following costs, which the Court deems reasonable[13]:

19    online legal research ($125,131.03), travel and lodging ($15,597.37), e-discovery ($59,778.32),

20    document delivery ($6,796.64), distance telephone charges ($497.91), patent searching services

21    ($10,334.51), court transcripts ($798.11), and subpoena service vendors ($1,696.54). Cook Decl.

22    ¶¶ 58, 62, *see also Id.* Exh. F.

23        In the absence of fraud or abuse, a court may not award expert fees above the 28 U.S.C

24    § 1821 statutory cap. *See Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 378-79

25    (Fed. Cir. 1994). Therefore, the Court declines to award Sidense its requested expert fees of

26

27        [13] KTS did not bill Sidense for various "internal expenses," such as the cost of in-house
28    photocopies, and therefore does not request such costs. Cook Decl. ¶ 60.

United States District Court
Northern District of California

23

**A48**

1    $434,853.56. Cook Decl. ¶ 55. The Court also declines to award Sidense $8,216.04 in foreign

2    translation service costs, as it is unclear how such costs were necessary to the litigation of this

3    matter. *Id.* ¶ 58.

### E. Other Considerations

Kilopass, which instituted this action with an eye toward "tak[ing] Sidense out," Docket No. 417-6 Tadlock Decl. Exh. 3., now argues, without even a wisp of irony, that the risk of bankruptcy entitles it to a reduced fee liability. Pl. Opp'n at 18 ("an award of Sidense's request would bankrupt Kilopass."). "In applying the lodestar method, a court may also take into account the ability to pay any sanction as a relevant factor in determining a reasonable sum for an award of attorney's fees." Skenyon, Marchese & Land, *Patent Damages Law and Practice* § 4:35. In *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 208 F.3d 981, 988 (Fed. Cir. 2000), the Federal Circuit acknowledged that a district court may take into account a party's ability to pay when calculating the appropriate fee amount. In that case, the court's decision to reduce the award was based on detailed, itemized financial information, not simply gross revenue and cost figures.

Here, Kilopass' CEO has declared that Kilopass "has been essentially cash-flow neutral" over the past five years, provided some very high level financial data showing its cash on hand, characterized the semi-conductor sector as highly competitive, and described difficulties with raising venture capital. Cheng Decl. ¶¶ 3-4, 6-7. Remarkably, Mr. Cheng contends only that a fee award in excess of $4 million "*may* lead customers to terminate contracts with Kilopass." *Id.* at ¶ 16 (emphasis added). He does not contend that it would, or even could, result in bankruptcy as Kilopass' opposition brief asserts. Taken together, these facts are too speculative to merit a diminution in fees. Furthermore, capping a litigant's § 285 liability at the value that it can comfortably pay comes close to effacing the statute's distinct purpose as a deterrent to frivolous litigation.[14]

---

[14] In a recently submitted supplemental declaration, filed on January 14, 2015, Mr. Cheng has provided an updated financial outlook for Kilopass wherein he states his belief that "Kilopass has sufficient funds to be able to satisfy a judgment for attorneys' fees." Docket No. 460.

United States District Court
Northern District of California

24

**A49**

1    Similarly, Kilopass' contention that a large fee award would threaten national security is

2    based on a speculative and attenuated causal chain of events whereby Kilopass (a) would go

3    bankrupt, (b) it would no longer be able to fulfill contracts with defense contractors, (c) these

4    contractors would not be able to find adequate substitutes, and (d) this would in some way —

5    which Kilopass has failed to articulate — result in harm to our nation's safety. Pl. Opp'n at 19. The

6    Court is not persuaded.

7

8                                    **CONCLUSION**

9    The Court awards Sidense attorneys' fees in the amount of $5,315,315.01, and costs in the

10   amount of $220,630.53.

11

12   **IT IS SO ORDERED.**

13   Dated: March 11, 2015

14

15                                                  SUSAN ILLSTON
                                                    United States District Judge

# CERTIFICATE OF SERVICE

I, Jennifer Posada, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

I am an employee at Durie Tangri LLP, Counsel for Plaintiff-Appellant. I have retained Counsel Press to print this document.

On July 28, 2015, I electronically filed the foregoing **Brief of Plaintiff-Appellant Kilopass Technology, Inc. (confidential and non-confidential versions)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Roger L. Cook (Principal Counsel)
Sara B. Giardina
Kevin J. O'Brien
KILPATRICK TOWNSEND &
STOCKTON LLP
Eighth Floor, Two Embarcadero Center
San Francisco, CA  94111
415 576 0200
rcook@kilpatricktownsend.com
sgiardina@kilpatricktownsend.com
kobrien@kilpatricktownsend.com

Joshua H. Lee
KILPATRICK    TOWNSEND
& STOCKTON LLP
1100 Peachtree Street, NE
Suite 2800
Atlanta, GA 30309
404-815-6500
jlee@kilpatricktownsend.com

Additionally on this date, pursuant to the agreement of the parties, the confidential copy will be emailed to the above counsel and paper copies will be mailed to the above principal counsel by Counsel Press on July 29, 2015.

Upon acceptance by the Court of the e-filed document, six paper copies of the confidential version will be filed with the Court within the time provided in the Court's rules.

Dated: July 28, 2015

*/s/ Jennifer Posada*

Jennifer Posada
Legal Secretary, Durie Tangri LLP

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 13,222 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 point font.

Dated:  July 28, 2015                      DURIE TANGRI LLP


                                      By:   */s/ Daralyn J. Durie*
                                            Daralyn J. Durie

                                            *Counsel for Plaintiff-Appellant*
                                            *Kilopass Technology, Inc.*