**2015-1506, -1543**

# United States Court of Appeals
# for the Federal Circuit

KILOPASS TECHNOLOGY, INC.,

*Plaintiff-Appellant,*

v.

SIDENSE CORPORATION,

*Defendant-Cross-Appellant.*

*Appeal from the United States District Court for the Northern District of California in Case No. 3:10-cv-02066-SI, Judge Susan Illston*

**REPLY AND CROSS APPEAL RESPONSE OF PLAINTIFF APPELLANT KILOPASS TECHNOLOGY, INC.**

DURIE TANGRI LLP
DARALYN J. DURIE
ddurie@durietangri.com
MARK A. LEMLEY
mlemley@durietangri.com
TIMOTHY C. SAULSBURY
tsaulsbury@durietangri.com
ZAC A. COX
zcox@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:    415-362-6666

October 26, 2015

*Counsel for Plaintiff-Appellant Kilopass Technology, Inc.*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4(a)(1) and Federal Rule of Appellate

Procedure 26.1, counsel for Plaintiff-Appellant Kilopass Technology, Inc. certifies

the following:

1.     The full name of every party represented by us is:

Kilopass Technology, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Kilopass Technology, Inc.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:

None.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

Dentons US LLP, Greenberg Traurig LLP, LiLaw Inc.: Mark L. Hogge, Shailendra K. Maheshwari, Jimmy Shin, Andrew H. Blair, Rachel Repka, Imran A. Khaliq, James A. Klenk, David Perez, J. James Li, Matthew Larson, Qian Huang.

Durie Tangri LLP: Daralyn J. Durie, Mark A. Lemley, Eugene Novikov, Alex J. Feerst, Timothy C. Saulsbury, Zac A. Cox

DATED:  October 26, 2015          DURIE TANGRI LLP


                                  By:  */s/ Daralyn J. Durie*
                                       Daralyn J. Durie

                                       *Counsel for Plaintiff-Appellant*
                                       *Kilopass Technology, Inc.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ........................................................................i

TABLE OF CONTENTS..................................................................................i

TABLE OF AUTHORITIES ......................................................................... iii

TABLE OF ABBREVIATIONS AND CONVENTIONS ...................................v

STATEMENT OF THE ISSUES OF SIDENSE'S CROSS-APPEAL .................1

SUMMARY OF THE ARGUMENT ...............................................................2

REPLY ARGUMENT ON KILOPASS'S APPEAL ...........................................8

     I.     KILOPASS'S DOCTRINE OF EQUIVALENTS
            ARGUMENT WAS NOT BASELESS .........................................8

          A.     The District Court's Legally Erroneous Analysis................8

          B.     Sidense's Resort To Extrinsic Evidence Fails In
                Any Event ........................................................................17

          C.     Sidense's Resort to "Common Sense" Fails ......................22

     II.     THE DISTRICT COURT'S DOCTRINE OF
            EQUIVALENTS ERRORS INFECT ITS PRESUIT
            INVESTIGATION FINDINGS......................................................23

     III.     REMAND IS NECESSARY IF THE DISTRICT
            COURT'S DOCTRINE OF EQUIVALENTS
            ANALYSIS IS REJECTED .........................................................25

ARGUMENT ON SIDENSE'S CROSS APPEAL ...........................................29

     I.     STATEMENT OF THE FACTS .................................................29

     II.     STANDARD OF REVIEW .........................................................31

     III.     SIDENSE'S CROSS APPEAL CONTRAVENES

DECADES OF SUPREME COURT PRECEDENT ...................31

A.     The Legal Standard for Determining Fee Awards.............32

B.     The District Court Properly Calculated the "Reasonable Rate"; Sidense's Cross Appeal Rests On A Misreading Of *Bywaters* ...........................................34

IV.     SIDENSE'S REMAINING ARGUMENTS FAIL .....................41

CONCLUSION ................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amstar Corp. v. Envirotech Corp.*,
  730 F.2d 1476 (Fed. Cir. 1984) ..........................................................................21

*AquaTex Indus., Inc. v. Techniche Solutions*,
  479 F3d 1320 (Fed. Cir. 2007) .................................................................... passim

*Beckman Instruments, Inc. v. LKB Produkter AB*,
  703 F. Supp. 408 (D. Md. 1988) .................................................................. 41, 42

*Blanchard v. Bergeron*,
  489 U.S. 87 (1989) ...................................................................................... passim

*Blum v. Stenson*,
  465 U.S. 886 n.11 (1984) ....................................................................... 32, 33, 36

*Bus. Objects, S.A. v. Microstrategy, Inc.*,
  393 F.3d 1366 (Fed. Cir. 2005) .................................................................. 11, 12

*Bywaters v. United States*,
  670 F.3d 1221 ............................................................................................. passim

*City of Burlington v. Dague*,
  505 U.S. 557 (1992) .........................................................................................32

*Fox v. Vice*,
  131 S. Ct. 2205 (2011) .......................................................................... 6, 26, 27

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ................................................................................. 31, 44

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  134 S. Ct. 1744 n.2 ...........................................................................................16

*Homeland Housewares, LLC v. Sorensen Research & Dev. Trust*,
  581 Fed. App'x 877 (Fed. Cir. 2014) .................................................................31

*Johnson v. Georgia Highway Express, Inc.*,
488 F.2d 714 (5th Cir. 1974) ...............................................................39

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999) .................................................... 10, 16

*MarcTec, LLC v. Johnson & Johnson*,
664 F.3d 907 (Fed. Cir. 2012) ............................................................44

*Marré v. United States*,
38 F.3d 823 (5th Cir. 1994) ................................................................33

*Mathis v. Spears*,
857 F.2d 749 (Fed. Cir. 1988) ................................................ 27, 43, 44

*Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*,
726 F.3d. 1359 (Fed. Cir. 2013) .........................................................27

*Perdue v. Kenny A.*,
559 U.S. 542 (2010) ............................................................... passim

*Special Devices v. OEA, Inc.*,
269 F.3d 1340 (Fed. Cir. 2001) .........................................................26

*Teva Pharmaceuticals USA., Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015) .........................................................................15

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
141 F.3d 1084 (Fed. Cir. 1998) .........................................................10

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
520 U.S. 17 (1997) ........................................................ 9, 10, 11, 15

**Statutes**

35 U.S.C. § 285 ............................................................... passim

# TABLE OF ABBREVIATIONS AND CONVENTIONS

| | |
|---|---|
| Kilopass | Kilopass Technology, Inc. |
| Sidense | Sidense Corporation |
| Antitrust Action | *Sidense Corporation v. Kilopass Technology, Inc.*, Case No. 14-02238-SI (N.D. Cal.) (filed May 14, 2014) |
| '751 patent or '751 | U.S. Patent No. 6,940,751 |
| '757 patent or '757 | U.S. Patent No. 6,777,757 |
| '540 patent or '540 | U.S. Patent No. 6,856,540 |
| Kilopass Patents | U.S. Patent Nos. 6,940,751, 6,777,757, and 6,856,540 |
| Dentons | Dentons (f/k/a SNR Denton) |
| Kilpatrick | Kilpatrick Townsend & Stockton LLP |
| MoFo | Morrison & Foerster LLP |
| Initial Brief or Initial Br. | Brief of Plaintiff Appellant Kilopass Technology, Inc. filed Jul. 28, 2015 (D.I. 30) |
| Sidense Brief or Sidense Br. | Brief of Defendant-Cross-Appellant Sidense Corporation filed Sep. 11, 2015 (D.I. 35) |
| STI | Shallow Trench Isolation |

**STATEMENT OF THE ISSUES OF SIDENSE'S CROSS APPEAL**

1.      Did the district court abuse its "considerable discretion" in calculating the fee award when it set fees in an amount equal to the product of Kilpatrick's reasonable hours times its standard hourly rates, as the Supreme Court's lodestar jurisprudence requires, and declined to award Sidense the contingency bonus contemplated by its fee agreement with counsel where Sidense provided no evidence showing that its fee agreement was representative of prevailing community rates?

## SUMMARY OF THE ARGUMENT

Sidense does not seriously contest the legal errors identified in Kilopass's opening brief.  In concluding that Kilopass's infringement action was objectively baseless, the district court erred as a matter of law in finding that an STI could not be equivalent to a first doped semiconductor region if it did not further the size benefit the patent attributes to other elements of the invention.  The district court also erred insofar as it relied on extrinsic evidence to identify the result of the first doped semiconductor region.  Sidense does not attempt to defend either of these determinations as legally correct.

Instead, Sidense attempts to characterize the district court's determinations as a "factual finding" subject to clear error review.  Specifically, Sidense claims that the district court made a "finding[] of fact" that the "cell size reduction of the patent is a function of the first doped semiconductor region. . . ."  Sidense Br. at 39-40.  The district court made no such factual finding.  Nor did the district court look to the asserted patents for a disclosure linking the size benefit to the first doped semiconductor region, as this Court requires.  Had it done so, it would have found that the very passage of the patent specification upon which it relied for the proposition that the benefit of the invention is a smaller cell size also distinguishes the invention on that basis from prior art that included both first and second doped semiconductor regions.  Thus, although Sidense contends that "the invention of the

patent" is "the use of a first doped semiconductor region," Sidense Brief at 3, the patent itself acknowledges that the use of a first doped semiconductor region is found in the prior art. Sidense simply ignores the intrinsic evidence on this point: the benefit of a small cell size cannot be attributed to the use of a "first doped semiconductor region" when the patent asserts that the invention achieves that benefit relative to prior art that also had that precise feature. Because the identification of the function, way, or result of a claim element must be based "solely" on the intrinsic record, and because the only intrinsic evidence identified by Sidense and the district court demonstrates conclusively that the result of the first doped semiconductor region *cannot* be a reduction in cell size, this should end the inquiry. *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F3d 1320, 1328 (Fed. Cir. 2007).

The district court also erred by conflating the "result" of the first doped semiconductor region in the claims with all possible results flowing from the use of a first doped semiconductor region. The fact that it might be possible to replace a first doped semiconductor region with something larger does not mean that the "function" of that region in the context of the claims is to reduce cell size. (To the extent that it is likewise possible to replace the first doped semiconductor region with something smaller, could its function be both to decrease and increase cell size at the same time?) Here, the claims are express that the function of the "first

and second doped semiconductor regions" is "to define a channel region therebetween and under [the memory cell's] gate[.]" *See, e.g.*, A117 col. 10 ll. 40-44 ('757 Patent, Claim 1).  The district court made no effort to link cell size to that function of the first doped semiconductor region.  Instead, the district court concluded that even if the function of the first doped semiconductor region is to provide a channel stop, "Kilopass never disputed that the use of an STI rather than a first doped semiconductor region *results* in a larger sized memory cell."  A20.  But, even if the use of an STI results in a larger sized cell, it does not follow that the result of the first doped semiconductor region in the claims has anything to do with the size of the cell.  The inventor testimony cited by the district court does not support the proposition that the result of the first doped semiconductor region in the claims is to reduce cell size and, in any event, any reliance on that extrinsic evidence to define the function of the first doped semiconductor region is itself legal error.

The district court's legal errors form the sole predicate for its finding that Kilopass's infringement action was objectively baseless at its inception.[1]  Remand

---

[1] Sidense observes at length that Kilopass does not challenge the district court's findings with respect to Kilopass's literal infringement case and disclaimer based on proceedings in the patent office.  Kilopass should not be penalized for streamlining this appeal.  The district court's finding that the case was objectively baseless at its inception turned **solely** on its conclusion with respect to the result of

is thus required if this Court rejects the district court's doctrine of equivalents analysis. Sidense's arguments against remand essentially presume that the doctrine of equivalents baselessness finding remains intact, noting that "the District Court explicitly found that full fees were warranted in view of the 'striking dearth of merit to Kilopass's claims for **both** literal infringement and infringement under the doctrine of equivalents."[2] Sidense Br. at 49. Remand is thus required if this Court concludes that the district court's finding of objective baselessness with respect to the doctrine of equivalents argument was premised on legal error so that the district court may assess what fee award, if any, would be warranted based on the assertion of literal infringement and subsequent events in the litigation.[3] At a minimum, Kilopass's assertion that the function and result of the first doped semiconductor region was not to make the cell size smaller, particularly when the patent

---

the first doped semiconductor element, and that is the finding that Sidense hopes to leverage in its sham litigation antitrust lawsuit. *Sidense Corp. v. Kilopass Tech., Inc.*, No. 3:14-cv-02238 SI (N.D. Cal. May 14, 2014).

[2] Emphasis in quotations supplied unless otherwise noted.

[3] Sidense does not deny that, if this Court rejects the district court's finding of objective baselessness with respect to Kilopass's doctrine of equivalents arguments, remand is required so that the district court may determine whether the remaining circumstances underlying its original "exceptionality" finding (*i.e.*, Kilopass's assertion of literal infringement and subsequent events in the litigation) could support an "exceptionality" finding. *See* Sidense Br. at 35-50. Because the district court based its exceptionality finding on the "totality of the circumstances," it did not determine whether any of the individual circumstances, standing alone, would warrant an exceptional case finding. *See* A23-24.

specification noted that the invention provided a smaller cell size relative to prior art that also included a first doped semiconductor region, was not objectively unreasonable and does not support an award of sanctions. Even if this Court were to decline to vacate the exceptionality finding, *Fox v. Vice* requires that the district court deduct from the $5.5 million sanction those fees that "would have been incurred in the absence of the frivolous allegation." 131 S. Ct. 2205, 2216 (2011).

Not content in the district court's $5.5 million sanction, Sidense has cross appealed and seeks over $9 million in fees and costs based on a contingent fee agreement with its counsel. Straining to create the appearance of legal error, Sidense contends that the district court "ignor[ed]" Sidense's actual fee agreement with counsel and thereby violated a supposed bright line rule established by this Court in *Bywaters*, which, according to Sidense, requires "incorporation of the fee agreement" into the lodestar calculus. Sidense Br. at 57-61. As a threshold matter, Sidense's assertion that the district court "ignored" the fee agreement is flatly inaccurate. The district court devoted an entire section of its opinion, spanning three full pages, to whether it may consider the agreement, and concluded that it could. In any event, nothing in *Bywaters* supports Sidense's contention that a district court must in all cases give controlling effect to a party's fee agreement. Rather, all *Bywaters* requires is that, *if* the district court is to consider the fee agreement, it must do so when determining the "reasonable rate," rather than using

the fee agreement to enhance or reduce the lodestar after the fact. Nor could *Bywaters* have held that district courts must give binding effect to a contingent fee agreement because this Court could not have overruled the Supreme Court's jurisprudence requiring an award of an ***objectively*** reasonable fee based on the rates an attorney in the community would have received had she billed by the hour in a comparable case. Because the district court considered Sidense's contingency arrangement with its counsel, and properly applied the approach required by this Court and the Supreme Court, Sidense's cross appeal should be rejected.

**REPLY ARGUMENT ON KILOPASS'S APPEAL**

## I.  KILOPASS'S DOCTRINE OF EQUIVALENTS ARGUMENT WAS NOT BASELESS

Although Kilopass need not demonstrate that the district court's doctrine of equivalents analysis constituted reversible error—it need only demonstrate that its arguments to the contrary were not so without merit as to render its claim objectively baseless—the district court's legal errors demonstrate conclusively why its $5.5 million sanction cannot stand.

### A.    The District Court's Legally Erroneous Analysis

The district court committed legal error in requiring that the first doped semiconductor region element further the size benefit of the overall invention without analyzing whether that benefit actually corresponds to function of the element in the context of the claims.  Sidense does not attempt to justify this failure.  Nor does Sidense attempt to defend the district court's independent error of relying on extrinsic evidence in its identification of the "result" of the first doped semiconductor region.

Instead, Sidense's only response on the merits of the district court's doctrine of equivalents analysis is to try to characterize these errors as a factual finding subject to deferential review.  According to Sidense, the district court's doctrine of equivalents analysis turned on the underlying "finding[] of fact" that the "cell size reduction of the patent is a function of the first doped semiconductor region. . . ."

8

Sidense Br. at 39-40.  The problem with Sidense's characterization, however, is that the district court made no such finding and, in fact, **_declined_** to determine the function of that claim element.  Specifically, in response to Kilopass's argument that reducing cell size is not the function of the first doped semiconductor region, the district court concluded that it **_need not_** decide between the parties' proposed functions because, regardless of the element's function, "the use of an STI rather than a first doped semiconductor[] **_results_** in a larger sized memory cell."  A20.  Because the district court expressly avoided the very determination on which Sidense seeks clear error review, Sidense's attempt to characterize the district court's errors as fact finding fails.

Instead, by jumping directly to the "result" element of the function, way, result inquiry—without any analysis of the purpose of the first doped semiconductor region in the context of the claims—the district court effectively applied a rule that, if an accused infringer can identify **_any_** result of the claim element that is not matched by the accused equivalent, there can be no infringement.  That is not the law.

To the contrary, it is axiomatic that the doctrine of equivalents "does not require complete identity for every purpose and in every respect."  _Warner-Jenkinson Co. v. Hilton Davis Chem. Co_., 520 U.S. 17, 25 (1997) (internal quotations omitted).  Rather, the focus of the equivalents inquiry is on the specific

"role played" by the claim element in the context of the invention. *Id*. at 40. Accordingly, "the inquiry as to whether a substitute element matches the function, way, and result of the claimed element" requires "[a]n analysis of the role played by [the] element in the context of the specific patent claim. . . ." *Id*. In this way, the doctrine places a meaningful limit on the range of permissible equivalents: "where the patent document expressly identifies a role for a claim limitation, the doctrine of equivalents cannot be used to capture subject matter that does not substantially fulfill that role." *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1367 (Fed. Cir. 1999) (citing *Warner-Jenkinson*, 520 U.S. at 40). This limitation[] on the doctrine of equivalents [is a] question[] of law." *Id.*

Because the inquiry is directed to the "role" of the element "in the context of the specific claim language," whether "an explicit function has been identified with a claim limitation" turns on an "examination of the claim and the explanation of it found in the written description. . . ." *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1090 (Fed. Cir. 1998). Significantly, the doctrine of equivalents is not concerned with *every* function a claim element may be capable of. Rather, only where "a claim limitation *must* play a role in the context of the specific claim language" does that role factor into the doctrine of equivalents analysis. *Id*. at 1090. Thus, in determining the function of a claim element, courts must take care to avoid assigning an attribute of the broader invention to the claim

element in question absent clear disclosure in the intrinsic record linking that specific function to the claim element. *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F3d 1320, 1328 (Fed. Cir. 2007) (district court erred in assigning evaporative function of the overall invention to the claim element in question).

Once a court has identified the function of the element "in the context of the specific claim language," the inquiry turns to whether "the accused product perform[s] substantially the same function in substantially the same way to obtain substantially the same result." *Bus. Objects, S.A. v. Microstrategy, Inc.*, 393 F.3d 1366, 1374 (Fed. Cir. 2005) (citing *Warner-Jenkinson*, 520 U.S. at 40). The starting point under this tripartite test, however, is the identification of the function of the claim element. Until the court has identified that function, it is without a reference point to determine whether the "way" in which the accused device performs that function is substantially the same as the "way" the claim element does, or whether the accused device performs that function "to obtain substantially the same result." In other words, the test does not ask (as the district court did) whether the use of the claim element involves *any* result that differs from the use of the equivalent structure—rather, it asks whether, in carrying out substantially the same function of the claim element in the context of the specific claim language, the accused equivalent does so "to obtain substantially the same result"

as the claim element does in carrying out *that* function.[4] *Microstrategy, Inc.*, 393 F.3d at 1374. For example, if the function of a claim element were to block the flow of water, but the accused equivalent blocks just 10% of the water flow because it is porous, a jury may properly conclude that the equivalent does not obtain "substantially the same result" as the claim element. But, if the accused equivalent did, in fact, obtain substantially the same water blockage as the claim element, the accused infringer could not escape liability simply by identifying some *other* "result" of using the claim element (for instance, better seismic resistance than the accused equivalent) unless the patent actually identifies seismic resistance as an additional function of that claim element. Yet, this is exactly what Sidense attempts to do. Sidense argues that if "the first doped region serves no electrical function" then "[t]here is no logical reason for its presence in the memory cell other than to reduce cell size." Sidense Br. at 39. But the claim itself identifies the reason for the first doped semiconductor region—delineating one end of the channel region underneath the gate—and it is undisputed that the Sidense

---

[4] The grammar of the tripartite test confirms that the "result" must be tethered to the function of the claim element. Specifically, the only acceptable antecedent for "*to obtain* substantially the same result" is "the accused product performs substantially the same function." It would not make sense to ask only whether "the accused product performs . . . to obtain substantially the same result" because that begs the question: what, if not the function of the element, is performed *to obtain* substantially the same result?

STI performs that function.  Sidense points to an additional "result"—smaller overall cell size—but points to nothing in the patents linking that result to the purpose of the first doped semiconductor region.  Kilopass's argument is far from "frivolous," as Sidense labels it:  it is correct.

This Court's decision in *AquaTex* makes clear that the district court's failure to determine the first doped semiconductor region's function in the context of the claims constitutes legal error.  479 F.3d at 1327.  The patented technology in *AquaTex* involved methods of cooling a person through evaporation using multi-layered, liquid-retaining materials.  Each of the asserted claims was direct to a cooling method using a device having "fiberfill batting material" and "hydrophilic polymeric fibers."  *Id*. at 1323.  The district court had entered summary judgment of noninfringement on the grounds that the accused Vizorb® filler layer was not equivalent to the "fiberfill batting material" limitation because Vizorb® did not perform the function of promoting evaporation, which was the mechanism through which the overall invention accomplished cooling.  *Id*. at 1326-27.  On appeal, this Court rejected that ruling, holding that the district court erred in attributing the evaporative function of the invention to the fiberfill batting limitation where "nothing in the 'fiberfill batting limitation' of claims [], nor in the specification, [] indicates that its function is to promote evaporation."  *Id*. at 1327.  Although the specification suggested "that the ***blend*** of hydrophilic polymers and the fiberfill"

material "promotes evaporation," that statement was not sufficient to attribute the "evaporation promotion" function to the "fiberfill batting material" limitation because it "describe[d] a function of the filler layer as a whole, not the 'fiberfill batting material' in particular." *Id*. at 1328 (alterations and second emphasis omitted).

*AquaTex* also demonstrates that, contrary to the district court's approach, the identification of the "way" and "result" of the claim element likewise must turn solely on the intrinsic record. In particular, this Court held that, even assuming that the function of the fiberfill limitation were to promote evaporation, the district court erred in its analysis of the "way" the limitation performed that function. According to the district court, the "way" the fiberfill batting element promoted evaporation was by being hydrophobic and creating air pockets for evaporation. *Id*. However, although the claims and specification described how *other* elements of the invention reacted to water, this Court found nothing in the patent describing the fiberfill *in particular* as hydrophobic. *Id*. at 1327. "Similarly, although the specification suggest[ed] creating pockets by quilting together the various layers," it did "not suggest that the patented method creates air pockets *in the filler layer itself*." *Id.* Rather, the district court's attribution of these characteristics to the fiberfill batting element appeared to turn on extrinsic evidence concerning the features of the patentee's commercial embodiment, which described the fill of that

14

embodiment as "hydrophobic" and designed to create air pockets. *Id*. This Court, however, categorically rejected this reliance on extrinsic evidence, holding that "the identification of the elements of the function, way, result test solely entails an examination" of the intrinsic record. *Id*. at 1327-28.[5]

Here, the district court's objective baselessness finding fails to adhere to this legal framework. Indeed, the district court made **no** attempt to determine the "role played" by (and thus function of) the first doped semiconductor region element "in the context of the specific patent claim. . . ." *Warner-Jenkinson*, 520 U.S. at 40. Instead, it simply presumed that the "result" of the first doped semiconductor region must further the cell size benefit of the overall invention. Put differently, because the district court declined to identify the function of the claim element, it was without a reference point to determine whether the STI "performed substantially the same function . . . **to obtain** substantially the same result." By failing to undertake the predicate inquiry of the doctrine of equivalents analysis— determining "the role played by [the] element in the context of the specific patent

---

[5] Because the "identification of the elements of the function, way, result test" must turn solely on the intrinsic record, Sidense's reliance on *Teva Pharmaceuticals USA., Inc. v. Sandoz, Inc.* fails. *See* Sidense Br. at 39-40 (citing 135 S. Ct. 831, 837 (2015)). *Teva* is express that where, as here, "the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law" subject to *de novo* review. *Teva*, 135 S. Ct. at 841.

claim"—the district court erred as a matter of law. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc*., 134 S. Ct. 1744, 1748 n.2 (a district court "necessarily" abuses its discretion when its ruling is "based . . . on an erroneous view of the law"); *K-2 Corp*., 191 F.3d at 1367 ("Th[is] "limitation[] on the doctrine of equivalents [is a] question[] of law."). Had the district court looked to the intrinsic record for evidence of the first doped semiconductor region's role in the context of the claims, it would have found that, as expressly identified in the claims, the function of the first doped semiconductor regions is "to define a channel region" between it and the second doped semiconductor region "and under [the memory cell's] gate[.]"[6] *See, e.g*., A117 col. 10 ll. 40-44 ('757 Patent, Claim 1).

Indeed, even now, Sidense points to ***nothing*** in the patents showing that the function of the first doped semiconductor region is to reduce cell size. In its Initial Brief, Kilopass explained why the sole intrinsic evidence on which the district court relied actually demonstrates that the "result" of the first doped semiconductor region necessarily ***cannot*** be a reduction in cell size because the larger-celled prior art designs distinguished in that passage ***also*** contain the first doped semiconductor region element. *See* Initial Br. at 44-46. Tellingly, Sidense does not even attempt

---

[6] Sidense's expert never denied that that the function of the first doped semiconductor region was to define a channel region—nor could he, because that function is identified right in the claims. *See* A6978 ¶ 205.

to defend the district court's reliance on this passage. Because the only intrinsic evidence identified by Sidense and the district court demonstrates that the result of the first doped semiconductor region ***cannot*** be a reduction in cell size, the district court's determination cannot stand. *AquaTex*, 479 F.3d at 1327-28 (the identification of the elements of the tripartite test must be based "solely" on the intrinsic record).

## B.     Sidense's Resort To Extrinsic Evidence Fails In Any Event

The district court committed an independent legal error in relying on statements by the inventor about Kilopass's commercial embodiments in concluding that the "result" of the first doped semiconductor region is cell size reduction. *AquaTex*, 479 F.3d at 1327-28; *see* Initial Br. at 50-51.

Sidense spends little time defending the district court's reliance on the findings underlying its doctrine of equivalents baselessness determination. Instead, Sidense resorts to statements by its expert and the inventors from ***elsewhere*** in the record that appear in neither its fee motion[7] nor the district court's fee award.[8]

---

[7] Although Sidense introduced some of these facts in a supplemental declaration attached to its reply brief, A14160-63, it appears that the district court properly declined to consider the arguments Sidense made for the first time in reply, as they appear nowhere in the district court's baselessness analysis.

[8] Sidense also references an assertion in the district court's summary judgment order that the first doped semiconductor region allows the memory cell to be smaller because "the first doped regions of adjacent memory cells can be

Specifically, Sidense premises its factual argument on a two-sentence footnote from the district court's summary judgment order stating that "the fact that Kilopass uses a self-alignment process rather than a mask-alignment process represents another difference between the two cells." *See* Sidense Br. at 41 (citing A8850 n.9). The basis for that footnote was an email by Kilopass's inventor, Dr. Jack Peng, which the district court interpreted as "referenc[ing] the fact that the patents-in-suit use a first doped semiconductor region in a 'self-aligned' design, whereas Sidense's STI region is 'mask-aligned.'" A8850 n.9.

As a threshold matter, even if the district court's interpretation were correct, Dr. Peng's email is extrinsic evidence and is thus irrelevant to the identification of the function, way, or result of the first doped semiconductor region element. *See AquaTex*, 479 F.3d at 1327-28. In any event, Dr. Peng's email speaks to neither

---

combined[,]" but makes no attempt to explain how it supports the district court's baselessness finding. *See* Sidense Br. at 41. Nor could it. As a threshold matter, neither the district court nor Sidense pointed to any intrinsic evidence supporting the proposition that linking adjacent doped regions can reduce cell size. *See AquaTex*, 479 F.3d at 1327-28 (identification of the elements of the tripartite test must be based "solely" on the intrinsic record). And, more fundamentally, as explained in Kilopass's Initial Brief (and not rebutted by Sidense), that one could further reduce the size of the claimed memory cell by linking adjacent cells is irrelevant to whether that is a function of the first doped semiconductor region because such linking is not required by the claims (nor could it, because each of the claims is directed to the structure of a *single* memory cell, not an array of cells). Initial Br. at 45-46; *see, e.g.*, A117 col. 10 ll. 36-38 & 51 ('757 Patent, Claim 1).

the asserted patents nor Sidense's STI.  First, the text of the email does not purport to say anything about Kilopass's patents—much less whether the first doped semiconductor region of the patents must be self-aligned.  Instead, it refers only to an unidentified Kilopass "product."  *See* A6408 ("Why we did not implement this cell in our ***product***, because this split gate Cell is not self-aligned, so their practical cell size will be larger than Our [*sic*] 1.5T cell.").  Second, even with respect to the Kilopass product, the email does not purport to speak to the alignment methods used to fabricate a doped semiconductor region, but, rather, speaks only to the alignment of the gate.  As explained in Kilopass's Initial Brief (and not contested by Sidense), the claims are agnostic as to the type, and fabrication method, of the "gate" element.  Third, the email says nothing about the STI of the accused design because, as Sidense itself has repeatedly noted, the Sidense patent application referenced in Dr. Peng's email does not incorporate an STI.  *See, e.g*., Sidense Br. at 9.  In short, Dr. Peng's email speaks to neither side of the doctrine of equivalents equation—it discusses neither the first doped semiconductor region of the patents nor Sidense's STI.

Sidense's reliance on its expert's statements about mask-alignment likewise fails.  According to Sidense, the invention's first doped semiconductor region "allows the memory cell to be smaller because it can be self-aligned, whereas Sidense's STI region is mask aligned. . . ."  Sidense Br. at 41.  Significantly,

however, neither Sidense nor its expert contends that the claims *require* that the first doped semiconductor region be self-aligned. They also do not claim that, as a technological matter, a doped semiconductor region must be fabricated using a self-aligned process (and not a mask-aligned process), nor would such a claim reflect reality.

Indeed, rather than anything in the patent, Sidense's expert, Dr. Gosney, relies on the deposition testimony of one of the inventors. According to Dr. Gosney:

> As Kilopass inventor Dr. Peng testified, the cell in the patents in suit was "fully self-aligned." (Peng Depo. Tr., at 133:20-134:5 (referring to Peng Ex. 262, at KILOPASS 324144). Dr. Peng further testified that the cell of the Patents-in-Suit is self-aligned because the poly line crosses the active line creating self-aligned diffusions on each side of the poly line and that "[t]his is . . . the smallest cell you can make . . ."

A6958 ¶ 158. But, contrary to Dr. Gosney's assertion, the cited portions of Dr. Peng's deposition say *nothing* about the patented cells. Indeed, far from one of the asserted patents, the document to which the quoted testimony refers (Peng Ex. 262, entitled "TD Modules on TSMC") was a design document reflecting data used by Kilopass's foundry partner to generate masks to manufacture semiconductor wafers for one of Kilopass's commercial embodiments. *See* A13790-92 at 125:1-127:25; A13789 (identifying Exhibit 262 as "TD Modules on TSMC"). And, significantly, the design document, which is dated April 11, 2005, postdates the

filing of the '757 patent (from which the two other asserted patents claim priority) by three years. *See* A13671 ("TDMs 04/11/05 SMTIC Tape-out"). Dr. Peng never testified that the asserted claims were limited to Kilopass's commercial embodiment from three years later as depicted in the design document, nor would that have been possible given the varying scope of the claims. Moreover, even had the district court relied on this testimony (or Dr. Gosney's mischaracterization of this testimony), doing so would have been legal error. *See AquaTex*, 479 F.3d at 1327-28 ("[R]eliance on the characteristics of the patentee's product [is] erroneous" because "the identification of the elements of the function, way, result test solely entails an examination" of the intrinsic record.).[9]  And, even if it were proper to rely on testimony about the patentee's products, Dr. Gosney's reasoning fails for the additional reason that it effectively reads into the claims a limitation on how the first doped semiconductor region is fabricated (*i.e.*, it presumes that the claims require that the first doped semiconductor region is made through a self-aligned process). Because none of the claims are directed to a process for

---

[9] For the same reason, Dr. Gosney's comparison of Kilopass's commercial embodiments to Sidense's accused product is legally irrelevant. *See* Sidense Br. at 42-44; *AquaTex*, 479 F.3d at 1327 ("Infringement, either literally or under the doctrine of equivalents, does not arise by comparing the accused product . . . with a commercialized embodiment of the patentee.") (citation omitted); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1481-82 (Fed. Cir. 1984) ("Infringement is not determined . . . by comparison between commercial products sold by the parties. . . .").

manufacturing the memory cells of the invention, it would be improper to read in such a limitation. *See Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 873 (Fed. Cir. 2010) ("Courts must generally take care to avoid reading process limitations into an apparatus claim . . . because the process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim.") (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008)).

### C.    Sidense's Resort to "Common Sense" Fails

Without any basis in the record to contest the district court's finding that the invention's "use of only two connections rather than three enhances the density of the memory device, making it smaller[,]" A8837 n.2, Sidense attempts to fall back on "common sense." *See* Sidense Br. at 38.  According to Sidense, common sense dictates that, rather than the "reduction in the number of electrical connections," the basis of the invention is "the use of a 'first doped semiconductor region.'" *Id*. Remarkably, however, Sidense makes no attempt to square this assertion with the fact that the larger-celled prior art designs distinguished in the specification ***also*** contain the first doped semiconductor region element.  A structural element also

found in larger memory cell designs necessarily cannot be what renders the new design smaller.[10]

Sidense's analysis of the claim language likewise fails.  Sidense suggests that, because the first doped semiconductor region element is found in all of the claims, it must be "essential" to the reduced cell size of the invention.  Not so.  No one would reasonably contend that the presence of a "screen" element in every claim of a patent to a lighter-weight smartphone means that the "screen" is what renders it lighter.  Here, it is the arrangement of elements in the claim that permits the drain to be "floating," thus eliminating the need for a third electrical connection and giving rise to the size benefit.  A6862-63.  The fact that one could attach a third (now unnecessary) electrical connection and eliminate the size benefit, while still practicing the claim, is irrelevant.

## II.   THE DISTRICT COURT'S DOCTRINE OF EQUIVALENTS ERRORS INFECT ITS PRESUIT INVESTIGATION FINDINGS

In its Initial Brief, Kilopass explained how the district court's doctrine of equivalents errors infected its conclusions concerning the adequacy of Kilopass's presuit investigation.  Sidense does not deny this inextricable relationship between

---

[10] Sidense also rhetorically questions what the first doped semiconductor region's purpose is if it "serves no electrical function?"  Sidense Br. at 39.  Simple: as set forth in the claims, its purpose is "to define a channel region" between it and the second doped semiconductor region "and under [the memory cell's] gate."  *See, e.g.*, A117 col. 10 ll. 40-45 ('757 Patent, Claim 1).

the district court's doctrine of equivalence analysis and its conclusions concerning the adequacy of Kilopass's presuit investigation.

Instead, Sidense argues that "[t]here is no evidence that Kilopass ever had a reasonable basis for predicating success on [its doctrine of equivalents theory], and substantial evidence shows that Kilopass was motivated to pursue its infringement case without regard to whether it had a reasonable likelihood of success on the merits." Sidense Br. at 47. But, as Kilopass showed in its Initial Brief, the "evidence" from which the district court concluded that Kilopass was motivated to pursue its case without regard for the merits was the fact that Kilopass and its lawyers failed to consider the size benefit of the invention in connection with the doctrine of equivalents infringement theory. *See* Initial Br. at 52-57. Sidense's Brief only confirms this inextricable relationship. *See* Sidense Br. at 44-47. Stripped of that legal error, the record reveals that Kilopass solicited an analysis from counsel which identified the use of an STI as equivalent to the first doped semiconductor region. Neither Sidense nor the district court identified any facial deficiency in that analysis, let alone a basis for Kilopass to conclude that it was unreliable.[11]

---

[11] Although Sidense suggests that Kilopass did not consider MoFo's presuit investigation in deciding to bring suit," Sidense Br. at 14, conspicuously absent from its brief is any reference to evidence supporting that notion, nor does any

Because nothing in the patent demonstrates that the role of the first doped semiconductor region is to further the size benefit of the patent, the predicate to the district court's presuit investigation findings is therefore invalid. Consequently, those findings cannot support the exceptionality determination.

## III. REMAND IS NECESSARY IF THE DISTRICT COURT'S DOCTRINE OF EQUIVALENTS ANALYSIS IS REJECTED

Remand is necessary if this Court rejects the district court's doctrine of equivalents analysis. Sidense does not deny that, if this Court rejects the district court's finding of objective baselessness with respect to Kilopass's doctrine of equivalents arguments, remand is required so that the district court may determine whether the remaining circumstances underlying its original "exceptionality" finding (*i.e.*, Kilopass's assertion of literal infringement and subsequent events in the litigation) could support an "exceptionality" finding.[12] *See* Sidense Br. at 35-

---

exist.

[12] Because the district court based its exceptionality finding on the "totality of the circumstances," it did not determine whether any of the individual circumstances, standing alone, would warrant an exceptional case finding. *See* A23-24.

Sidense refers to the district court's finding that Kilopass's expert relied on a different articulation of the doctrine of equivalents theory than had been set forth in the infringement contentions. Sidense infers that the expert did not consider the infringement contentions; the district court suggested that he must have disagreed with them. A21. The expert himself testified that he simply conducted his own analysis from scratch. A13703-04 at 27:6-28:10. As explained in the opening brief, the two articulations were consistent. In any event, however, the district court did not determine that the difference between the articulation in the

50.  Sidense also does not contest that *Fox v. Vice* requires that the district court deduct from the $5.5 million sanction those fees that "would have been incurred in the absence of the frivolous allegation."  131 S. Ct. at 2216.

Instead, Sidense's arguments against remand presume that the doctrine of equivalents baselessness finding remains intact.  *See, e.g.*, Sidense Br. at 48-49 (arguing that the district court was not required to trace the fees it awarded to discrete instances of misconduct because it found objectively baseless "every theory of infringement Kilopass asserted," including its "theories of infringement under the doctrine of equivalents").  Neither Sidense's arguments nor its authorities[13] change the rule that tracing is required when the prevailing party incurred some fees attributable to neither misconduct nor frivolous allegations.

---

infringement contentions and the expert report would justify a $5.5 million fee award.

[13] Sidense appears to cite *Special Devices v. OEA, Inc.*, 269 F.3d 1340, 1344 (Fed. Cir. 2001) for the proposition that the **only** circumstances under which a district court may decline to award full fees are where: (1) the "sole basis" for the exceptionality finding is litigation misconduct; or (2) the party seeking fees only partially prevailed on the claims at issue.  Sidense Br. at 49.  But neither Sidense's pincite nor anything else in *Special Devices* supports this proposition.  To the contrary, the case recognizes that "the amount of attorney fees awarded may be zero, even though the case is exceptional."  269 F.3d at 1344.  And, if this Court rejects the district court's doctrine of equivalents baselessness finding, the second prong of Sidense's proposition is inapplicable in any event.

*Fox*, 131 S. Ct. at 2218 ("[T]he defendant may not receive compensation for any fees that he would have paid in the absence of the frivolous claims.").[14]

Indeed, Sidense's own authorities support the need for remand. For instance, Sidense relies on *Mathis* for the proposition that the purpose of Section 285 is to make a party whole. *See* Sidense Br. at 48-49 (citing *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988)). If this Court rejects the doctrine of equivalents analysis, awarding the entire $5.5 million sanction would do far more than make Sidense whole—it would provide a "windfall" because it would compensate Sidense for fees incurred in addressing Kilopass's legitimate theory of infringement under the doctrine of equivalents. *Fox*, 131 S. Ct. at 2215 (holding that it would be a "windfall" to require the sanctioned party to pay the prevailing party's attorneys' fees that would have been incurred anyway on proper claims). Even Sidense does not contend that reimbursement of its fees for the entire case is necessary to make it whole in the event that the doctrine of equivalents baselessness finding is rejected. *See* Sidense Br. at 48-50.

---

[14] Neither Sidense nor the district court contend that this is a case like *Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*, where the party's litigation misconduct was so "pervasive" that it "infect[ed] the entire litigation." 726 F.3d. 1359, 1369 (Fed. Cir. 2013). And, the record would not support such a conclusion in any case.

Remand is necessary if this court rejects the district court's doctrine of equivalents finding.

## ARGUMENT ON SIDENSE'S CROSS APPEAL

## I.    STATEMENT OF THE FACTS

Shortly after the district court's entry of summary judgment, Sidense sought fees it incurred in connection with Kilopass's patent claims under Section 285. This initial fee request did not seek the contingency bonus Sidense now seeks in its cross appeal and, indeed, expressly cited controlling Supreme Court precedent "holding that enhancement of attorneys' fees awards to account for contingency is not permitted." A10534 at 19:3-6. Accordingly, Sidense sought $5.05 million in fees and non-taxable costs based on the very calculus the district court ultimately applied here: the product of its lawyer's standard hourly rates multiplied by the time they reasonably spent litigating Kilopass's patent claims.[15] *See* A13807 ¶¶28, 32. To support this request, Sidense submitted an expert declaration attesting to the reasonableness of Kilpatrick's standard hourly rates—and the ultimate fee request based thereon—relative to prevailing community rates. *See generally* A13801-12; A13806 ¶20 (expressly stating that the fee request "do[es] not seek to recover the 'success' fee" that Sidense had negotiated with its counsel). The district court denied the fee request on the grounds that the case was not

_____

[15] The district court's $5.5 million sanction exceeds Sidense's initial $5.05 million request primarily because it incorporates fees incurred by Sidense after its initial fee request.

"exceptional," A13032, and Sidense appealed.  This Court vacated the denial of fees and remanded for further consideration of the objective merits of Kilopass's claims, which the district court had not considered.

On remand, Sidense renewed its fee request and represented to the district court that it requested only "fees in the amount previously requested plus an appropriate *update*."  A13512 ll. 19-20.  Only after the district court ruled that Sidense was entitled to fees did Sidense reverse course and demand nearly $4 million as a contingency enhancement.  Sidense made no attempt to justify its enhancement request with a supplemental expert declaration or any other new evidence.  Instead, with the exception of the fee agreement itself, Sidense relied on the same record as its original $5.05 million fee request.  Kilopass objected that contingency enhancements were unavailable and that the contingent fee agreement should not be considered.  The district court disagreed in a lengthy analysis, holding that Sidense's contingent fee agreement was properly subject to consideration under "step one" of the Supreme Court's well established lodestar fee-shifting jurisprudence. *See* A38-41.

In considering Sidense's request on the merits, however, the district court determined that Sidense had not provided sufficient evidence to permit it to recover the contingency bonus and thus fixed the fee award at $5.5 million based

on the standard hourly rates that Sidense's expert had determined were a reasonable reflection of prevailing market rates. *See* A45-46.

## II.    STANDARD OF REVIEW

This Court's review of a district court's determination of the amount of reasonable attorneys' fees is highly deferential. *See Bywaters v. United States*, 670 F.3d 1221, 1228 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983)) ("[T]he district court is afforded considerable discretion" in "determining the amount of reasonable attorneys' fees" given its "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters."). Because such determinations "essentially are factual matters[,]" they may be disturbed only where the district court has abused its discretion. *Id.*; *Homeland Housewares, LLC v. Sorensen Research & Dev. Trust*, 581 Fed. App'x 877, 881 (Fed. Cir. 2014).

## III.   SIDENSE'S CROSS APPEAL CONTRAVENES DECADES OF SUPREME COURT PRECEDENT

Sidense contends that the district court's fee award is "directly contrary" to the purpose of Section 285 because the district court did not award the full amount of fees contemplated under its hybrid fee agreement with counsel. According to Sidense, Section 285 mandates a "full award of fees" actually incurred by the prevailing party. *See, e.g.*, Sidense Br. at 55. Sidense's argument, however, contravenes decades of Supreme Court precedent requiring an award of an

"objectively" reasonable fee based on the rates an attorney in the community would have received had she billed by the hour in a comparable case. *Perdue v. Kenny A.*, 559 U.S. 542, 551-52 (2010). Because the district court **considered** Sidense's contingency arrangement with its counsel, and properly applied the approach required by this Court and the Supreme Court, Sidense's cross appeal should be rejected.

### A.    The Legal Standard for Determining Fee Awards

Section 285 provides that a court "may award reasonable attorney fees" to the prevailing party "in exceptional cases." 35 U.S.C. § 285. Because the statute provides for "reasonable attorney fees," the determination of the amount of any award under Section 285 is governed by the Supreme Court's "lodestar" framework applicable to all such federal fee-shifting statutes. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) ("[O]ur case law construing what is a 'reasonable' fee applies uniformly to all of the[]" federal statutes with that language.). "To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

Unlike the approach under statutes permitting the recovery of "fees paid or incurred,"[16] the lodestar method does not set out to award the prevailing party the actual amount it owes its attorneys.  Rather, the lodestar is an "objective" calculus "that *roughly* approximates the fee the prevailing attorney would have received for representing a paying client who was billed by the hour in a comparable case." *Perdue*, 559 U.S. at 551-552 (emphasis in original).

The lodestar analysis involves two steps.  First, the court must "make an initial estimate of reasonable attorney's fees" by "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blanchard v. Bergeron*, 489 U.S. 87, 94 (1989).  To determine the "reasonable hourly rate," courts "look[] to the prevailing market rates in the relevant community." *Perdue*, 559 U.S. at 551 (internal quotation marks omitted).  There is a "strong presumption" that this "lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable fee.'" *Blanchard*, 489 U.S. at 95. Although a court may consider, under step one, the party's actual fee agreement with counsel insofar as it sheds light on "the prevailing market rates in the relevant community," *Blum*, 465 U.S. at 895, the "fee arrangement is but a single factor and

---

16 *See, e.g*., *Marré v. United States*, 38 F.3d 823, 828 (5th Cir. 1994) (holding that statute providing for "reasonable fees paid or incurred" fell outside of the lodestar framework and thus required that the award conform to the actual contingent-fee agreement entered between the prevailing party and counsel).

not determinative," *Blanchard*, 489 U.S. at 92.  Then, in the second step, a court "may then adjust this lodestar calculation by other factors."  *Id*. a 93.

### B.    The District Court Properly Calculated the "Reasonable Rate"; Sidense's Cross Appeal Rests On A Misreading Of *Bywaters*

Sidense does not deny that it was proper to apply the Supreme Court's lodestar jurisprudence in calculating the fee award.  Nor does it allege error in the district court's "step two" analysis, in which the district court declined to adjust its lodestar figure on the basis of the contingent fee bonus in Sidense's fee agreement.

Instead, Sidense argues only that the district court "committed clear legal error" in "step one" by "ignoring" Sidense's "fee agreement in its lodestar figure." Sidense Br. at 59.  Sidense does not explain *how* the district court should have incorporated its hybrid fee agreement into the loadstar calculus; it does not say whether the district court should have increased the "prevailing community rate" component (much less *why* such an adjustment would be warranted), nor does it suggest that the district court somehow understated the "number of hours reasonably expended" component (nor could it, given that the district court adopted Kilpatrick's representations virtually wholesale).

As a threshold matter, Sidense's assertion that the district court "ignored" the fee agreement is flatly inaccurate.  Whether the district court may properly consider the fee agreement in its lodestar calculus was contested by the parties, and the district court devoted an entire section of the opinion, spanning three full pages,

to the issue. Ultimately, the district court agreed with Sidense and concluded that it may rely on the fee agreement "in determining the reasonable rate." (Sidense quietly admits as much.)[17] *See* Sidense Br. at 28 (quoting A41). The district court then did just that: in connection with its "reasonable rate" analysis, it considered whether the fee agreement's contingency bonus warranted an upward adjustment of the "reasonable rate," weighed the evidence, and concluded that Sidense had failed to adduce evidence that the fee agreement—and, in particular, the variable nature of its rates—reflected prevailing rates in the community. A45. Such weighing of evidence "in determining the amount of reasonable attorneys' fees" is not only appropriate, but is due "considerable discretion," particularly given that the "criterion for the court is not what the part[y] [and counsel] agree but what is reasonable." *See Bywaters*, 670 F.3d at 1228 (citing *Hensley*, 461 U.S. at 437); *Blanchard*, 489 U.S. at 92.

Applying these principles, the district court determined that Sidense's fee agreement could be considered in determining the "reasonable" rate under the first

---

17 Below, Kilopass argued that the district court could not consider the fee agreement based, in part, on the notion that it was improper to apply the Supreme Court's lodestar analysis from its Section 1988 jurisprudence in the Section 285 context. At Sidense's urging, the district court rejected that argument, and Kilopass does not now contest whether the district court may consider the agreement because, as demonstrated herein, Sidense's cross appeal should be rejected in any event.

part of the lodestar calculus.    A41.    Ultimately, however, the district court concluded that Sidense's fee agreement did not warrant an upward departure from Kilpatrick's standard hourly rates because Sidense provided no evidence that fees associated with the contingency bonus reflected the prevailing rates in the community.    A45.    Consistent with the conclusion of Sidense's expert, the district court determined that Sidense's standard hourly rates best reflected "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."    A44 (quoting *Blum*, 465 U.S. at 896, n.11).

Sidense nevertheless insists that the district court committed legal error because "this Court's precedent requires ***incorporation*** of the hybrid-fee agreement into the lodestar analysis."    Sidense Br. at 57.    It is not entirely clear what Sidense means by "incorporation."    If all Sidense means is that the district court must ***think about*** or consider the fee agreement, then its appeal fails for the simple reason that it is undisputed that the district court did so.    Presumably what Sidense really means, then, is that the district court must ***give controlling effect*** *to* the fee agreement.    That is just wrong, as we demonstrate below: this Circuit never has held any such thing, and the Supreme Court's precedent is squarely to the contrary.

As authority for the notion that a district court is bound by the prevailing party's contingent-fee agreement, Sidense cites only to this Court's decision in *Bywaters* concerning fee shifting under the Vaccine Act.  *See id*. at 57-59 (citing *Bywaters*, 670 F.3d at 1228-29).   Contrary to Sidense's assertion, nothing in *Bywaters* purports to "require" that district courts give preclusive effect to the prevailing party's actual fee agreement in conducting the lodestar analysis.  Nor does *Bywaters* support Sidense's claim that "a contingency agreement is ***essential*** to the lodestar figure."  Sidense Br. at 58 (citing *Bywaters*).

The only thing *Bywaters* held with respect to contingent fee agreements was that, ***if*** the district court is inclined to consider the party's fee agreement, it should do so in "step one" (the "initial estimate" of the lodestar figure), not in "step two" ("adjustment" of the lodestar).   670 F.3d at 1229-32.   Based on the plaintiff's contingent fee agreement (among other factors), the district court in *Bywaters* had reduced the lodestar figure in "step two."  *Id*. at 1231-32.   Applying the Supreme Court's lodestar jurisprudence, this Court held that the district court's "step two" adjustments to the lodestar amounted to legal error because "step two" adjustments are reserved for "rare" and "exceptional" cases.  *Id*. at 1230-31.   This Court left open the possibility that, on remand, the fee agreement "***may*** be taken into account in the lodestar calculation."  *Id*. at 1231; *see also id*. at 1232 ("We nonetheless think that the agreement ***may*** be considered in calculating the lodestar figure.").

Contrary to Sidense's assertion, *Bywaters* certainly did not establish a legal rule that fee agreements ***must*** be given preclusive effect in calculating the lodestar figure.  That a district court "may" in its discretion consider a fee agreement does not mean that it "must" apply the rate (much less contingency bonus) agreed to by the parties in that agreement.  Rather, all *Bywaters* requires is that, ***if*** the district court is to consider the fee agreement, it must do so in "step one" when determining the reasonable rate.  Here, the district court expressly acknowledged this requirement and clearly applied it by considering the fee agreement in its analysis of the "reasonable rate."  *See* A41 (concluding that "the CFA may be relied upon in determining the 'reasonable rate'"); *see also* A42-46.

Nor could *Bywaters* have held that district courts must give binding effort to a contingent fee agreement because this Court could not have overruled the Supreme Court's jurisprudence concerning the proper role of a party's fee agreement in the lodestar method.  Under that jurisprudence, although a court may consider the party's actual fee agreement with counsel insofar as it sheds light on "the prevailing market rates in the relevant community," the "fee arrangement is but a single factor and not determinative."  *Blanchard*, 489 U.S. at 92. Significantly, a fee agreement may ***not*** be used to depart from the reasonable hours multiplied by reasonable hourly rate calculus—even where, as here, the party's fee agreement incorporates a contingent fee resulting in a total amount that exceeds the

lodestar. *Id*. at 94 ("[W]e have said repeatedly that the initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate" and "have never suggested that a different approach is to be followed in cases whether the prevailing party and his (or her) attorney have executed a contingent-fee agreement.") (internal quotation marks and citations omitted). As the Supreme Court has recognized, though a party "might agree to pay his lawyer a percentage contingent fee that would be greater than the fee the court might ultimately set," such "arrangement should not determine the court's decision." *Id*. at 92 (quoting *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 718 (5th Cir. 1974)). "The criterion is not what the parties [to that arrangement] agree but what is reasonable." 489 U.S. at 92; *see also id*. at 93 (holding that a party "is not . . . required to pay the amount called for in a contingent-fee contract if it is more than a reasonable fee calculated in the usual way.").

Straining to create the appearance of legal error, Sidense characterizes the district court's ruling as imposing a "variable prevailing rates" evidentiary requirement that the district court "created from whole cloth. . . ." Sidense Br. at 60. Specifically, Sidense contends that "there is no support in the case law" for this "requirement" because, "in *Bywaters*, this Court ***demanded*** incorporation of the fee agreement into the lodestar figure without any analysis with respect to the

frequency or market acceptance of such contingency agreements." *Id*. at 61.  In other words, Sidense contends that *Bywaters* established a requirement that a district court **must** incorporate the party's fee agreement into the lodestar calculus.

As demonstrated above, however, *Bywaters* demanded no such thing; it simply held that such agreements "may be considered" (and that if they are to be considered, they must be considered in "step one" not "step two").  670 F.3d at 1231-32.  In any event, Sidense's suggestion that the district court somehow abused its discretion in considering whether the nature of Sidense's fee agreement—that the fees are variable in nature and linked to pre-specified litigation outcomes—was comparable to "prevailing rates in the community" makes no sense.  Because "the lodestar looks to the prevailing market rates in the relevant community," Sidense's fee agreement is relevant only insofar as it speaks to those rates; since Sidense provided no evidence showing that the agreement was, in fact, representative of prevailing community rates, the agreement did not aid in the district court's lodestar inquiry.  *See Perdue,* 559 U.S. at 551.

In sum, Sidense's cross appeal turns on a fundamental misreading of *Bywaters*.  The district court acted well within its discretion in weighing the evidence; its rejection of Sidense's attempt to double up on the $5.5 million fee award should be upheld.

## IV.   SIDENSE'S REMAINING ARGUMENTS FAIL

Sidense's remaining arguments fail for multiple additional reasons.

First, Sidense's attempt to undercut the district court's reliance on *Beckman* and *Perdue* is unavailing.  *See* Sidense Br. at 61 (citing *Beckman Instruments, Inc. v. LKB Produkter AB*, 703 F. Supp. 408, 411 (D. Md. 1988), *aff'd in part and vacated in part*, 892 F.2d 1547 (Fed. Cir. 1989); *Perdue v. Kenny A.*, 559 U.S. 542, 556 (2010)).  Sidense claims that these cases involved fee requests by plaintiff's counsel such that they represented a "true bonus," while the fee request here is "sought to reimburse Sidense for its actual legal expenses."  Sidense Br. at 61. Sidense's distinction, however, makes no sense.  Just as with a defendant who enters a contingent fee agreement, a plaintiff who enters one must ***also*** pay its lawyers the agreed upon amount, even if it exceeds the lodestar amount.  *See Blanchard*, 489 U.S. at 92 (recognizing that although a party "might agree to pay his lawyer a percentage contingent fee that would be greater than the fee the court might ultimately set[,]" such "arrangement should not determine the court's decision.").  Thus, there is no such thing as a "true" bonus for a plaintiff—any additional fees she owes her attorney by virtue of the fee agreement must come out of pocket (or, at a minimum, from the damages that were to compensate her for her injury).  Consequently, the district court properly relied on *Beckman* in rejecting Sidense's attempt to wedge its contingency bonus into the fee award.  *See* A45-46

41

(quoting *Beckman*, 703 F. Supp. at 411 ("[T]he Court will not grant the request for $75,178.75 for fees withheld. That represents an amount plaintiff's attorneys agree to bill only if a favorable outcome were obtained. As such, it represents a bonus rather than standard fees. The Court is of the opinion 'reasonable attorney fees' should reflect standard rates, not agreed upon bonuses.").

Sidense's assertion that *Perdue* "suggests it is appropriate" to incorporate a hybrid-fee agreement into the lodestar is similarly misplaced. *See* Sidense Br. at 62. To the extent the Supreme Court suggested that it might be permissible to recalibrate the lodestar where a hybrid arrangement is involved, any such recalibration would simply scale up the "reduced hourly rate" component of the hybrid arrangement to an equivalent standard hourly rate; if the lodestar were simply set at the reduced rate, the hybrid arrangement would ***penalize*** the party because it would fail to account for the incremental value of the variable component. *Perdue*, 559 U.S. at 557-558. Here, Sidense has ***already*** been compensated at the full prevailing rate because the district court calculated the lodestar using Kilpatrick's standard hourly rates, in accord with Sidense's expert opinion that they were in line with prevailing rates in the community. A44. As the Supreme Court recognized, a party, like Sidense, "who is compensated at the *full prevailing rate*" and then seeks an added "performance enhancement" is in a "far different" position than the hybrid-fee attorney whose reduced rate was used as the

lodestar. *Perdue*, 599 U.S. at 557. Contrary to Sidense's claims, *Perdue* confirms that the district court properly calculated the lodestar using Kilpatrick's standard rate.[18]

Sidense also argues that the district court's "ruling fails to abide by the central purpose of § 285, which is to provide compensation" to the prevailing party. Sidense Br. at 53. Not so. As demonstrated above, all federal statutes providing for "reasonable attorney fees," including Section 285, require application of the lodestar method, which expressly contemplates that, under its objective inquiry, a party may be awarded fees falling short of the amount owed to its attorneys.

Indeed, the Section 285 authorities on which Sidense relies stand for no more than the unremarkable proposition that a party should be awarded fees corresponding to the exceptional nature of the case.[19] None purport to do away

---

[18] Sidense's suggestion that the district court interpreted *Perdue* in conflicting ways is likewise misplaced. *See* Sidense Br. at 63. As demonstrated above, that a court may *consider* the party's actual fee agreement does not mean that the agreement necessarily (or even probably) is relevant to the lodestar calculus. Rather, whether the agreement is relevant requires a case by case inquiry into whether the agreement bears on the prevailing community rates element of the lodestar, which is precisely what the district court did.

[19] Indeed, this is the proposition for which Sidense cites these cases earlier in its brief. *See* Sidense Br. at 49-50 (citing *Mathis v. Spears*, 857 F.2d 749, 758 (Fed. Cir. 1988)).

with the lodestar inquiry, nor could they.  For example, *Mathis* simply held that, where a prevailing party has obtained "excellent results, his attorney should recover a full compensatory fee[,]" which "[n]ormally . . . will encompass all hours reasonably expended on the litigation."[20]  *Mathis*, 857 F.2d at 755 (citation omitted).  For this proposition, *Mathis* relies on *Hensley*, the Supreme Court case adopting the lodestar approach.  Indeed, *Mathis* actually blessed the very lodestar calculus that the district court used here.  *See id*. at 755-56 (quantifying the fee award by multiplying the attorneys' standard hourly rates by the number of hours they reasonably expended).  Significantly, this Court's Section 285 jurisprudence recognizes that, even where the district court finds a case "exceptional," the district court has the discretion to award no fees at all.  *MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 915-16 (Fed. Cir. 2012).  Likewise, the district court was well within its discretion when it awarded $5.5 million in fees instead of the $9 million plus requested by Sidense.  In short, this Court's Section 285 cases do not override, nor are they in tension with, the Supreme Court's lodestar methodology properly applied by the district court.

Finally, besides being unauthorized in law, Sidense's contingency enhancement makes no sense as an economic matter.  We are aware of no authority

---

[20] Sidense does not contest the district court's findings concerning hours (which adopted Sidense's position nearly wholesale).  A47.

suggesting that a fee award can encompass such things as the hypothetical dilution suffered by shareholders as a result of a company's raising additional capital or the interest it pays on loans used in whole or in part to pay its attorneys' fees. From an economic perspective, Sidense's fee agreement is nothing more than such a loan, at a variable interest rate. Here, that interest rate amounts to 150%: the "principal" on the loan is the amount of fees Sidense would have paid in the normal course, and the interest is the amount that must be paid over and above the principal. Because the "Success Fee" amounts to 250% of the amount of unpaid fees, the interest rate (in simple terms) is 150%. A13730-31 ¶¶ 15-16. Kilopass should not be subject to paying a wildly inflated fee award because Sidense in effect elected to take a loan from its lawyers at a usurious 150% rather than take an equity investment or a more conventional loan at a much lower interest rate.[21]

---

[21] Sidense asserted below that it became unable to pay its legal fees without raising additional venture capital and cited the Amended Supplemental Fee Calculation Declaration of Xerxes Wania, A13742-45 ("Wania Declaration"), but that is beside the point. The Wania Declaration does not say Sidense couldn't raise additional funds and it does not even detail efforts to try. *See id.* Wania says, rather, that Sidense got a bridge loan from an investor after prevailing (A13744 ¶ 6) but does not say it tried and failed to get such a loan—or any other form of financing—prior to that. The Contingent Fee Agreement itself confirms that Sidense **could** have raised (and did raise) capital to fund this case but **preferred** to enter into the contingency enhancement arrangement with its counsel. *See* A13778 at 3rd and 4th Whereas clauses: "Sidense is in the process of raising additional investment capital to fund its current operations, including defense . . . ; Sidense

**CONCLUSION**

For all the above reasons, the district court's finding that this case was objectively meritless at its inception, and its award of all attorneys' fees and costs based thereon, should be reversed and remanded.  Sidense's cross appeal should be rejected.

---

*wishes* to reduce its need for additional investment [by entering this agreement] . . . .").

Dated:  October 26, 2015          Respectfully submitted,

                                   DURIE TANGRI LLP

By:  */s/ Daralyn J. Durie*
       Daralyn J. Durie

       *Counsel for Plaintiff-Appellant*
       *Kilopass Technology, Inc.*

## CERTIFICATE OF SERVICE

I, Melissa Sotto, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

I am an employee at Durie Tangri LLP, Counsel for Plaintiff-Appellant.  I have retained Counsel Press to print this document.

On October 26, 2015, I electronically filed the foregoing **Reply and Cross Appeal Response of Plaintiff Appellant Kilopass Technology, Inc.** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Roger L. Cook (Principal Counsel)
Sara B. Giardina
Kevin J. O'Brien
KILPATRICK TOWNSEND &
STOCKTON LLP
Eighth Floor, Two Embarcadero Center
San Francisco, CA  94111
415 576 0200
rcook@kilpatricktownsend.com
sgiardina@kilpatricktownsend.com
kobrien@kilpatricktownsend.com

Joshua H. Lee
KILPATRICK    TOWNSEND
& STOCKTON LLP
1100 Peachtree Street, NE
Suite 2800
Atlanta, GA 30309
404-815-6500
jlee@kilpatricktownsend.com

**CERTIFICATE OF COMPLIANCE**
**WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,**
**AND TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e). The brief contains 10,821 words, as calculated by the "Word Count" feature of Microsoft Word 2010 (the word processing program used to create it), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 point font.

Dated:  October 26, 2015                    DURIE TANGRI LLP


                                  By:    */s/ Timothy C. Saulsbury*
                                         Timothy C. Saulsbury

                                         *Counsel for Plaintiff-Appellant*
                                         *Kilopass Technology, Inc.*